**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NOS.** <u>26-mj-03259-LOUIS</u>
<u>26-mj-03260-LOUIS</u>

**IN THE MATTER OF THE EXTRADITION**
**OF TRISTAN TATE,**

                                                  /

**IN THE MATTER OF THE EXTRADITION**
**OF EMORY ANDREW TATE,**

                                                  /

### RESPONSE IN OPPOSITION TO ANDREW TATE'S AND TRISTAN TATE'S MOTION FOR RELEASE PENDING EXTRADITION PROCEEDINGS

The United States, in executing its treaty responsibilities and acting at the request of the Government of the United Kingdom ("U.K.")[1], responds in opposition to the combined request of the fugitives, Tristan Tate ("T. TATE") and Emory Andrew Tate ("A. TATE"), collectively "the TATES" or "the Fugitives"), for release on bond pending a hearing on the certification of extraditability pursuant to 18 U.S.C. § 3184.  A. TATE is charged in England with a total of forty-two (42) charges, including rape, assault occasioning actual bodily harm, arranging or facilitating the travel of another for exploitation, controlling prostitution for gain, distributing indecent images of a child, making indecent images of a child, and possession of extreme pornography.  T. TATE

---

[1]     Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, and related Exchanges of Letters, U.S.-U.K., Mar. 31, 2003, S. Treaty Doc No. 108-23 (2004) (the "2003 Treaty"), *as amended by the* Instrument as contemplated by Article 3(2) of the Agreement on Extradition Between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty Between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003, U.S.-U.K., Dec. 16, 2004, S. Treaty Doc. No. 109-14 (2006) (the "Instrument"), with Annex (the "Annex") reflecting the integrated text of the operative provisions of the 2003 Treaty and the Instrument (collectively, the "Treaty").

is charged in England with a total of seventeen (17) charges, including rape, sexual assault, assault occasioning actual bodily harm and arranging or facilitating the travel of another for sexual exploitation.  The TATES are also charged in Romania with similar offenses to those in the U.K., as well as influencing witness statements while they were detained and on release conditions in Romania.  The TATES were arrested on July 18, 2026, pursuant to a provisional arrest complaint that was based only on a limited subset of the charges they are currently facing in the U.K.; it is expected that the U.K. will provide additional information about the other charges in its formal extradition request, due to the United States on September 16, 2026.

The TATES, who are dual U.K. and U.S. citizens, should be detained pending their extradition hearing because they cannot overcome the strong presumption against bail in international extradition cases. The arguments offered in their motion for release fail to demonstrate lack of flight risk, lack of danger to the community, or any special circumstances to justify release, either individually or cumulatively.  The serious pending U.K. charges involving human trafficking and violent rapes and assaults against multiple victims, together with recent Romanian charges alleging that the TATES interfered with and attempted to intimidate witnesses, present a clear public safety concern.  That the TATES also claim to maintain multiple passports and identities, have access to excessive wealth and influence in numerous countries, and are stridently unwilling to voluntarily return to face prosecution in the United Kingdom, collectively demonstrate a heightened risk of flight that no amount of bond could overcome.

## BACKGROUND

In addition to the information contained within the Provisional Arrest Complaints (ECF No. 3 (both dockets)) and the Government's Memorandum of Extradition Law and Request for Detention Pending Extradition Proceedings (ECF No. 11 (A. TATE) and ECF No. 12 (T. TATE)),

the government has obtained documents from both the U.K. and Romania that provide more background on those countries' respective proceedings. Specifically, the U.K. has submitted a letter dated August 10, 2026, which supports an order of detention and provides additional details that are relevant to detention, including evidence of the TATES' unwillingness to return to the U.K., their possession of multiple passports to facilitate travel, and their financial means to facilitate flight and evasion, among other things. *See Exhibit 1*. Romania has also submitted two letters, dated July 23 and July 27, 2026, for this Court's consideration. *See Exhibits 2, 3*. Romania describes their ongoing criminal cases against the TATES, which notably includes recent charges of witness interference based on alleged conduct that occurred while the TATES were detained and under judicial supervision in Romania. Below, the Government sets out its current understanding of the procedural history of the U.K. and Romanian charges against the TATES, as well as facts from those proceedings that are relevant to the issue of detention.

## I. RELEVANT PROCEDURAL HISTORY OF THE U.K. AND ROMANIAN CHARGES AGAINST THE TATES

### a. The Initial U.K. Charges: Human Trafficking, Rapes, and Assaults ("the 2024 U.K. Charges")

On January 19, 2024, the U.K. issued warrants for the arrest of A. TATE and T. TATE. *Ex. 1* at TATE_0005. A. TATE was charged in the U.K. with 10 counts, including three counts of rape against two separate victims, four counts of assault occasioning actual bodily harm against three separate victims, two counts of arranging or facilitating travel for sexual exploitation, and one count of controlling prostitution. *Id.* at TATE_0004. T. TATE was charged with 11 counts, including three counts of rape, six counts of assault occasioning actual bodily harm against one victim, and two counts of arranging or facilitating travel for sexual exploitation, all involving the same victim. *Id.* at TATE_0004-0005. According to U.K. authorities, at the time of the alleged

criminal conduct, the TATES ran an operation in the U.K. and Romania where the women they recruited, referred to as "cam girls," performed sexual acts online for subscribers in exchange for money. It is alleged that the victims engaged in commercial sexual acts for the TATES as "cam girls." The TATES are also alleged to have committed forcible rapes with strangulation on more than one victim, who have described struggling to breathe while their sexual assaults took place. ECF No. 3, Complaints (both dockets).

By the time the 2024 U.K. Charges issued, the TATES had moved to Romania. A. TATE posted on social media on May 3, 2020, "The UK government tried to destroy me. I was arrested in 2014 and the case dropped. But they took my phone and laptop and raised 11 new cases. This is when I moved to Romania. I had an apartment in the mountains already paid for. With money inside. Thank fuck I thought ahead." *Ex. 1* at TATE_0018. In another social media post from December 13, 2019, A. TATE wrote, "England froze my passport and bank about 3 years ago. It's all unfrozen now. But it didn't matter anyway. Romanian passport. Jumped on a plane. Bye. Banks? 18 countries my friends. HARD TO KILL. ABOVE THE LAW." *Id.* at TATE_0016 In Romania, the TATES continued to encounter other serious legal troubles, starting in or around 2022.

### b. The Romanian Charges of Human Trafficking, including Trafficking of Minors ("the 2022 Romanian Charges")

According to Romania, the TATES were charged there in December 2022 with various offenses related to running an organized crime group and human trafficking, including trafficking minors. The Romanians allege that the TATES' criminal conduct took place between 2014-2022, against a total of 46 victims, including minors, and involved, in part, "various forms of psychological and, in certain cases, physical coercion [ ] exerted on the victims, consisting of

intimidation, constant surveillance, control, emotional blackmail, threats, and other means of pressure, for the purpose of sexually exploiting them." *Ex. 2* at TATE_0040.

The TATES were initially arrested on the Romanian charges on December 30, 2022, and they remained in custody until March 31, 2023, when they were placed on house arrest. *Id*. at TATE_0041. They were released from house arrest on August 4, 2023, at which point they were placed on judicial supervision. *Id.* While under judicial supervision, the TATES were required to comply with several conditions, including "not to approach the other co-defendants, the alleged victims, or the witnesses in the case." ECF No. 30-3 at 1.

### c.   The Romanian Extradition Order and Postponement of Surrender to the U.K.

While under judicial supervision on the 2022 Romanian Charges, the TATES were arrested on March 12, 2024, in Romania for purposes of possible extradition to the U.K., based on the January 2024 U.K. charges. ECF No. 30-1 at 6 (A. TATE); *see also* ECF No. 30-2 at 5 (T. TATE). Romania promptly granted the U.K.'s request for extradition, over the TATES' objections, finding among other things sufficient particularity of the U.K.'s charges. *See* ECF Nos. 30-1, 30-2. The Romanian extradition judge ruled in pertinent part:

> The objections raised by the defense of the requested person regarding the lack of clarity in the description of the accusations are unfounded, since the criminal activities in consideration of which the British judicial authorities are requesting the surrender of the requested person TATE EMORY ANDREW were presented in the arrest warrant in a succinct, but explicit and comprehensive manner, with a concrete indication of the circumstances of time and place in which they were committed, as well as the manner in which they were committed, sufficient information being provided for their legal classification through the prism of the criminal provisions set out in the legislation of the executing state.
>
> The fact that the names of the victims are not indicated in the description of the acts presented in the arrest warrant on the basis of which surrender is requested does not affect the legality of the procedure, since this information is, of course, known to the British judicial authorities conducting the criminal investigation in that case (so that there is no fear whatsoever that there would be difficulties with regard to the observance and application of the rule of specialty), but for reasons related to the option of the injured parties to have their identity protected and to

have their personal safety and that of their family members ensured (as results from the notification letter communicated to the requested person TATE EMORY ANDREW in June 2023 – attached in the file concerning the requested person TATE TRISTAN), the solution of anonymizing the personal data was resorted to.

ECF No. 30-1 at 6 (A. TATE); *see also* ECF No. 30-2 at 8 (same ruling as to T. TATE).

Pursuant to Romanian law, the extradition court postponed the TATES' surrender to the U.K. until after the conclusion of the ongoing Romanian domestic case. ECF No. 30-1 at 9 (A. TATE); *see also* ECF No. 30-2 at 10 (same ruling as to T. TATE). As stated above, at the time of Romania's March 12, 2024, extradition decision, the TATES were already under judicial supervision in Romania, including under strict travel restrictions that required continued presence in Romania. ECF No. 30-4 at 2. On February 25, 2025, the prosecutor removed the restriction that prevented the TATES from leaving Romania,[2] citing in part the considerable delay in the Romanian prosecution, the European Court of Human Rights' ("ECHR") right to private and family life, and the ECHR's presumption of bail (the opposite presumption applied in U.S. extradition cases). The condition precluding contact with alleged victims and witnesses remained in place.[3] *See id.* at 2.

### d. Witness Interference and Intimidation Allegations While Under Conditions ("the 2026 Romanian Charges")

By letter dated July 23, 2026, Romanian authorities state that the TATES "have fully complied with the obligations imposed on them, appearing in response to all summonses from the judicial authorities and complying with the measures ordered on each occasion." *Ex.* 2 at 3.

---

[2]   Despite the lifting of their travel restrictions, the TATES have not returned to the U.K. since being permitted to travel freely. *See* ECF No. 30-7.

[3]   According to the TATES' evidence, on September 5, 2024, the Bucharest Court of Appeal lifted the obligation of A. TATE not to communicate with *one* of the alleged victims. ECF No. 30-4 at 2.

However, notwithstanding Romania's confirmation that the TATES appeared for Romanian proceedings as ordered, Romanian authorities allege, by letter dated July 27, 2026, that the TATES "took steps to influence victims' statements" between January 2023 and July 2024, while they were in pretrial detention and under judicial supervision. *Ex*. 3 at 1. On July 3, 2026, approximately two weeks before the TATES were provisionally arrested in the United States, Romanian authorities announced that they brought new charges against the TATES.[4]

In their July 27, 2026, letter, Romania presented the facts underlying the charges for influencing witness statements:

> The evidence presented in this case shows that the defendants Emory Andrew TATE II and Tristan TATE, while held in custody in pretrial detention, as well as subsequently, after they were placed under judicial supervision, **respectively, between January 2023-July 2024,** were aware of the charges against them, during criminal procedures related to the case, interviews of the victims were conducted in order to gather evidence, and consistently the defendants took steps intended to influence the victims' statements.

> Therefore, Emory Andrew TATE III and Tristan TATE attempted to persuade or did persuade the individuals being interviewed not to make any statements related to the case, to make false statements, or to retract their previous statements. They resorted to acts of bribery consisting of offering money and property to the victim, as well as acts of coercion, manifested through threats and the unauthorized disclosure to the public of documents and information regarding the private lives of the victims and their family members. These actions were intended to expose the victims to a wave of threats and online harassment through numerous intimidating messages, including death threats, sent by supporters of the two defendants. These messages significantly affected the victims' privacy, safety, and mental well-being.

---

[4] Romanian authorities confirm in their July 23, 2026, letter that the TATES were notified of these new charges, *Ex.* 2 at TATE_0039, and the government has since learned from Romanian authorities that service was made upon their Romanian counsel. To prevent any doubt, the charges were publicized in the Romanian media. *See* Romania-Insider, *Romania's DIICOT links Tate brothers to asset removal and trafficking of minors*, *available at* https://www.romania-insider.com/romania-tate-brothers-trafficking-minors-new-case-july-2026 (last visited August 9, 2026).

*Ex.* 3 at TATE_0046-TATE_0047.[5]

With respect to A. TATE, Romania alleges that, "between January 2023-July 2024, he influenced or attempted to influence 7 victims with the aim of inducing them to make false statements, to refrain from making any statements, or to retract their statements." In the case of T. TATE, "it was found that, between August 2023-May 2024, he influenced or attempted to influence a total of 12 victims under the same circumstances." *Ex.* 3 at TATE_0047.

In its July 23, 2026, submission, Romania states that the TATES were recently notified of their standing as defendants and of the charges brought against them, and that by prosecutorial order dated July 3, 2026, the preventative measures of judicial supervision were re-imposed on T. TATE "as a result of new charges brought against him."[6] *Ex.* 2 at TATE_0039, TATE_0041.

e. **Subsequent U.K. Investigation and Charges ("the 2026 U.K. charges")**

Following the U.K.'s initial January 2024 charging decision, U.K. authorities continued their investigation of the TATES and announced on July 19, 2026, that they had levied additional charges and obtained new warrants of arrest for both defendants. ECF No. 11-1 at 20 (A. TATE), ECF No. 12-1 (T. TATE).

As a result of the 2026 charges, A. TATE is now charged in England with a total of forty-two (42) charges including, rape, assault occasioning actual bodily harm, arranging or facilitating the travel of another for exploitation, controlling prostitution for gain, distributing indecent images

---

[5]     Additional information about the facts underlying the Romanian charges of influencing witnesses may be found in the attached submission from the U.K. at *Ex.* 1 at TATE_0011-TATE_0013. The U.K. confirms in its submission that it obtained consent from Romania to share information about their most recent charges against the TATES. *Id.* at 8.

[6]     At the time the 2026 charges were lodged, A. TATE had already been placed back under judicial supervision after he was arrested on new Romanian charges in 2024. *See Ex.* 2 at TATE_0041.

of a child, making indecent images of a child, and possession of extreme pornography.  T. TATE is charged in England with a total of seventeen (17) charges, including rape, sexual assault, assault occasioning actual bodily harm and arranging or facilitating the travel of another for sexual exploitation.  The totality of the charges against the TATES now involve seven (7) different victims of sexual violence, including rape and/or trafficking.  The offenses of rape and trafficking for sexual exploitation both carry a maximum penalty of life imprisonment.  *Ex.* 1 at TATE_0006. According to the U.K., '[t]he position faced by Andrew and Tristan Tate is considerably more serious than it was when they were arrested in Romania in March 2024 . . . potentially including discretionary life sentences or determinate sentences in the region of 20 years' imprisonment." *Id*.

## II.   ADDITIONAL FACTS RELEVANT TO DETENTION

### a.   The TATES' Use of Multiple Identities to Evade Law Enforcement

A. TATE speaks—and posts online—unabashedly about his possession of multiple passports and identities, his and his brother's excessive (and hidden) wealth, as well as their purported influence over foreign authorities.  He claims to have previously escaped the law on numerous occasions and has unapologetically declared his intent to do so again in the future.  A. TATE has publicly stated, "[y]ou can't ban me from driving I have 9 licenses.  You can't freeze my passport.  I have 4.  You can't take my money.  It's EVERY WHERE.  It takes INTERNATIONAL COOPERATION to slow me down.  And that's rare."  *Ex.* 1 at TATE_0015. A. TATE posted online on December 21, 2019, "I have 5 passports.  I also changed my name legally in 3 of the countries so that my passports all have completely different names.  I have had warrants out for my arrest and travelled freely.  I am smarter than you… I am above the law." *Id*. at TATE_0017.   He has also claimed on social media that he possesses passports from Estonia,

Nigeria, Poland, the U.K., and the U.S., and that he has four more that he has never publicly disclosed. *Ex.* 8.

There is some evidence that T. TATE likewise maintains multiple identities and passports under false names. U.K. authorities have discovered an online post containing a photo of a Mexican passport bearing T. TATE's photograph and date of birth but issued under the name "Vladimir Scorpius."[7] *Ex. 1* at TATE_0009, TATE_0032. Importantly, the U.K. also uncovered evidence corroborating T. TATE's connection to that name, including an online video in which T. TATE declares while standing on a ship, "I'm Captain Vladimir Scorpius" and his registration as a director of a U.K. company called "Scorpius Ltd." *Id.* at TATE_0009. Mexican officials communicated to U.S. law enforcement that they are unable to find a record of ever having issued a passport in the name Vladimir Scorpius.

Based on its investigation, U.K. authorities also believe that the TATES both have passports from Vanuatu. *Ex.* 1 at TATE_0007. The U.K. reports that it has been largely unsuccessful tracing the TATES' travel movements. *Id.* In particular, U.K. authorities have not successfully received travel alerts for the TATES' true passports, even though authorities know from social media that the TATES have been traveling. U.K. authorities suspect that the TATES may be traveling on unknown passports in their possession. *Id.*

In addition to possibly maintaining identity documents from multiple countries in different names, the TATES have also publicly discussed how they have used those documents to evade law enforcement. On August 12, 2020, A. TATE wrote a post on social media about being on the run from French and German police. In his post, which contained a photograph of himself on a

---

[7]    A character in a 1998 James Bond novel, who was an arms dealer, bore the name "Vladimir Scorpius." *See Ex.* 1 at TATE_0009.

10

train, he stated, "[o]bjective one is always to escape the hot zone.  French and German police after me on two different names.  Heading to East Europe where my connections keep me above the law.  Stage one is a 6 hour train to escape German borders."  *Id*. at TATE_0024.

He has also posted repeatedly about Spanish authorities, including on August 29, 2021, when he said, "[i]magine respecting a Spanish Court.  That just shows you don't have your life in order.  There's 8 different Andrews. (THE WAR ROOM).  I got 8 lives.  8 licenses and passports."  *Id*. at TATE_0029.  A. TATE wrote on social media on August 30, 2021, "[i]f you can't think 'fuck the law' then you don't have fuck you money.  Bribes. Cash bail.  Expensive lawyers. Fines.  It doesn't matter.  As long as you have money the problem vanishes.  The law only punishes broke people."  *Id*. at TATE_0030.  On August 31, 2021, he further wrote, "[t]he face you make when you tried to do a simple car rally and ended up with 3 court cases.  Fuck the Spanish.  Leaving Marbella in protest.  They don't deserve my money.  Paella eating losers.  FUELLING THE JET.  Next stop…"  *Id.* at TATE_0031.

Additional samplings of A. TATE's declarations of being "above the law" and expressing the need for an "escape plan,"[8] are contained in Annex A of *Exhibit 1*.

### b.  The TATES' Attempts to Identify and Intimidate the U.K. Victims

Since at least February of 2025 (when the travel restrictions were lifted against them in Romania), the TATES have declined to voluntarily appear in the U.K. to face prosecution.  Meanwhile, from afar, they have pursued their quest for the identities of the victims in the U.K. matter.  *See The King (on the application of Tate) v. Director of Public Prosecutions*, [2026] EWHC 1600 (Admin), *available at https://www.judiciary.uk/wp-content/uploads/2026/06/The-*

---

[8]      On April 24, 2021, A. TATE posted "I'm untouchable because I've spent a decade spreading myself into MANY grids. I can be in another country under a different name, with a penthouse, and $300k if things go bad. You don't need to be at the extreme level I am… but you need an escape plan." *Ex. 1* at TATE_0027.

*King-on-the-application-of-Tate-v-Director-of-Public-Prosecutions-Judgment.pdf*  (last   visited

August 9, 2026).

Similar to Romania, the U.K. has also documented fears of witness intimidation.  *See Ex.*

*1* at TATE_0013.  Specifically, the U.K. has explained:

> All of the complainants in this case are vulnerable and in fear of Andrew and Tristan
> Tate because of the violence used towards them – several of the complainants
> describe being assaulted and threatened with weapons – and because of the
> resources available to Andrew and Tristan Tate, and because of their propensity to
> intimidate vulnerable complainants.

*Id.*  Relatedly, A. TATE's own words on social media demonstrate the broad-reaching tools the

TATES have to engage in witness intimidation.  According to the U.K., on September 16, 2025,

A. TATE posted on one of his X accounts, which had more than 10 million followers at the time,

photos of a male with text saying, "10k reward for this man's identity and work place."  *Id.*

According to U.K. authorities, the post had almost 3 million views in less than 10 hours.

### c.  The TATES' Self-Proclaimed Excessive Wealth and Influence

The TATES are self-proclaimed *billionaires* who say that they own high-end vehicles,

private jets, and a custom $50-million-dollar superyacht and have unrestricted access to traditional

funds, crypto currency, and bitcoin. The TATES' wealth is often publicly documented by their

own videos and statements.

For years the TATES have appeared on podcasts boasting of their unrestricted access to

money.  For instance, in a 2024 X post, T. TATE mocked people who doubted his wealth by

posting blueprints of the superyacht "he purchased."  *See Exhibit 5,* TATE_0049.  In a 2025 X

post, A. TATE said, "when my superyacht is finished I[']m joining the Flotilla."  *See Exhibit 6,*

TATE_0050.  As recently as July 14, 2026, T. TATE recorded a walkthrough of their superyacht

where he detailed the progress made and custom furnishings.  Tristan Tate (@notristantate),

INSTAGRAM, A tour of just 70% of the new super yacht. Share this video and follow @obsidianbladetv for a chance to win a ticket to the launch party! (July 14, 2026). The TATES have appeared on CEOCAST, a purported entrepreneurial and lifestyle podcast, where they explain how they live among the top percent of society. CEOCAST, *Andrew Tate: Reveals the Truth About the Matrix, Power & Wealth Episode 77*, YouTube (2022) (last visited August 9, 2026); CEOCAST, *Andrew Tate: You Need to Get Rich Now or Else Episode 139,* YouTube (2024) (last visited August 9, 2026); CEOCAST, *Tristan Tate: Reveals his Past Businesses, Net Worth, Getting Good Girls, & More Episode 141*, YouTube (2024) (last visited August 9, 2026).

The TATES started their careers as professional kickboxers. Aashna Nadkarni, *Tate Brothers Net Worth 2026: Andrew and Tristan's Worth, Properties, Career, And More,* Mashable (July 19, 2026), https://in.mashable.com/culture/112097/tate-brothers-net-worth-2026-andrew-and-tristans-worth-properties-career-and-more. Since leaving professional sports, the TATES began a webcam pornography business in 2014, which expanded substantially after they relocated to Romania, growing to include dozens of women recruited through an agency called Model Stars. Heidi Blake, *Andrew Tate's Empire of Abuse*. The New Yorker. (June 8, 2026), Archived. As the webcam business wound down, the TATES built an online-education business, becoming prominent as internet celebrities through courses including Hustler's University (later relaunched as The Real World) and the secretive group "The War Room." Shanti Das, *Inside the violent, misogynistic world of TikTok's new star, Andrew Tate*, The Guardian, (August 6, 2022), Archived. In August 2023, it was estimated that the TATES' online ventures generated $5 million in revenue monthly. Lucy Williamson, *Andrew Tate prosecution files reveal graphic claims of coercion ahead of trial*, BBC News, (August 23, 2023), Archived. Today, A. TATE's meme coin

DADDY's market capitalization is $7.55 million. *Top Meme Coins Today by Market Cap*, FORBES, https://www.forbes.com/digital-assets/categories/meme-coins/.

The TATES' public presence comes with a heavily documented history of their lavish spending and access to money. They appear in video interviews, podcasts, and posts on their own social media accounts in which they claim that "there is nothing left to buy." @thePrinceofPerception, *Andrew Tate's Most Unusual Watch Collection*, (September 5, 2025), https://youtu.be/Mhxtqe1fdbY?si=XCER3uEh5d-UqQc4. Each boasts of different luxuries, including diamond encrusted jewelry, luxury car collections (e.g., Ferrari, Lamborghini, and Maclaren), and elite aviation choices. A. TATE detailed that he made his millions in an interview with Anthony Pompliano in 2022. Anthony Pompliano, *How Andrew Tate Got Rich,* (August 3, 2022), https://youtu.be/n7g6T6HNymo?si=1Y9Xyk1a254-pBkp. T. TATE detailed his $2.1 million Astin Martin and $5 and $7 million Bugattis in a self-recorded video posted on The Real World School's Facebook page. The Real World School, *Tristan Tate elite advice on how to be rich,* (October 2, 2025), https://www.facebook.com/joinrealworldschool/videos/tristan-tate-elite-advice-on-how-to-be-rich/2012761616233463/.

## ARGUMENT

### I.    APPLICABLE LEGAL STANDARDS

This proceeding is not criminal, and the Bail Reform Act does not apply. *See In re Extradition of Shaw*, No. 14-MC-81475-WM, 2015 WL 521183, at *5 (S.D. Fla. Feb. 6, 2015). Neither the Treaty nor the extradition statute provide for a right to release in an extradition case, and if anything, the Treaty contemplates detention. *See* Treaty, Art. 12(4) (permitting a fugitive to seek release from custody if the requesting state does not submit its extradition request within the timeframe required by the Treaty). Case law provides that bail should be granted in an

14

extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)).  Unlike in domestic criminal cases, "there is a presumption against bond." *Martin v. Warden, Atlanta Pen.,* 993 F.2d 824, 827 (11th Cir. 1993); *see also Matter of Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1294 (S.D. Fla. 2017) ("[A]ny release of a detainee awaiting extradition is largely antithetical to the entire process.").  A fugitive may not be released on bail unless *he* demonstrates that (1) he is neither a flight risk nor a danger to the community, **and** (2) "special circumstances" warrant his release.  *See*, *e.g.*, *Salerno v. United States*, 878 F.2d 317, 318 (9th Cir. 1989); *Leitner*, 784 F.2d at 160.

Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight.  *See*, *e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1303 ("The majority of cases that have examined this question, especially those in our Circuit, have concluded that the risk of flight analysis is a separate inquiry" from special circumstances) (citing *Shaw*, 2015 WL 521183, at *9).  "Even a low risk of flight" is not a circumstance sufficiently "unique" to constitute a special circumstance. *Leitner*, 784 F.2d at 161; *see also Martin*, 993 F.2d at 827 (stating that "a defendant in an extradition case will be released on bail only if he can prove 'special circumstances'" and declining to consider the fugitive's argument that the district court erred in determining that he was a flight risk); *Salerno*, 878 F.2d at 317-18 (lack of flight risk "is not a criteria for release in an extradition case").  Accordingly, a fugitive who poses a flight risk or a danger to the community should be denied bail, even in the face of special circumstances.  *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1384 (D. Nev. 1995); *In re Extradition of Nacif-Borge*, 829 F. Supp. at 1215, 1221 (D. Nev. 1993).  The burden is on the fugitive to establish the

existence of special circumstances by clear and convincing evidence. *Matter of Extradition of Rangel Prentt*, 2024 WL 22198823, at *13 (S.D. Fla. May 7, 2024) (Mattewman, J.). While the TATES argue that the Court should apply a preponderance of the evidence standard (ECF No. 23 at 15-16 (A. TATE), ECF No. 24 at 15-16 (T. TATE)), the Court need not reach that issue because the TATES' arguments fail under either standard.

## II.      THE TATES SHOULD BE DETAINED AS DANGEROUS

The TATES should not be released on bond because they cannot show that they pose no danger to the community. The alleged conduct underlying the charged offenses, and their conduct while on prior supervised release, clearly demonstrate that they should remain detained.

### a.      The Facts Supporting the U.K. Charges Involve Alleged Violent and Dangerous Behavior

From the outset, the nature and circumstances of the offenses for which the TATES are charged in the U.K.—including the rape and strangulation of victims—are serious and, alone, show they are dangers to the community. As Chief Magistrate Judge William Matthewman has found, the sheer nature of an alleged rape is enough to show a defendant is a danger to the community. *In the Matter of the Extradition of Bell*, 2021 WL 1616127, at * 7 (S.D. Fla. Apr. 26, 2021). That is, a defendant can fail "to meet his burden, even by the lesser preponderance of the evidence standard, of establishing that he is not a danger to the community" where he is "alleged to have committed a forcible rape against a struggling victim." *Id*. Likewise, in the U.K., the TATES are alleged to have committed forcible rapes with strangulation on more than one victim, who have described struggling to breathe while their sexual assaults took place. These allegations are serious and show their capacity to behave in a violent manner. The TATES' lack of prior criminal history does not disturb this conclusion as it "does not outweigh the seriousness of the allegation." *Id.* (citing *In re Extradition of Pelletier*, 2009 WL 3837660 at *2 (S.D. Fla., Nov. 17, 2009));

16

*Martinelli Berrocal*, 263 F. Supp. 3d at 1300; *Shaw*, 2015 WL 521183 at \*7.  Consequently, the alleged offense conduct alone demonstrates that the TATES are dangers to the community.

        **b.**        **The TATES Engaged in Threatening Behavior against Victims while Detained and on Release in Romania**

Notwithstanding the serious and violent allegations against them, the TATES argue that they are not dangerous because "[d]uring the years that Andrew and Tristan have been on pretrial release, there were no allegations of criminal conduct while on release, they have not been charged with any current wrongdoing while on release, and they have no other criminal history in the United States, the U.K., Romania or any other country."  ECF No. 23 at 39 (A. TATE), ECF No. 24 at 39 (T. TATE).  This is false.

Indeed, the TATES' conduct during their pretrial supervision in Romania demonstrates their danger to others.  As discussed above, Romanian authorities filed charges against the TATES for the offense of "influencing witness testimony on a continuing basis," *i.e.*, witness tampering. *See Ex.* 2 at TATE_0041.  Committing new crimes while on any form of pretrial release cannot be considered compliance with a court's release conditions.  This Court cannot risk further harm solely on the TATES' promise to comply with release conditions when they have already shown their inability to conform their actions to the law.  This is especially true when considered in connection with the TATES' repeated and ongoing efforts to identify the victims in the U.K.  case.

For these reasons, the TATES' claim that they have complied with prior conditions in Romania as a means of assuring the Court that they are not a danger to the community should be treated with extreme skepticism.  Indeed, their actions since 2022 belie their claim that they do not pose a danger, and instead, serve as a calling card that demonstrates their dangerousness and lack of willingness to comply with court orders.  Consequently, the Court should deny the TATES' request for release because they failed to establish that they are not dangers to the community.

### III.   THE TATES ARE SELF-PROCLAIMED FLIGHT RISKS WITH A HISTORY OF VIOLATING CONDITIONS OF RELEASE

The Court need not look much further than the TATES' own social media posts to understand the great lengths they have gone to avoid detection by government.  A. TATE has stated online that he has seven different passports and 15 driver's licenses so that if he is stopped by the authorities, he can "pull out a license from some random country" to prevent authorities from determining his true identity.[9]  *Exhibit 7.*[10]  He has also posted about having changed his name in multiple countries to avoid detection and has repeatedly declared himself "above the law." *Ex.* 1 at TATE_0014-0016.  Indeed, he has continually advised his online followers to obtain multiple passports under aliases, spread their money across different countries, and change their names to avoid detection.  *See Ex.* 1, Annex 1.  It also appears that T. TATE may have a fraudulent Mexican passport under an alias's name.  *Ex.* 1 at TATE_0009, *id.* at Annex B.  As evidence by the U.K.'s inability to successfully track the TATES' whereabouts, it appears that their use of fraudulent passports has, at least partially, accomplished its purpose of preventing law enforcement from determining their whereabouts that are not otherwise posted on social media.[11]

---

[9]     While the TATES have attempted to dismiss some of these statements as "hearsay" (ECF No. 23 at 37), they fail to acknowledge that hearsay is permissible in extradition proceedings, *e.g.*, *Matter of Extradition of Shaw,* No. 14-cv-81475, 20 15 WL 3442022, at *4 (S.D. Fla. May 28, 2015).

[10]     The video may be found at this link: https://www.youtube.com/watch?v=LrIQkdU8XPI (last visited August 10, 2026).

[11]     To the extent the TATES claim that public social media posts documenting their current locations are indicative of their willingness to appear at these extradition proceedings, they are mistaken.  First, they could stop posting about their locations at any time.  Second, the calculation of flight risk changed after the TATES were arrested in the United States and were informed that the U.K. has dozens of charges against them that carry a possible penalty of twenty years to life imprisonment.  *See* Ex. 1 at 3; *Matter of Extradition of Duarte Jacquez*, No. 20-mc-022829, Dkt. Entry 24, at 8 (S. D. Fla. Sept. 14, 2020) (considering the fugitive's financial means, foreign connections, age, and the seriousness of the offenses alleged and concluding that "the

The TATES have also shown a particular propensity for avoiding going to the U.K. specifically.  Indeed, they have both publicly mocked and evaded the U.K. proceedings.  *See*, *e.g.*, *Ex.* 1 at TATE_0007 (describing and providing links for a March 22, 2026, social media post in which A. TATE calls the U.K. a "joke" and "total clowns" and a video that appears to be from March 2026, in which he brags about "never getting extradited" and urging the U.K. to "come get" him in Hong Kong); *id.* at TATE_0006 (describing A. TATE's attempts to resolve civil litigation in the U.K. by (unsuccessfully) requesting the U.K. suspend its warrant to allow him to return to the U.K.); ECF No. 30-2 at 4 (describing Tristan's requests to Romania to lift travel restrictions so he could visit his mother in the U.K., which he never did after travel restrictions were lifted).

The TATES have not only demonstrated an intent to flee, but they also repeatedly espoused their wealth, solidifying their means to flee.[12]  The TATES are self-proclaimed *billionaires* who say they own high end vehicles, private jets, a custom $50-million-dollar superyacht and have unrestricted access to traditional funds, crypto currency, and bitcoin, facts that are glaringly absent from their pleadings.  The TATES' wealth, which allegedly includes high-end vehicles, private jets, custom yachts, crypto currency, bitcoin, and bank accounts and residences around the world, has been frequently documented by their own videos and statements, as described above, *infra* p.

---

circumstances have changed with his arrest, and the absence of evidence of earlier flight are not sufficient to meet his burden to show that he is not a risk of flight *now*.") (emphasis in original).

[12]   In responding to the government's assertion that the TATES have significant financial resources to fund their flight (ECF No. 11 at 22 (A. TATE), ECF No. 12 at 22 (T. TATE)), the TATES attempt to push the burden to establish their wealth back onto the government without denying the government's assertions.  *See* ECF No. 23 at 36-37 (A. TATE); ECF No. 24 at 36-37 (T. TATE).  It is not the government's burden to establish that release from custody is warranted, and the TATES have failed to meet *their* burden by declining to propose a bail package for the court's consideration.  Without a proposed bond package, the Court has limited ability to assess whether a bond can be crafted in a manner that ensures the amount of the bond meaningfully influences the TATES' willingness to participate in these extradition proceedings.

12-14. Access to this kind of money certainly necessitates detention as it renders them serious flight risks.

The TATES argue that their notoriety and global visibility demonstrate their inability to go into hiding (ECF No. 23 at 32-34 (A. TATE); ECF No. 24 at 32-34 (T. TATE)), but this argument is in direct tension with the TATES' extensive social media posts in which they discuss their ability to avoid detection by using false identity documents in different names. In any event, the TATES' fame does not necessarily mean that they could not flee. Of the millions of dedicated followers on the TATES' social media platforms, some may be willing to take extraordinary measures to help the TATES to go into hiding.

As discussed in the government's prior filing (ECF No. 11 (A. TATE), ECF No. 12 (T. TATE)), the nature of the charges, which carry potential lengthy prison sentences, further provides a strong incentive to flee. When considered with the possibility that they have fake passports, it becomes clear that no amount of bail would be significant enough to guarantee the TATES' presence at these proceedings. Without more, the TATES have failed to meet their burden of establishing either that they do not have the means, motive, or intent to flee, or that they can be incentivized to appear through a yet-to-be submitted bond package.

## IV.   THE   TATES   HAVE   FAILED   TO   ESTABLISH   "SPECIAL CIRCUMSTANCES"

The Court may deny the TATE's request for release solely for failure to present evidence that they are not risks of flight nor dangerous. However, even if the Court were to find that the TATES are not flight risks or dangers to the community, they are still obligated to establish "special circumstances" to justify release. *Cf. Matter of Extradition of Drumm*, 150 F. Supp. 3d 92, 97-100 (D. Mass. 2015) (denying bail because of a failure to show a special circumstance, even though the court found that defendant posed no danger to the community and defendant's risk of

flight could be adequately mitigated).   No factors cited by the TATES constitute special circumstances, either individually or collectively.

### a. The TATES Spurious Claim that they Complied with Conditions in Romania is not a Special Circumstance

The TATES argue that "[t]here is no greater 'special' circumstance than the TATES' demonstrated compliance with Romania's conditions of release for more than 3 years."  ECF No. 23 at 24 (A. TATE), ECF No. 24 at 24 (T. TATE).  As established above, the TATES' claim that they fully complied with the conditions of their release in Romania is factually false.  The TATES did not comply with Romanian no-contact provisions, and they both have been charged with multiple instances of witness interference for alleged conduct committed while they were under either pretrial detention or judicial supervision.[13]   Accordingly, Romania's earlier decision to release the TATES from custody, before the new charges had been lodged, has no impact on whether they should be released in these extradition proceedings.

### b. The Existence of a Romanian Extradition Order does not Support Release

In their motion for release, the TATES assert that there is no diplomatic necessity to detain them because "the U.K. has already obtained a surrender order from Romania based on the same warrants that are before this Court."  ECF No. 23 at 16 (A. TATE), ECF No. 24 at 16 (T TATE).  Without citing any law, they argue that the U.K. is improperly seeking to "jump the line" in front

---

[13]     Even if the TATES had fully complied with bail conditions in Romania, the Court should not be influenced by Romania's decision to release them from custody.  The Romanian court decisions granting bail confirm that the Romanians made its decision in a legal posture that is materially different than the one applicable here, *i.e.*, a presumption *in favor of* bail that government must bear the burden to rebut.  ECF Nos. 30-5 at 3, 30-6 at 3.  In addition, the Romanian decisions indicate that they were at least partially influenced by the length of time the TATES had already spent in detention awaiting the criminal proceedings in Romania.  *See* ECF No 30-5 at 4.  In this case, the TATES have been detained for only a few weeks.

of Romania by now seeking their extradition from the United States. *Id*. This argument is flawed for multiple reasons.

The argument ignores the reality that, as of July 2026, the TATES are facing new U.K. charges that are not the subject of any extradition order—in Romania or elsewhere—and that will form, at least in part, the basis of the instant extradition request. Moreover, while the U.K.'s January 2024 charges formed the basis of the U.K.'s prior extradition request to Romania, the TATES do not point to any legal authority that this fact precludes the U.K. from pursuing their extradition elsewhere. They also do not present any evidence that the U.K. violated any agreement or order from Romania in seeking extradition from the United States. To the contrary, the Romanian authorities have submitted two letters to assist in the instant U.S.-U.K. extradition proceedings. *See Exhibits 2 and 3*. However, even if there was a breach of misunderstanding between the U.K. and Romania—of which there is no evidence—any such breach would have no bearing on the United States' independent treaty obligations to the United Kingdom under the U.K.-U.S. Extradition Treaty. That would be a diplomatic matter between the U.K. and Romania, which has no bearing on the U.S. proceedings. But even if this were relevant, the TATES' argument is based exclusively on foreign policy considerations that belong to the discretion of the Secretary of State. *See, e.g., Arias Leiva v. Warden*, 928 F.3d 1281, 1287 (11th Cir. 2019); *Martin*, 993 F.2d at 829 & 830 n.10.

> **c.      Neither Delay in Seeking Extradition, nor the Availability of Bond in the U.K., Constitute Special Circumstances Warranting Release**

> > i.      <u>There was no Delay in Pursuing Extradition, and Any Such Delay is not a Special Circumstance in any Event</u>

The TATES next assert that, "[w]hen a requesting country significantly delays seeking extradition, the diplomatic necessity for detention is reduced." ECF No. 23 at 18 (A. TATE), ECF

No. 24. at 18 (T. TATE).  However, they then fail to articulate any 'significant delay' that can be attributed to the U.K., likely because the facts demonstrate nothing but prompt and consistent efforts by the U.K. to prosecute their case and extradite them.[14]  If anyone is at fault for the delay, it is the TATES refusal to return to the U.K., moving to Romania, and allegedly committing new crimes there.  Any argument regarding the U.K.'s delay should be rejected as nothing more than an attempt to misdirect the Court's focus and distract from their own criminal and evasive conduct.

Even assuming delay—of which there was none—there is nothing in the extradition statute nor the extradition treaty with the U.K. that relieves the United States of its obligation to surrender fugitives simply because of the amount of time that has passed between the charged conduct and the presentation of an extradition request.  In addition, "the Constitution does not of its own force impose on foreign governments the obligation to act speedily in seeking extradition of a fugitive from the United States."  *In re Extradition of Kraiselburd*, 786 F.2d 1395, 1398 (9th Cir. 1986); *see also Martin*, 993 F.2d at 829 ("There is no Sixth Amendment right to a speedy trial in extradition cases.").  Thus, this argument about diplomatic necessity is, as a general matter, without merit.  *See, e.g., Martinelli Berrocal*, 263 F.Supp.3d at 1299 ("A number of other courts have rejected arguments similar to Pres. Martinelli's contention concerning diplomatic necessity.").

Regardless, any supposed delay here would be far shorter than the time elapsed in other cases where courts have rejected arguments based on delay.  *See, e.g., Martin*, 993 F.2d at  830

---

[14]  The victims came forward in 2020 and 2022, when the TATES were already living in Romania.  Following an investigation, charges were brought in January of 2024. A European Arrest Warrant was obtained, which the Romanians executed in March 2024, and promptly ordered extradition.  The Romanians deferred surrender due to their own domestic proceedings, for which the TATES were subject to pretrial detention, house arrest, and then judicial supervision with travel restrictions through February 2025.  At best, any delay attributable to the U.K. would be from February 2025 through July of 2026—a time when the TATES' own evidence shows them traveling to 12 different countries with at least 34 different international flights.

(seventeen-year delay in seeking extradition was not a special circumstance for bail purposes or a bar to extradition); *Drumm*, 150 F. Supp. 3d at 98-99 (seven-year delay in seeking extradition not a special circumstance warranting bail); *In the Matter of the Extradition of Johnson*, No. 12-mj-65, 2012 WL 3929811, at *4-5 (W.D. Pa. 2012) (delay between the offense and the formal request for extradition was not a special circumstance, where the Mexican arrest warrant was issued in 2003 and the extradition bail hearing was conducted in 2012).

Finally, the extent, if any, to which a delay in filing an extradition request should factor into the extradition decision is an issue that is left to the Secretary of State. *See Martin*, 993 F.2d at 829 (fugitive "should direct his argument that extradition is unjust in this case based on Canada's alleged lengthy delay in seeking extradition or on humanitarian grounds to the Executive Branch"). The Secretary of State, not a judicial officer, is better positioned to evaluate whether a delay indicates that a requesting government has "not made prosecution of this offense a priority." *See In re Extradition of Chapman*, 459 F. Supp. 2d 1024, 1027 (D. Haw. 2006). Such a judgment clearly affects foreign relations, not to mention the requesting country's willingness to honor the United States' extradition requests. It also requires knowledge of another country's judicial systems, procedures, resources, and other factors affecting the timing of an extradition request, which the Secretary of State is in a better position to evaluate. *See Martin*, 993 F.2d at 829 (adoption of speedy extradition right would conflict with the rule of non-inquiry, which generally "precludes extradition magistrates from assessing the investigative, judicial, and penal systems of foreign nations when reviewing an extradition request"). Accordingly, because the length of pre-arrest delay should not affect the United States' obligation to honor an extradition request, and because there was no unreasonable delay here, it is not a valid "special circumstance" justifying bail.

ii.    Any Potential for Bail in the U.K. is not a Special Circumstance

Similarly, the TATES' argument that availability of bail in the U.K. for extradition proceedings, or for the underlying crimes themselves, constitute a special circumstance warranting release should be rejected.  It is entirely speculative to acclaim that a U.K. court faced with a U.S. extradition request for similarly situated U.S. fugitives, or a defendant faced with multiple counts of human trafficking, rape, and assault, would grant release from detention.  The mere *possibility* of bail cannot be a special circumstance because there is no mechanism by which to discern whether the particular defendant would get bail in the other country.  *See*, *e.g.*,  *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 86-87 (S.D.N.Y. 2003) ("Here, at best, [the fugitive] has shown that the [requesting country's] bail statute would not preclude his release on bail. . . . [T]here is no basis for [the fugitive's] suggestion that the mere possibility of bail in the requesting nation constitutes a special circumstance.").

Moreover, this speculation is not an appropriate consideration for this Court because U.S. extradition courts should not attempt to apply foreign law to ensure it does not erroneously interpret the foreign country's law.  *See, e.g., Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) ("[W]e have declined to rule on the procedural requirements of foreign law out of respect for other nations' sovereignty"); *In re Assarsson*, 635 F.2d 1237, 1244 (7th Cir. 1980), *cert. denied*, 451 U.S. 938 (1981) ("[T]he narrow scope of review [in extradition proceedings] is based on respect for the sovereignty of other nations.  While our courts should guarantee that all persons on our soil receive due process under our laws, that power does not extend to overseeing the criminal justice system of other countries.").

Additionally, it is well settled that the requesting country's bail practices have no bearing on the United States' mandatory treaty and statutory obligations to deliver fugitives to that country.

*See Martinelli Berrocal*, 263 F. Supp. 3d at 1298; *Matter of Extradition of Antonowicz*, 244 F.

Supp. 3d 1066, 1071 (C.D. Cal. 2017); *Siegmund*, 887 F. Supp. at 1386-87.  This is because

> [A]n extradition treaty between sovereign nations is essentially a contract, and the
> concern in an international extradition case is not to mirror the internal bail
> practices of the requesting country, but, rather, to deliver the extraditee to that
> country if the conditions precedent to extradition, as set out in the treaty, are
> satisfied.  To say that the extraditee would have been granted bail in the requesting
> country had he been arrested there, or that he will be granted bail once returned
> there, thus misses the point.

*Siegmund*, 887 F. Supp. at 1386-87.  Accordingly, the TATES have failed to show that any delay

in pursuing extradition and/or the potential availability of bail in the U.K. constitutes a special

circumstance.

> **d.      Alleged Due Process Concerns Do Not Amount to Special Circumstances**

The TATES next assert several alleged due process concerns that they claim are "special

circumstances," including lack of probable cause, the anticipated length of the extradition

proceedings, and the purported "harsh" conditions of confinement.  These claims all fail as either

matters of law or fact.

> i.   The TATES Exaggerate their Conditions of Confinement, Which in Any
>      Event Do Not Constitute Special Circumstances

First, the TATES' argument that their conditions of confinement are so unreasonable as to

constitute a special circumstance fails.   BOP retains wide latitude to decide how and where to

house the TATES in consideration of their safety and that of other prisoners, staff, and the

institution.    Moreover,  the  TATES'  conditions  of  confinement  are  not  unduly  harsh.

Consequently, they do not constitute a special circumstance.

As "the realities of running a penal institution are complex and difficult," the Supreme

Court has "recognized the wide-ranging deference to be accorded the decisions of prison

administrators." *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433, U.S. 119, 126 (1977).

Federally, BOP has been given statutory authority to determine the location of a prisoner's custody. *See generally* 18 U.S.C. § 3621(b). Accordingly, BOP is "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order," *Bell v. Wolfish*, 441 U.S. 520, 547 (1979), and in the classification and housing of prisoners. Thus, judicial review of those decisions is limited. *See generally* 18 U.S.C. §§ 3621(b), 3624(b)(1), 3625, 4081; *see also Moody v. Daggett*, 429 U.S. 78, 88 n. 9 (1976) (clarifying that "no due process protections [are] required ... [for] prisoner classification and eligibility for rehabilitative programs in the federal system ... [and that] Congress has given federal prison officials full discretion to control these conditions of confinement"). Consequently, "only extreme deprivations are adequate to satisfy the objective component of an Eighth Amendment claim regarding conditions of confinement." *Rish v. Johnson,* 131 F.3d 1092, 1096 (4th Cir. 1997). It follows, then, that only similarly excessive conditions could constitute a special circumstance here.

Currently, the TATES have been placed in the Special Housing Unit ("SHU") for their safety and the safety of the institution. Their classification and housing placement is not outside of BOP's statutory authority. *See* 28 C.F.R. § 541.21 (2026) ("Special housing units help ensure the safety, security, and orderly operation of correctional facilities, and protect the public, by providing alternative housing assignments for inmates removed from the general population."); *see also* BOP Program Statement 5270.12. As such, the mere fact the TATES are in the SHU does not, in and of itself, constitute undue confinement.

Notwithstanding, here the fugitives allege that their confinement is unreasonable by falsely claiming that they have been denied basic needs and access to their legal counsel.[15] The TATES

---

[15] AUSA López will answer any of the Court's questions about the finer details of the TATES' conditions of confinement at the August 13th hearing.

have been provided with suitable, reasonable housing.  They have been provided with adequate sleeping arrangements; food and access to water; the ability to order and obtain basic and extra supplies; recreation time; the opportunity to receive social visits; access to phone calls; and the opportunity to visit with their attorneys, often twice a day.  Moreover, BOP Policy Statement 5270.12 provides that their placement will be reviewed periodically to determine if they should be housed elsewhere.

Not only do the TATES have access to basic needs and care in the SHU, but they have also been given dispensations that others similarly housed do not have.  For example, FDC Miami granted their request for joint meetings with their attorneys, rather than the one-on-one meetings usually attended by other inmates.  Moreover, the TATES have been given special exemptions and considerations as to commissary that are not available to other inmates in the SHU because their placement there is administrative, rather than disciplinary.

As a result, the TATES' reliance on *In the Matter of the Extradition of Manrique*, No. 19-mj-71055, 2019 WL 5168587 (N.D. Cal. Oct. 10, 2019), is misplaced.  In that case, the fugitive (a former president of Peru) was held in a county jail in SHU-like housing where he was held in "a small cell for all but an hour of every two days," about which a staff psychiatrist at the jail opined had created a decline in the fugitive's mental health.  *Id.* at 1.  But these facts are not present in this case.  The TATES are consistently allowed out of their cells for hours (on almost a daily basis) for recreation time and to hold joint meetings with their attorneys.  There is also no evidence that continued solitary confinement has resulted, or would result in the TATES' mental decline, nor do they allege as much.[16]

---

[16] *Manrique* is a district court decision from the Northern District of California, in the Ninth Circuit Court of Appeals' jurisdiction.  As such, it is not binding here as it is common knowledge that even decisions of "court of appeals for one circuit are not binding upon the courts of appeals for

Every consideration has been taken by FDC Miami to address the TATES' needs and requests, and the institution has taken all needed steps to ensure their safety and that of the institution. Consequently, while FDC Miami is not a Marriott, the TATES' conditions of confinement are reasonable, constitutional, and within BOP's discretion. Therefore, they do not constitute a special circumstance here. *See In re Extradition of Garcia*, 615 F. Supp. 2d 162 (S.D.N.Y. 2009) (finding that "unpleasant prison conditions do not entitle Garcia to be granted bail" in extradition proceedings); *Borodin v. Ashcroft*, 136 F. Supp. 2d 125, 131 (E.D.N.Y. 2001) ("While there are undoubtedly large differences between prison and house arrest in terms of comfort and convenience . . . these are not enough to constitute 'special circumstances'") (internal citation omitted).

ii. The Potential Duration of Extradition Proceedings Does Not Warrant Release

The TATES assert they should be released from custody because they may be subject to a lengthy period of detention while they await the submission of the U.K.'s extradition request and subsequently litigate against extradition. ECF No. 23 at 28-30 (A. TATE), ECF No. 24 at 8-30 (T. TATE). Their argument falls flat.

While some courts have found that "unusual" delay in the extradition proceedings may constitute a special circumstance, *e.g.*, *Matter of Extradition of Kirby*, 106 F.3d 855, 863 (9th Cir. 1996), the delay must be something beyond "factors applicable to all defendants facing extradition," *In re Extradition of Maniero*, 950 F. Supp. 290, 294 (S.D. Cal. 1996). For a delay to constitute a "special circumstance," it must be "unusual or excessive." *Antonowicz*, 244 F. Supp. 3d at 1070. Here, the TATES have not provided any reason to think their proceedings will be unusually protracted. *See* ECF No. 23 at 29-30 (A. TATE), ECF No. 24 at 29-30 (T. TATE).

---

other circuits." *Bonner v. City of Pritchard, Ala.*, 661 F.2d 1206, 1209 (11th Cir. 1981) (quoting 1B J. Moore, Federal Practice P 04.02(1) (1980)) (internal quotations omitted).

29

Indeed, their reliance on the brief delay between their arrests and forthcoming submission of the U.K.'s extradition requests is misplaced because it is not unique; such delay universally applies, by authority of the applicable extradition treaty, to any fugitive who is provisionally arrested.  Moreover, the TATES' general intent to challenge extradition is not a sufficient reason to grant bail, as putting together a defense is something that all fugitives who seek to contest extradition must do.  *See e.g.*, *Matter of Extradition of Smyth*, 976 F.2d 1535, 1535-36 (9th Cir. 1992) ("The need to consult with counsel, gather evidence and confer with witnesses, although important, is not extraordinary; all incarcerated defendants need to do these things."); *Matter of Extradition of Budrys*, No. 19-MJ-179, 2019 WL 1958566, at *3 (N.D. Ill. May 2, 2019) (finding that the "normal passage of time inherent in the litigation process" does not constitute a special circumstance) (quoting *United States v. Kin-Hong*, 83 F.3d 523, 525 (1st Cir. 1996)).  The TATES' nonspecific assertion that there is potential for delay in these extradition proceedings is simply not enough to establish a special circumstance warranting release from custody.  *See, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1298 ("[W]e do not find here that the length of the anticipated extradition process [of a former President of Panama], real or imagined, warrants a finding of special circumstances sufficient to grant bail contrary to the presumption of detention.").

Further, any delay caused by or attributed to the TATES cannot form the basis of a special circumstance.  *See, e.g.*, *Kin-Hong*, 83 F.3d at 525 (rejecting bail claim where "[t]o the extent that there has been some delay, [the petitioner] himself is partly responsible"); *In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1581 (W.D. Mich. 1991) (court unsympathetic to petitioner who requested several delays); *United States ex rel. McNamara v. Henkel*, 46 F.2d 84 (S.D.N.Y. 1912) (delay justifies bail "only where the hearing date comes and the complainant is not ready to proceed").  The government is prepared to proceed expeditiously upon receipt of the formal

extradition request from the U.K.  Thus, any delay beyond the normal course that results from the TATES' strategic decision making on how to litigate these extradition proceedings should not be considered a special circumstance.  *See In re Extradition of Carr*, No. 20-CR-370, 2020 WL 4816052, at *7 (N.D. Ill. Aug. 18, 2020) (refusing to find "special circumstances" when there is merely a "potential for an extended delay" and when the delay "would largely arise from [the fugitive's] own strategic decisions").

Accordingly, the TATES have failed to show that their extradition proceedings will be excessively or unusually delayed through no fault of their own such that release from custody is warranted.

### iii.   The TATES' Probable Cause Arguments Are Fundamentally Flawed and Improper at this Stage of the Proceedings

The TATES' further argue that they should be released from custody because the U.K. has not provided sufficient evidence to establish probable cause that they committed the alleged offenses.  *See* ECF No. 23 at 27-28 (A. TATE), ECF No. 24 at 27-28 (T. TATE).  The Court should reject this argument for several reasons.

As a preliminary matter, it would be improper to consider the merits of probable cause during bail proceedings.  *See*, *e.g.*, *United States v. Risner*, 3:18-mj-765, 2018 WL 6809796, at *12 (N.D. Tex. Dec. 27, 2018 (rejecting fugitive's attempt to contest probable cause during bail proceedings and instead reserving the issue for the forthcoming extradition proceedings) (citing *United States v. Castaneda-Castillo*, 739 F. Supp. 2d 49, 61 (D. Mass. 2010); *Sacirbegovic*, 280 F. Supp. 2d at 88; *Matter of Extradition of Sidali*, 868 F. Supp. 656, 658-59 (D.N.J. 1994)).  Instead, the issue of probable cause should be addressed when the Court is considering whether to certify extradition to the Secretary of State.  *See Martin*, 993 F.2d at 828 ("The extradition magistrate conducts a hearing simply to determine whether there is 'evidence sufficient to sustain

the charge [against the defendant] under the provisions of the proper treaty or convention.'") (quoting 18 U.S.C. § 3184); *see also Matter of Extradition of Martinelli Berrocal,* No. 17-cv-22197, 2017 WL 3776953, at \*10 (S.D. Fla. Aug. 31, 2017) (noting that the court considers whether there is probable cause to believe that the accused is guilty of the charge pending against him in the requesting state when determining the fugitive's extraditability).

The Court should consider probable cause arguments only after the U.K. has submitted its extradition request, which will contain the documents specified by the Treaty. The request may contain additional information and evidence that addresses the TATES' concerns about lack of probable cause raised in their detention brief. Accordingly, it would be premature to base a custody decision on whether the TATES are likely to succeed on a challenge to probable cause at the certification stage of these extradition proceedings. *See Garcia*, 615 F. Supp. 2d at 171 (denying bail upon finding that, *inter alia*, the fugitive failed to establish a likelihood of success on a probable cause claim that was raised prior to receipt of the requesting country's extradition request).

However, even if the Court were to entertain the TATES' arguments on probable cause in these detention proceedings, the Court should reject them as fundamentally flawed. The premise of their probable-cause argument appears to be that the U.K.'s charges primarily are based on testimony from unidentified, uncorroborated witnesses.[17]   *See* ECF No. 23 at 27-28 (A. TATE), ECF No. 24 at 27-28 (T. TATE). However, this argument is contrary to Eleventh Circuit

---

[17]     Significantly, the TATES' challenge to probable cause fails to acknowledge that the Romanian court already considered the same 2024 warrant on which the U.K. sought the TATES' provisional arrest in the United States, which does not include the victims' identities, and concluded that there was sufficient evidence to authorize extradition to the U.K. *See* ECF Nos. 30-1 at 6, 30-2 at 8. The TATES' should not be permitted to argue deference to the Romanian extradition and release decisions while also attempting to undermine the strength of the U.K. charges upon which the Romanian decisions were based.

precedent.  *E.g.*, *United States v. Martinelli*, 454 F. 3d 1300, 1306-07 (11th Cir. 2006) (concluding that testimony from unidentified victim-witnesses with first-hand knowledge of the criminal activity was sufficient to establish probable cause); *see also United States v. Golden*, 545 F. App'x 920, 921 (11th Cir. Nov. 20, 2013) (upholding a search warrant based on uncorroborated testimony from a minor victim).  Moreover, if the TATES had been charged by state authorities in Florida, their argument would be precluded by statute.  *See* Fla. Stat. 794.022(1) (stating that the testimony of a victim need not be corroborated in a prosecution for certain offenses, including rape and human trafficking).

e.  **Release is not Warranted due to Alleged Lack of Urgency**

The TATES allege that they are entitled to release from custody because, according to them, the U.K.'s requests for provisional arrest were not sufficiently urgent, as contemplated by Article 12(1) of the Treaty.  ECF No. 23 at 20-24 (A. TATE), ECF No. 24 at 20-24 (T. TATE).  However, their perceived lack of urgency cannot constitute a special circumstance because the issue of urgency is not justiciable.[18]  *E.g.*, *Matter of Extradition of Correa*, No. 17-mc-14059, 2017 WL 8780154, at *2 (S.D. Fla. May 8, 2017).

---

[18]     The TATES, without citing any legal authority, have renewed their request for an order requiring the government to provide them with a copy of the U.K.'s provisional arrest requests. ECF No. 23 at 14 (A. TATE), ECF No. 24 at 14 (T. TATE).  It is well-established that fugitives do not have a constitutional or statutory right to discovery in extradition proceedings.  *See, e.g.*, *Arias Leiva v. Warden*, No. 17-cv-23938, 2018 WL 9662551, at *19 (S.D. Fla. Sept. 6, 2018); *Prasoprat v. Benov,* 421 F.3d 1009, 1014 (9th Cir. 2005).  Even to the extent the Court retains discretionary authority to order discovery in an extradition case, *see Jimenez v. Aristeguieta*, 311 F.2d 547, 556-57 (5th Cir. 1962), requiring discovery at this preliminary provisional arrest stage would be antithetical to the purpose of provisional arrest requests.  The TATES will have access to the U.K.'s extradition requests after the United States receives them.  Additionally, the reasons the TATES seek the provisional-arrest requests are outside the scope of the Court's authority.  *See* ECF No. 23 at 14 (A. TATE), ECF No. 24 at 14 (T. TATE) (claiming the provisional arrest requests would help the Court determine whether the U.K. informed the United States about the extradition proceedings in Romania and whether there was urgency in provisionally arresting the TATES)).  As discussed above, no aspect of the Romanian proceedings is dispositive or even

The reference to "urgency" in the Treaty specifies when "the Requesting State may request the provisional arrest of the person sought pending presentation of the request for extradition," either through the diplomatic channel or directly between the competent authorities of the U.K. and the United States. Treaty, Art. 12(1). Thus, "urgency" merely serves as the treaty's Contracting Parties' guidance to one-another on when one state may request that their treaty partner take the necessary steps to secure a provisional warrant before receiving an extradition request. However, the transmission of a provisional arrest request, no matter how urgent, does not empower the Court to act, as the Court's authority stems from the filing of a complaint. *See* 18 U.S.C. § 3184. Correspondingly, an alleged absence of "urgency" does not limit the power of the Court to proceed. *See Avila-Ramos v. Kammerzell*, 228 F. Supp. 3d 1196, 1203 (D. Colo. 2017) (rejecting fugitive's contention that essentially everything involved in the process of requesting extradition is jurisdictional). Because the calculation of urgency is not a matter for the extradition court to consider, "there is no requirement that a requesting party . . . affirmatively demonstrate the urgency for the provisional arrest." *Correa*, 2017 WL 8780154, at *2. Nor is there a requirement that the complaint allege urgency. *Matter of Extradition of Ernst*, No. 97-CRM.MISC-1PG.22, 1998 WL 51130 at *8 (citing *LoDuca v. United States*, No. 95-cv-713, 1995 WL 428636, *10 (E.D.N.Y. July 7, 1995) and *United States v. Messina*, 566 F. Supp. 740, 743 (E.D.N.Y. 1983)).

As a result, the evaluation of whether a requesting party has made a sufficiently "urgent" request is within the providence of the foreign sovereign and the executive authority of the requested state. This makes sense because "urgency" is not solely temporal or related to immediacy. The term involves other considerations, including the importance of the matter to the

---

persuasive on the issues currently before the Court, nor is the government's determination on urgency justiciable.

country seeking extradition and foreign policy concerns of the United States. *See Matter of Extradition of Russell*, 805 F.2d 1215, 1218 (5th Cir. 1986). These foreign policy matters are outside the purview of the courts. *See, e.g., Arias Leiva*, 928 F.3d at 1287 ("The Executive Branch, by contrast [to the courts], is 'well situated' to weigh the 'sensitive foreign policy issues' inherent in this sphere—and, we would add, politically accountable in a way that the courts are not."); *Russell*, 805 F.2d at 1218 ("The determination of Colombia that a case is 'urgent' is due deference as a matter of comity . . . [I]n addition, . . . considerable weight [attaches] to the judgment of the United States, given its foreign affairs interest in the matter."); *Ernst*, 1998 WL 51130 at *11 ("Since 'urgency' incorporates 'foreign policy concerns,' it is impossible for a court to review the claim of urgency made here without either passing judgment on foreign policy determinations made by the executive branch or taking action that may run counter to such determination.").

For these reasons, courts have consistently concluded that the executive's determination of "urgency" is non-justiciable. *See Correa*, 2017 WL 8780154, at *2 ("The issue of urgency for a provisional arrest warrant is not subject to judicial review."); *Ernst*, 1998 WL 51130 at *11 ("the executive's conclusion in this case that Ernst's provisional arrest was justified by urgency is not subject to judicial review"); *LoDuca*, 1995 WL 428636 at *10 ("the issue of urgency for a provisional arrest warrant is not subject to judicial review . . . there is no requirement that a requesting party affirmatively demonstrate the urgency for the provisional arrest . . . Therefore, a court need not make a specific finding of urgency to issue a provisional arrest warrant."), *aff'd*, 93 F.3d 1100 (2d Cir. 1996), *cert. denied*, 519 U.S. 1007 (1996); *In re Extradition of Hamilton-Byrne*, 831 F. Supp. 287, 293 (S.D.N.Y. 1993) ("In light of the treaty and relevant authorities, the Court has concluded that the issue of urgency under Article VIII of the protocol [of the Australia-United

35

States extradition treaty] is not subject to judicial review.").[19]  Because the Court cannot review,

or at least must defer to, the government's decision to proceed with provisional arrest on an urgent

basis, the TATES' allegations of lack of urgency cannot form the basis for release from custody.[20]

## CONCLUSION

For the foregoing reasons, the United States requests that both A. TATE and T. TATE be

detained pending resolution of this extradition proceeding.

Respectfully submitted,

JASON A. REDING QUIÑONES
UNITED STATES ATTORNEY

By: */s/ Alejandra L. López*
Alejandra L. López
Assistant United States Attorney
Fla. Bar No. 37132
99 Northeast 4th Street
Miami, Florida 33132
Tel.: (305) 961-9241
Email: Alejandra.Lopez@usdoj.gov

By: */s/ Abbie D. Waxman*
Abbie D. Waxman
Assistant United States Attorney

---

[19] To the extent some courts have found that the government's assessment of urgency is reviewable, the government's determination is entitled to deference at a minimum. *Messina*, 566 F. Supp. at 745 ("[T]he government contends that the [Requesting State's] determination, while not binding on the United States, is due deference as a matter of comity. The court agrees, and, in addition, accords considerable weight to the judgment of the United States, given its foreign affairs interest in the matter. Taking appropriate account of the determinations of both governments and the facts presented to this court, urgency has been established.").

[20] To be clear, the government reasonably determined that the provisional arrest requests in this case were urgent based on the serious and violent nature of the allegations and the extensive worldwide travel in which the TATES engage. *See* ECF No. 30-7. By the TATES' own admission, they have spent only 64 days, or less than 13% of their time, in the United States between February 25, 2025, when the Romanian court lifted their travel restrictions, and July 13, 2026, when they last arrived in the United States. *See id.*

Fla. Bar No. 109315
99 Northeast 4th Street
Miami, Florida 33132
Tel.: (305) 961-9240
Email: Abbie.Waxman@usdoj.gov


A.  TYSEN DUVA
ASSOCIATE ATTORNEY GENERAL
CRIMINAL DIVISION

By:   */s/ Kerry A. Monaco*
Kerry A. Monaco
Associate Director
Office of International Affairs
Criminal Division
U.S. Department of Justice
Court ID: A5503560
1301 New York Avenue, NW
Washington, DC 20530
Telephone: (202) 616-4798
Email: Kerry.Monaco2@usdoj.gov

By:   */s/ Rachel M. Yasser*
Rachel M. Yasser
Trial Attorney
Office of International Affairs
Criminal Division
U.S. Department of Justice
Court ID: A5503561
1301 New York Avenue, NW
Washington, DC 20530
Email: Rachel.Yasser2@usdoj.gov

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on August 10, 2026, I electronically filed the foregoing document with the Clerk of the Court via CM/ECF, which caused the same to be served on Howard Srebnick, Esquire, Jackie Perczek, Esquire, Thomas Maniotis, Esquire and Joseph McBride, Esquire, counsel for the Defendant.

*/s/ Alejandra L. López*
Alejandra L. López
Assistant United States Attorney
