Neutral Citation Number: [2026] EWHC 1600 (Admin)

Case No: AC-2025-LON-003270

**IN THE HIGH COURT OF JUSTICE**
**KING'S BENCH DIVISION**
**ADMINISTRATIVE COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

Date: 26/06/2026

**Before :**

**MR JUSTICE CHAMBERLAIN**

- - - - - - - - - - - - - - - - - - - - -

**Between :**

**THE KING**
**on the application of**
**(1) ANDREW EMORY TATE**
**(2) TRISTAN TATE**

**Claimants**

**- and -**

**DIRECTOR OF PUBLIC PROSECUTIONS**

**Defendant**

**-and-**

**CHIEF CONSTABLE OF BEDFORDSHIRE POLICE**

**Interested Party**

- - - - - - - - - - - - - - - - - - - - -

**Sallie Bennett-Jenkin KC and Robert Fitt** (instructed by **Holborn Adams**) for the **Claimants**
**Tom Little KC** (instructed by the **Crown Prosecution Service**) for the **Defendant**
The **Interested Party** was not represented

Hearing date: 23 June 2026

- - - - - - - - - - - - - - - - - - - - -

# Approved Judgment

This judgment was handed down in Court 1 at 12 noon on Friday 26 June 2026.

TATE - 08-27-26
Hearing
1
26-mj-03259 & 26-mj-03260
exhibitsticker.com

**Mr Justice Chamberlain:**

## Introduction

1. The claimants, Andrew and Tristan Tate, are well-known on social media, where they have accounts with many millions of followers. They are controversial figures and have at times been banned from some platforms, including—at the present time—those owned by Google. The UK has sought their extradition from Romania to stand trial in England for offences including rape, assault and human trafficking.

2. The Crown Prosecution Service ("CPS") has refused to disclose to the claimants the names of the complainants who are said to be the victims of these alleged offences. The claimants have challenged that decision in judicial review proceedings against the Director of Public Prosecutions ("DPP"), who is responsible for the CPS.

3. The claimants challenge the refusal to provide the names of the complainants on the ground that it is irrational (ground 1) and in breach of their right to a fair trial under Article 6 of the European Convention on Human Rights ("ECHR") (ground 2). The DPP submits that neither ground is arguable and that permission to apply for judicial review should be refused.

4. I ordered that the application for permission to apply for judicial review should be determined after a hearing. That took place earlier this week, on 23 June 2026. The claimants were represented by Sallie Bennett-Jenkins KC and Robert Fitt. The DPP was represented by Tom Little KC. I am grateful to all counsel for their helpful submissions.

## Background

5. The claimants are citizens of the USA and the UK. They have been habitually resident in Romania since 2017. In 2022, they were arrested by Romanian police and, in 2023, they were charged by Romanian prosecutors with rape and human trafficking offences alleged to have been committed in Romania. They contest those charges.

6. Separately, and also in 2022, individuals claiming to have been the victim of sexual assaults brought civil proceedings in England against the claimants. In those proceedings, the identities of the individuals bringing the claims are known to the claimants, subject to a confidentiality regime which prevents the claimants from revealing those identities.

7. On 19 January 2024, officers of Bedfordshire Police applied for and obtained domestic arrest warrants for the claimants under s. 1 of the Magistrates' Courts Act 1980 and accusation warrants for the claimants under s. 142 of the Extradition Act 2003 in the form prescribed by the Trade and Cooperation Agreement between the UK and the EU ("the TCA"). These were granted by the Senior District Judge (Chief Magistrate) on the same day. They request the claimants' arrest and surrender to the UK to be tried for specified offences.

8. In Andrew Tate's case, the warrant specifies three offences of rape, four of assault occasioning actual bodily harm, two of human trafficking and one of controlling

prostitution for gain. These offences are alleged to have been committed between 2014 and 2016. In Tristan Tate's case, the warrant specifies three offences of rape, six of assault occasioning actual bodily harm and two of human trafficking. These offences are alleged to have been committed between 2012 and 2016.

9. When issuing an accusation warrant under Title VII of the TCA, the judicial authority of the issuing state must give particulars of the alleged offences for which extradition is sought. In this case, the warrant gives particulars of the offences alleged, but does not give precise dates, nor does it identify the complainants.

10. On 12 March 2024, the Court of Appeal of Bucharest ordered the claimants' extradition to the UK on the basis of the warrants, but only after the criminal proceedings in Romania have concluded. Any challenge to this decision would, of course, have to be pursued before the courts of Romania.

11. On 14 March 2024, the claimants' solicitor spoke to the Officer in the Case. In the light of that conversation, he wrote to that officer noting that it was concerning that the refusal of his request for the complainants' identities had been justified by reference to the claimants' profile and the duty to protect the complainants. The claimant's solicitor renewed his request for certain details in relation to the allegations, including the complainants' names. Reference was made to the Code for Crown Prosecutors ("the Code"), para. 3.4, which provides:

> "Although prosecutors primarily consider the evidence and information supplied by the police and other investigators, the suspect or those acting on their behalf may also submit evidence or information to the prosecutor, before or after charge, to help inform the prosecutor's decision."

There was also reference to the Attorney General's November 2018 review into the efficiency and effectiveness of disclosure in the criminal justice system, which had emphasised the importance of early engagement with the defence, including during the investigation and pre-charge.

12. On 19 March 2024, the Officer in the Case emailed back as follows:

> "My comments in relation to the profile of your clients were directly related to the need to also consider the rights and interests of the complainants. For instance, they are entitled to protection against identification in public. Had your clients been arrested and charged by UK police, bail conditions could be imposed relevant to this aspect of the investigation."

The email added that the officer had just spoken to CPS colleagues, who would be writing.

13. On the same day, a Specialist Prosecutor in the CPS wrote to the claimants' solicitor, explaining as follows:

> "I completed a charging decision in this case, applying the full code test of the Code for Crown Prosecutors, this review included an assessment on the absence of an interview from your clients and possible defences. With

> regards to your request for disclosure of the following: complainants' identity, when they reported the complaint and previous complaints, I do not intend, at this stage, to disclose this information. I note your reference to the AGs guidelines and early engagement. The AG guidelines 2024 confirm that a prosecutor's statutory duty of disclosure applies from the point of a not guilty plea in the magistrates' court and from the point a case is sent to the Crown Court. Prosecutors must also consider their duties under the common law which apply at all stages of a case, from charge to sentence and post-conviction, these duties may require the prosecutor to disclose material to the accused outside the statutory scheme in accordance with the interests of justice and fairness.
>
> Your clients have not been charged and are not subject to any bail conditions. I am satisfied that the safeguarding of the complainants in this matter (non-disclosure of their identities), at this stage, is a proportionate measure, that complies with the prosecution's common law duties of disclosure. This decision will be subject to an ongoing review."

14. There was further correspondence, in which an undertaking was offered on behalf of each claimant that he would not disclose the identities of the complainants. In due course, the claimants' solicitor offered security for the undertaking in the sum of £10,000 each, which would be forfeit if the undertaking were breached.

15. On 9 January 2025, the CPS declined to accept the undertakings, saying:

> "Your clients are not subject to bail within this jurisdiction and therefore there are no legal mechanisms in place in relation to the administration and, if applicable, forfeiture of the monies. Furthermore, the proposed undertaking and security do not mitigate the risk of harm to the victims and therefore it would not be appropriate to enter into such an arrangement."

16. On 18 February 2025, the claimants' solicitor sent a letter before claim to the DPP, threatening judicial review proceedings if the complainants' identities were not disclosed.

17. On 7 March 2025, the DPP responded, maintaining the decision not to disclose the complainants' identities, while making clear that the decision would be kept under review. In explaining the decision not to disclose the names of the complainants, the DPP pointed out that the claimants were "notorious and have a massive following on social media. One of Andrew Tate's accounts on X has over 10,500,000 followers across the world." The DPP continued:

> "18… The TaCA warrants do not contain the names of the complainants. That was a deliberate decision that was taken in the specific circumstances of the case where it was assessed there was and is a real risk of the identities of the complainants being published on social media and/or being contacted by or on behalf of the Claimants with the consequential risk of interference with the administration of justice. The DPP has been able to confirm to the Claimants that none of the complainants who are referred to in the TaCA warrants are complainants in the civil proceedings...

> 19. It should also be noted that the Reviewing Lawyer at the CPS has met each of the three complainants personally. They are vulnerable and all have differing levels of mental health issues arising out of the alleged abuse by the Claimants. There are no measures capable of being put in place to protect and safeguard the complainants, should their identities be revealed to the Claimants prior to their surrender. The Reviewing Lawyer and the Police are uniquely well placed to assess the risks and the concerns that the complainants have on the known facts and the risk of attrition. That is particularly so given the fact that the naming of any of the complainants on social media by someone outside of the jurisdiction is almost impossible to Police and/or successfully prosecute.
>
> 20. Given that decision and in order to ensure the fairness of any future trial the DPP has ensured that all reasonable lines of inquiry (including in so far as electronic communications and devices are concerned) takes into account the fact that there will be a period of time when the Claimants will not be aware of the names of the complainants. The decision that has been made is that the Claimants will be informed once they have been extradited to the United Kingdom and before their first appearance at Court. The reasonable lines of inquiry include the preservation of material of potential relevance to the investigation – consistent with the duties placed upon the Police and the DPP by the relevant statutory provisions. This will ensure that the Claimants can, in due course, have a fair trial."

18. On 24 July 2025, the claimants increased the security offered to £20,000 and said that they were willing to assist the investigation by being interviewed under caution in Romania, notwithstanding that a charging decision had already been made.

19. On 11 August 2025, the CPS again rejected the offer, telling the claimants' solicitor:

> "Whilst you have offered undertakings that your clients will not disclose the complainants' identities (and would pay £20,000 if they did so), we do not consider that there is any enforceable legal basis for such undertakings, either in this country or more particularly as your clients are outside the jurisdiction. Furthermore, the prosecution has set out in detail our position on this issue in our response dated 7 March 2025 to your proposed claim for judicial review and do not propose to repeat that."

20. The claimants have travelled from Romania to the US and back and then to Dubai. According to their own Statement of Facts and Grounds, they remain "under Romanian judicial control, meaning they must regularly meet with prosecutors and are obliged to return to Romania as and when required by the Romanian authorities". They say that they have complied with every obligation imposed on them by Romanian law.

21. The claim was filed on 29 August 2025.

## Ground 1

Submissions for the claimants

22. Ms Bennett-Jenkins submitted that a suspect in a criminal investigation has a right to provide information to the police and CPS that might affect a charging decision. She referred in this regard to para. 3.4 of the Code and para. 78 of the Attorney General's Guidelines on Disclosure (2024), which explain that a prosecutor's common law disclosure obligations apply "at all stages of a case, from charge to sentence and post-conviction… and regardless of anticipated or actual plea."

23. The claimants cannot make effective use of their right to provide information if they do not know the identities of the complainants. This means that they cannot provide information that might undermine the credibility of the complainants or the accounts they have provided to the police. This is particularly significant in the present case where the allegations are historic and the Romanian criminal proceedings mean that any trial in England will not take place for many years. By the time the complainants' names are disclosed, opportunities to collect exculpatory evidence may have been lost.

24. The decision to seek TCA warrants without identifying the complainants is unprecedented. The genesis of the decision appears to have been the unreasoned view of the Officer in the Case that the claimants' high profile or notoriety means that the complainants need to be protected. This is a non sequitur. The decision was irrational in light of the facts that the claimants (i) are of good character; (ii) have not disclosed the names of the complainants in the English civil proceedings to which they have been party since 2022; (iii) have not publicly speculated about the identity of the complainants in these criminal proceedings; (iv) have given undertakings backed by substantial security to be held by their English solicitors and (v) have offered to be interviewed by Bedfordshire Police in Romania.

Discussion

25. Before examining the rationality of the challenged decision, it is necessary to put that decision in its proper legal context.

26. Police and prosecutors owe a range of disclosure duties to those subject to investigation or criminal proceedings in this jurisdiction. Statutory rights to disclosure apply from a defined point in the procedure. For present purposes, this is when the accused person is charged with an indictable offence and the case is sent for trial in the Crown Court: see s. 1(2)(cc) of the Criminal Procedure and Investigation Act 1996 ("CPIA"). It is common ground that the present case has not reached this stage, so no obligations under CPIA are owed.

27. When interviewed under caution, the Police and Criminal Evidence Act 1984 ("PACE") Code C, para. 11.1A provides:

> "Before a person is interviewed, they and, if they are represented, their solicitor must be given sufficient information to enable them to understand the nature of any such offence, and why they are suspected of committing

> it… in order to allow for the effective exercise of the rights of the defence. However, whilst the information must always be sufficient for the person to understand the nature of any offence…, this does not require the disclosure of details at a time which might prejudice the criminal investigation. The decision about what needs to be disclosed for the purpose of this requirement therefore rests with the investigating officer who has sufficient knowledge of the case to make that decision."

In the present case, however, there has been no interview, so the provisions of PACE Code C do not apply.

28. As the Attorney General's Guidelines on Disclosure make clear, common law duties of disclosure may apply outside the various statutory regimes and prior to the point when disclosure duties under the 1996 Act apply. In *R v Director of Public Prosecutions ex p. Lee* [1999] 1 WLR 1950, Kennedy LJ (sitting in the Divisional Court with Blofeld J) held at p. 1962 that a prosecutor "must always be alive to the need to make advance disclosure of material of which he is aware (either from his own consideration of the papers or because his attention has been drawn to it by the defence) and which he, as a responsible prosecutor, recognises should be disclosed at an earlier stage". Examples were given:

> "(a) previous convictions of a complainant or deceased if that information could reasonably be expected to assist the defence when applying for bail; (b) material which might enable a defendant to make a pre-committal application to stay the proceedings as an abuse of process; (c) material which might enable a defendant to submit that he should only be committed for trial on a lesser charge, or perhaps that he should not be committed for trial at all; (d) material which will enable the defendant and his legal advisers to make preparations for trial which may be significantly less effective if disclosure is delayed (e.g. names of eye-witnesses who the prosecution do not intend to use)."

29. Kennedy LJ continued as follows at p. 1963:

> "…even before committal, a responsible prosecutor should be asking himself what if any immediate disclosure justice and fairness requires him to make in the particular circumstances of the case. Very often the answer will be none, and rarely if at all should the prosecutor's answer to that continuing piece of self-examination be the subject matter of dispute in this court. If the matter does have to be ventilated it should, save in a very exceptional case, be before the trial judge."

30. It should be emphasised that all this was said in the context of criminal proceedings taking place in this jurisdiction. Where the accused is in another jurisdiction, and is the subject of an extradition request, it is rare (though not unknown) for him to be given any information beyond the particulars in the warrant. As to these, the required particulars are specified in Article 606 of the TCA and include "a description of the circumstances in which the offence was committed, including the time, place and degree of participation in the offence by the requested person" (Article 606(1)(e)). The particulars must be presented in accordance with the form in Annex 43.

31. In the present case, Ms Bennett-Jenkins criticised the specificity of the particulars given in the extradition warrants. However, as Mr Little observed, the claimants have not brought proceedings in this jurisdiction to challenge the validity of those warrants, whether on the ground of inadequate particularity or on any other ground. There is no information before me about the extent to which any such challenge was advanced in Romania. If so, it appears that the challenge failed, since it is common ground that the final relevant decision is that of the Bucharest Court of Appeal ordering the claimants' extradition following the conclusion of the Romanian criminal proceedings.

32. I must, therefore, proceed on the assumption that the particulars given in the extradition warrants are sufficient for the purposes of extradition law. This is not a surprising result because, unlike some other extradition treaties, the TCA does not require the issuing state to establish a prima facie case.

33. This case must, therefore, be determined on the footing that, at this stage, the claimants have no rights under any relevant statutory regime to be told of the identities of the complainants. That is not, however, to say that the claimants have no interest in receiving that information at this stage. There are two reasons why it could be useful to them. First, it could enable them to provide information that could conceivably lead to the withdrawal of the extradition request. Secondly, it could enable them to take steps to obtain evidence which might have become unavailable at the point (likely many years hence, after the conclusion of the proceedings in Romania) when they are extradited.

34. In these circumstances, I accept that it is at least arguable that the common law imposes a qualified duty to disclose the identities of the complainants. I say "qualified" because, as the reasoning in *ex. p. Lee* shows, the application of any common law duty of disclosure is intensely fact-specific. Whether there is a need for disclosure in any particular case requires what Kennedy LJ called a "continuing piece of self-examination" on the part of the prosecutor, involving a multi-factorial judgment weighing any reasons in favour of disclosure and any reasons against it.

35. It is very well established that, when dealing with judicial review challenges to decisions to prosecute (or continue to prosecute), the court accords a considerable margin of discretion to the prosecutor, so that judicial review is a "highly exceptional remedy": *Sharma v Brown-Antoine* [2006] UKPC 57, [2007] 1 WLR 780, [14(5)]. This principle was recently reaffirmed by Lady Carr of Walton-on-the-Hill CJ (giving the opinion of the Privy Council) in *Director of Public Prosecutions v Durham* [2024] UKPC 21, [2024] 1 WLR 3900, at [60], where she also explained the reasons for it:

> "(i) The prosecutorial powers are entrusted to the DPP and to no one else;
>
> (ii) The polycentric character of official decision-making in prosecutorial decisions, referred to above. It is within neither the constitutional function nor the practical competence of the courts to assess the merits of such decision-making;
>
> (iii) The powers are conferred on the DPP in very broad and unprescriptive terms;

(iv) The delays inevitably caused to the criminal trial if judicial review proceedings proceed, and the desirability of all challenges taking place in the criminal trial or on appeal;

(v) The great weight to be accorded to the judgment of experienced prosecutors on whether a jury is likely to convict;

(vi) The fact that an independent prosecutor will be bound by a code of conduct;

(vii) The need to avoid undermining prosecutorial effectiveness by subjecting the prosecutor's motive and decision-making to outside inquiry."

36. Although these factors justifying restraint on the part of the judicial review court were identified in the context of a challenge to a decision to continue criminal proceedings, they apply with equal force to a decision of the kind under challenge here whether to disclose information at an early stage.

37. The fourth reason given by Lady Carr (the desirability of all challenges taking place in the criminal trial or on appeal) is particularly apposite in the present context. The decision not to disclose the complainants' names at this stage may or may not cause difficulties for the defence at the point when the criminal proceedings in this jurisdiction begin. If they do, it will be open to the claimants to rely on those difficulties in support of an argument before the Crown Court that the proceedings should be stayed for abuse of process. That court will be best placed to assess what effect, if any, the late disclosure has had on the fairness of the proceedings.

38. I appreciate that the refusal to disclose the complainants' names at this stage will deprive the claimants of the opportunity to provide information with a view to persuading the CPS to withdraw the extradition warrant. But it is important to note that the statutory regime governing extradition does not provide for representations at this stage. Rather, it assumes that the opportunity to answer the case will be afforded once the accused person has been extradited.

39. Despite this, the reasons given by the Specialist Prosecutor, both in correspondence and on behalf of the DPP in the response to the letter before claim and Summary Grounds of Defence, indicate that she understood that there would need to be a good reason for refusing to provide the identities of the complainants. Having met the complainants, she considered that there was such a reason. In my judgment, her decision was coherent and rational and the contrary is not arguable.

40. First, the decision was taken by an experienced Specialist Prosecutor who had met the complainants and formed her own view about their vulnerability and the likely effect on them, and their willingness or ability to give evidence at a later date, if their identities were publicly disclosed. Prosecutors are not required to obtain, and certainly not required to disclose, expert medical evidence before making judgments of this kind. There is nothing that suggests that there was anything wrong with the judgment she formed that it was necessary to take steps to protect the complainants from the harm that would be caused by any public disclosure of their identities.

41. Secondly, the high profile of the claimants was not an irrelevant factor, because it bore on the extent of the damage that would be done if they chose to name the complainants publicly. When considering whether the claimants might disclose the identities of the complainants, the fact that they are "of good character"—in the technical sense used by criminal lawyers—was not determinative. The Specialist Prosecutor was not required to adopt an attitude of studied naïveté. The description of the claimants as "notorious" (in the response to the letter before action) was not unfair. It was consistent with the fact that they are currently banned from all Google-owned social media platforms. That fact, though deployed by Ms Bennett-Jenkins in support of the claimants' argument, did not seem to me to assist their case in any way.

42. Thirdly, notwithstanding that the claimants have not so far disclosed the names of the complainants in the English civil proceedings to which they have been party since 2022, and have not publicly speculated about the identity of the complainants in these criminal proceedings, the Specialist Prosecutor did not, and did not have to, find that it was more likely than not that the claimants would disclose the complainants' identities. She was entitled to take a precautionary approach, given the high public interest in ensuring that witnesses alleging serious offences (including sexual offences) are not discouraged from giving evidence.

43. Fourthly, the reasons for rejecting the security-backed undertakings were twofold. One was that the claimants were out of the jurisdiction and there was no obvious legal mechanism to administer and secure payment of the sum offered as security if the undertakings were breached. This was accurate. The involvement of the claimants' solicitor was nothing to the point: what was being offered was an ad hoc security arrangement not backed by any statutory regime. In any event, however, there was a second reason: the arrangements being offered "do not mitigate the risk of harm to the victims". That was an obviously rational conclusion given that the claimants are persons who give every appearance of having considerable resources available to them. The claimants' offer to give an interview under caution was not so obviously relevant to the risk of harm to the complainants as to render the decision irrational.

44. Fifthly, the risk of unfairness to the claimants flowing from the late disclosure of the complainants' identities was attenuated by factoring in that delay when considering what lines of inquiry should be pursued in relation to the collection of evidence from the complainants (including from their devices).

45. Ground 1 is not arguable.

## Ground 2

Submissions for the claimants

46. Ms Bennett-Jenkins submitted that the decision to withhold the names of the complainants breached Article 6(3)(a) ECHR, which confers on "everyone charged with a criminal offence" the right "to be informed promptly, in a language he understands and in detail, of the nature and cause of the accusation against him". The phrase "charged with a criminal offence" has an autonomous meaning under the ECHR. It is wide and includes any "official notification given to an individual by the competent

authority of an allegation that he has committed a criminal offence": see the decision of the European Court of Human Rights ("the Strasbourg Court") in *Deweer v Belgium* (1980) 2 EHRR 439.

47. In this case, although the claimants have not been charged in the domestic sense of that word, a charging decision applying the full Code test has been made. This means that the guarantee in Article 6(3)(a) applies. That being so, the claimants are entitled to be informed "promptly" of the identities of their accusers. The decision to refuse to provide those identities now makes a delay of many years inevitable. This is a breach of a requirement which is "an essential prerequisite for ensuring that the proceedings are fair": *Pélissier & Sassi v France* (2000) 30 EHRR 715, [51].

Discussion

48. I accept that it is at least arguable that the issue of the extradition warrants, following a charging decision applying the full Code test, meant that the claimants had been "charged with a criminal offence" for the purposes Article 6(3)(a) as interpreted by the case law of the Strasbourg Court, even though they had not been charged as a matter of English law.

49. Even on the assumption that the safeguards in Article 6(3) apply, however, the Strasbourg Court "does not impose any special formal requirement as to the manner in which the accused is to be informed of the nature and cause of the accusation against him" and "the right to be informed of the nature and the cause of the accusation must be considered in the light of the accused's right to prepare his defence": *Pélissier & Sassi*, [53]-[54].

50. As the reasoning in *Pélissier & Sassi* demonstrates, any analysis of compliance with Article 6(3)(a) involves a holistic examination of the criminal proceedings from charge (in the autonomous meaning of that word) to the conclusion of the proceedings. In asking whether there has been a breach of Article 6(3)(a), what matters is what effect any failure or delay in providing particulars of the offence has had on the fairness of the trial overall. This point was made expressly by the Grand chamber of the Strasbourg Court in *Ibrahim v UK* (2015) 61 EHRR 9, at [251]:

> "Compliance with the requirements of a fair trial must be examined in each case having regard to the development of the proceedings as a whole and not on the basis of an isolated consideration of one particular aspect or one particular incident, although it cannot be excluded that a specific factor may be so decisive as to enable the fairness of the trial to be assessed at an earlier stage in the proceedings."

In the same paragraph, the Strasbourg Court reiterated that the minimum rights set out in Article 6(3) "are not aims in themselves: their intrinsic aim is always to contribute to ensuring the fairness of the criminal proceedings as a whole".

51. Applying these principles, the present case has three features of particular significance.

52. First, the claimants have been given some particulars of the case against them. They know the offences of which they are accused and the date ranges in which those

offences are alleged to have been committed. These particulars have been considered by judges, both in England and in Romania, to be sufficient for the purposes of the law of extradition (which does not require the issuing state to demonstrate a prima facie case).

53. Secondly, the claimants will be provided with the identities of the complainants if and when they are surrendered to and prosecuted in this jurisdiction. In general, that is the point when an accused person is expected to answer the case against him and, therefore, the point when, as a matter of fairness, he needs to be given the information necessary to enable him to provide that answer. Given that the rights in Article 6(3) are instrumental to the overall aim of ensuring a fair trial, there is no reason to suppose that provision of the information at this stage would, as a general matter, be regarded by the Strasbourg Court as a breach of Article 6(3).

54. Thirdly, it is not at all obvious that the late provision of the identities of the complainants will hamper the ability of the claimants to gather and present evidence relevant to their defence. They are already on notice of the need to retain any electronic records (text messages, direct messages from social media platforms, social media posts etc.) relating to the time periods specified in the extradition warrants. If, however, the late provision of the complainant's identities does cause them significant difficulties in preparing their defence, they can, as I have already noted, apply to the court to stay the prosecution. If, at that stage, the circumstances are such as to show that the late disclosure makes the trial unfair for the purposes of Article 6 ECHR, the court will be obliged under s. 6 of the Human Rights Act 1998 to stop the trial. If it declines to do so, the point can be taken on appeal.

55. Given that it is uncertain whether the delay in provision of the complainant's identities will have any significant effect on the fairness of the proceedings as a whole, and given the availability of alternative remedies in the event that it does have such an effect, this is not a case at which it can be said—even arguably—that there has been a breach of Article 6(3) at this very early stage.

56. Taken together, these points mean that ground 2 is not arguable.

## Conclusion

57. Because neither ground of challenge is arguable, permission to apply for judicial review is refused.

58. In the Summary Grounds of Defence, the DPP argued that the claim was, in any event, out of time. The point was not pursued by Mr Little at the hearing. Given that the CPS said that its decisions in this case were being kept under review, and that certain new undertakings were offered before the final decision on 11 August 2025, I would not have refused permission on the ground of delay.