# DECLARATION OF TOM HEINEMANN

I, Tom Heinemann, declare and say as follows:

1. I am an Attorney Adviser in the Office of the Legal Adviser for the Department of State, Washington, DC. This office has responsibility for extradition requests, and I am charged with the extradition case of Tristan Tate. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2. The relevant and applicable treaty provisions in full force and effect between the United States and the United Kingdom are found in the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland, and related Exchanges of Letters, signed at Washington March 31, 2003 (the "Treaty"), and the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United

Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "Instrument"), with annex (the "Annex") and related Exchanges of Notes, signed at London December 16, 2004. A copy of the Instrument and Annex is attached to this declaration.

3. In accordance with the provisions of the Annex, the British Embassy has submitted Embassy Note No. 096/2026, dated September 9, 2026, which the Department of State received on the same day, formally requesting the extradition of Tristan Tate. A copy of the diplomatic note is attached to this declaration.

4. In accordance with Article 20 of the Annex, the Government of the United States appears in court in the United States on behalf of, and represents the interests of, the United Kingdom in any proceeding that arises out of a U.K. request for extradition. The United Kingdom provides the same legal representation in its courts on behalf of the United States with regard to extradition requests made by the United States.

5. The offenses for which extradition is sought are covered under Article 2 of the Annex.

6. Under Article 9 of the Annex, documents that bear the certificate or seal of the Ministry of Justice or Ministry or Department responsible for foreign affairs of the Requesting State are admissible in extradition proceedings without further certification, authentication or other legalization. Therefore, such documents

satisfy the authentication requirements without the need for certification by the U.S. Embassy in London. The United Kingdom, in submitting documents in the instant case that bear the certificate or seal of the Home Office, has complied with the Annex with respect to authentication.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Santa Fe, New Mexico, on September 25, 2026.

TOM HEINEMANN

Attachments:

1. Copy of Note
2. Copy of Instrument with Annex

British Embassy
Washington

Embassy Note No: 096/2026

**REQUEST FOR THE EXTRADITION OF TRISTAN TATE FROM THE UNITED STATES OF AMERICA TO THE UNITED KINGDOM.**

His Britannic Majesty's Embassy presents its compliments to the Department of State and encloses documents in support of the extradition from the United States of America of Tristan TATE to the United Kingdom.

His extradition is sought under the UK-US Extradition Treaty 2003, as amended, as a person accused of the following offences:

1. Rape a women 16 years of age or over, contrary to Section 1, Sexual Offences Act 2003 (Five (5) Offences)

2. Assault a person thereby occasioning them actual bodily harm, contrary to Section 47 Offences Against the Person Act 1861 (six (6) offences)

3. Arrange or facilitate travel of another person with a view to exploitation contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (two (2) offences)

4. Arrange or facilitate travel of another person with a view to sexual exploitation contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (three (3) offences)

5. Penetrative sexual assault of a woman 16 years of age or older, contrary to section 2, Sexual Offences Act 2003 (one (1) offence)

The Embassy would be grateful if the enclosed papers could be transmitted as soon as possible to the appropriate authorities with a request for the extradition of Tristan TATE.

In the event of his return being ordered the Embassy would appreciate being notified as soon as possible so that arrangements can be made for his prompt return to the United Kingdom.

His Majesty's Embassy avails itself of this opportunity to express to the Department of State the renewed assurance of its highest consideration.

**British Embassy, Washington DC**

**9th September 2026**

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 10-201.23

# EXTRADITION

**Instrument Amending the**
**Treaty of March 31, 2003**
**Between the**
**UNITED STATES OF AMERICA**
**and the UNITED KINGDOM OF**
**GREAT BRITAIN AND**
**NORTHERN IRELAND**

Signed at London December 16, 2004

*with*

Annex

*and*

Exchange of Notes

DEPARTMENT OF STATE • UNITED STATES OF AMERICA •

NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966 (80 Stat. 271; 1 U.S.C. 113)—

"...the Treaties and Other International Acts Series issued under the authority of the Secretary of State shall be competent evidence ... of the treaties, international agreements other than treaties, and proclamations by the President of such treaties and international agreements other than treaties, as the case may be, therein contained, in all the courts of law and equity and of maritime jurisdiction, and in all the tribunals and public offices of the United States, and of the several States, without any further proof or authentication thereof."

# UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

## Extradition

*Instrument amending the treaty of March 31, 2003.*
*Signed at London December 16, 2004;*
*Transmitted by the President of the United States of America to the Senate September 28, 2006 (Treaty Doc. 109-14, 109th Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations July 29, 2008 (Senate Executive Report No. 110-12, 110th Congress, 2d Session);*
*Advice and consent to ratification by the Senate September 23, 2008;*
*Ratified by the President December 11, 2008;*
*Exchange of Instruments of Ratification at London July 6, 2009;*
*Entered into force February 1, 2010.*
*With annex and exchange of notes.*

**Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003**

1. As contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed 25 June 2003 (hereafter "the Extradition Agreement"), the Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland acknowledge that, in accordance with the provisions of this Instrument, the Extradition Agreement is applied in relation to the bilateral Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed 31 March 2003 (hereafter "the 2003 Extradition Treaty") under the following terms:

a) Article 5(1) of the Extradition Agreement shall be applied as set forth in Article 8(1) and 12(4) of the Annex to this Instrument to provide for the mode of transmission of the extradition request and supporting documents;

b) Article 5(2) of the Extradition Agreement shall be applied as set forth in Article 9 of the Annex to this Instrument to provide for the requirements concerning certification, authentication or legalization of the extradition request and supporting documents;

c) Article 7(1) of the Extradition Agreement shall be applied as set forth in Article 12(4) of the Annex to this Instrument to provide for an alternative method for transmission of the request for extradition and supporting documents following provisional arrest;

d) Article 8(2) of the Extradition Agreement shall be applied as set forth in Article 10(2) of the Annex to this Instrument to provide for the channel to be used for submitting supplementary information;

e) Article 10 of the Extradition Agreement shall be applied as set forth in Article 15 of the Annex to this Instrument to provide for the decision on requests made by several States for the extradition or surrender of the same person; and

f) Article 14 of the Extradition Agreement shall be applied as set forth in Article 8 bis of the Annex to this Instrument to provide for consultations where the Requesting State contemplates the submission of particularly sensitive information in support of a request for extradition.

2. The Annex reflects the integrated text of the operative provisions of the 2003 Extradition Treaty and the Extradition Agreement that shall apply upon entry into force of this Instrument.

3.a) This Instrument shall apply to the United States of America and to Great Britain and Northern Ireland. Subject to subparagraph b), the application of the 2003 Extradition Treaty to the Channel Islands, the Isle of Man, and any other territory of the United Kingdom to which

the 2003 Extradition Treaty may apply in accordance with its terms, shall remain unaffected by the Extradition Agreement and this Instrument.

b) This Instrument shall not apply to any territory for whose international relations the United Kingdom is responsible unless the United States of America and the European Union, by exchange of diplomatic notes duly confirmed by the United Kingdom in accordance with Article 20(1) (b) of the Extradition Agreement, agree to extend its application thereto. The exchange of notes shall specify the authority in the territory responsible for the measure set forth in Article 9 of the Annex and the channels between the United States of America and the territory for transmissions pertaining to the extradition process, in lieu of those designated in the Annex. Such application may be terminated by either the United States of America or the European Union by giving six months' written notice to the other through the diplomatic channel, where duly confirmed between the United States of America and the United Kingdom in accordance with Article 20(2) of the Extradition Agreement.

4. In accordance with Article 16 of the Extradition Agreement, this Instrument shall apply to offenses committed before as well as after it enters into force.

5. This Instrument shall not apply to requests for extradition made prior to its entry into force.

6. (a) This Instrument shall be subject to the completion by the United States of America and the United Kingdom of Great Britain and Northern Ireland of their respective applicable internal procedures for entry into force. The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland shall thereupon exchange instruments indicating that such measures have been completed. This Instrument shall enter into force on the date of entry into force of the Extradition Agreement.

(b) In the event of termination of the Extradition Agreement, this Instrument shall be terminated and the 2003 Extradition Treaty shall be applied. The Governments of the United States of America and the United Kingdom of Great Britain and Northern Ireland nevertheless may agree to continue to apply some or all of the provisions of this Instrument.

IN WITNESS WHEREOF, the undersigned, being duly authorized by their respective Governments, have signed this Instrument.

DONE at London, in duplicate, this 16th day of December 2004.

| | |
|---|---|
| FOR THE GOVERNMENT OF UNITED STATES OF AMERICA: | FOR THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND: |
| John Ashcroft | Chl Clue |

ANNEX

EXTRADITION TREATY
BETWEEN
THE GOVERNMENT OF THE UNITED STATES OF AMERICA
AND
THE GOVERNMENT OF THE UNITED KINGDOM OF GREAT BRITAIN AND NORTHERN IRELAND

TABLE OF CONTENTS


| | |
|---|---|
| Article 1 | Obligation to Extradite |
| Article 2 | Extraditable Offenses |
| Article 3 | Nationality |
| Article 4 | Political and Military Offenses |
| Article 5 | Prior Prosecution |
| Article 6 | Statute of Limitations |
| Article 7 | Capital Punishment |
| Article 8 | Extradition Procedures and Required Documents |
| Article 8 *bis* | Sensitive Information in a Request |
| Article 9 | Authentication of Documents |
| Article 10 | Additional Information |
| Article 11 | Translation |
| Article 12 | Provisional Arrest |
| Article 13 | Decision and Surrender |
| Article 14 | Temporary and Deferred Surrender |
| Article 15 | Requests for Extradition or Surrender Made by Several States |
| Article 16 | Seizure and Surrender of Property |
| Article 17 | Waiver of Extradition |
| Article 18 | Rule of Specialty |
| Article 19 | Transit |
| Article 20 | Representation and Expenses |
| Article 21 | Consultation |
| Article 22 | Termination |

## Article 1
## Obligation to Extradite

The Parties agree to extradite to each other, pursuant to the provisions of this Treaty, persons sought by the authorities in the Requesting State for trial or punishment for extraditable offenses.

## Article 2
## Extraditable Offenses

1. An offense shall be an extraditable offense if the conduct on which the offense is based is punishable under the laws in both States by deprivation of liberty for a period of one year or more or by a more severe penalty.

2. An offense shall also be an extraditable offense if it consists of an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact to any offense described in paragraph 1 of this Article.

3. For the purposes of this Article, an offense shall be an extraditable offense:

(a) whether or not the laws in the Requesting and Requested States place the offense within the same category of offenses or describe the offense by the same terminology; or

(b) whether or not the offense is one for which United States federal law requires the showing of such matters as interstate transportation, or use of the mails or of other facilities affecting interstate or foreign commerce, such matters being jurisdictional only.

4. If the offense has been committed outside the territory of the Requesting State, extradition shall be granted in accordance with the provisions of the Treaty if the laws in the Requested State provide for the punishment of such conduct committed outside its territory in similar circumstances. If the laws in the Requested State do not provide for the punishment of such conduct committed outside of its territory in similar circumstances, the executive authority of the Requested State, in its discretion, may grant extradition provided that all other requirements of this Treaty are met.

5. If extradition has been granted for an extraditable offense, it may also be granted for any other offense specified in the request if the latter offense is punishable by less than one year's deprivation of liberty, provided that all other requirements for extradition are met.

## Article 3
## Nationality

Extradition shall not be refused based on the nationality of the person sought.

## Article 4
## Political and Military Offenses

1. Extradition shall not be granted if the offense for which extradition is requested is a political offense.

2. For the purposes of this Treaty, the following offenses shall not be considered political offenses:

(a) an offense for which both Parties have the obligation pursuant to a multilateral international agreement to extradite the person sought or to submit the case to their competent authorities for decision as to prosecution;

(b) a murder or other violent crime against the person of a Head of State of one of the Parties, or of a member of the Head of State's family;

(c) murder, manslaughter, malicious wounding, or inflicting grievous bodily harm;

(d) an offense involving kidnapping, abduction, or any form of unlawful detention, including the taking of a hostage;

(e) placing or using, or threatening the placement or use of, an explosive, incendiary, or destructive device or firearm capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage;

(f) possession of an explosive, incendiary, or destructive device capable of endangering life, of causing grievous bodily harm, or of causing substantial property damage;

(g) an attempt or a conspiracy to commit, participation in the commission of, aiding or abetting, counseling or procuring the commission of, or being an accessory before or after the fact to any of the foregoing offenses.

3. Notwithstanding the terms of paragraph 2 of this Article, extradition shall not be granted if the competent authority of the Requested State determines that the request was politically motivated. In the United States, the executive branch is the competent authority for the purposes of this Article.

4. The competent authority of the Requested State may refuse extradition for offenses under military law that are not offenses under ordinary criminal law. In the United States, the executive branch is the competent authority for the purposes of this Article.

## Article 5
## Prior Prosecution

1. Extradition shall not be granted when the person sought has been convicted or acquitted in the Requested State for the offense for which extradition is requested.

2. The Requested State may refuse extradition when the person sought has been convicted or acquitted in a third state in respect of the conduct for which extradition is requested.

3. Extradition shall not be precluded by the fact that the competent authorities of the Requested State:

(a) have decided not to prosecute the person sought for the acts for which extradition is requested;

(b) have decided to discontinue any criminal proceedings which have been instituted against the person sought for those acts; or

(c) are still investigating the person sought for the same acts for which extradition is sought.

## Article 6
## Statute of Limitations

The decision by the Requested State whether to grant the request for extradition shall be made without regard to any statute of limitations in either State.

## Article 7
## Capital Punishment

When the offense for which extradition is sought is punishable by death under the laws in the Requesting State and is not punishable by death under the laws in the Requested State, the executive authority in the Requested State may refuse extradition unless the Requesting State provides an assurance that the death penalty will not be imposed, or, if imposed, will not be carried out.

Article 8
Extradition Procedures and Required Documents

1. All requests for extradition shall be submitted through the diplomatic channel.

2. All requests for extradition shall be supported by:

(a) as accurate a description as possible of the person sought, together with any other information that would help to establish identity and probable location;

(b) a statement of the facts of the offense(s);

(c) the relevant text of the law(s) describing the essential elements of the offense for which extradition is requested;

(d) the relevant text of the law(s) prescribing punishment for the offense for which extradition is requested; and

(e) documents, statements, or other types of information specified in paragraphs 3 or 4 of this Article, as applicable.

3. In addition to the requirements in paragraph 2 of this Article, a request for extradition of a person who is sought for prosecution shall be supported by:

(a) a copy of the warrant or order of arrest issued by a judge or other competent authority;

(b) a copy of the charging document, if any; and

(c) for requests to the United States, such information as would provide a reasonable basis to believe that the person sought committed the offense for which extradition is requested.

4. In addition to the requirements in paragraph 2 of this Article, a request for extradition relating to a person who has been convicted of the offense for which extradition is sought shall be supported by:

(a) information that the person sought is the person to whom the finding of guilt refers;

(b) a copy of the judgment or memorandum of conviction or, if a copy is not available, a statement by a judicial authority that the person has been convicted;

(c) a copy of the sentence imposed, if the person sought has been sentenced, and a statement establishing to what extent the sentence has been carried out; and

(d) in the case of a person who has been convicted *in absentia*, information regarding the circumstances under which the person was voluntarily absent from the proceedings.

Article 8 bis
Sensitive Information in a Request

Where the Requesting State contemplates the submission of particularly sensitive information in support of its request for extradition, it may consult the Requested State to determine the extent to which the information can be protected by the Requested State. If the Requested State cannot protect the information in the manner sought by the Requesting State, the Requesting State shall determine whether the information shall nonetheless be submitted.

Article 9
Authentication of Documents

Documents that bear the certificate or seal of the Ministry of Justice, or Ministry or Department responsible for foreign affairs, of the Requesting State shall be admissible in extradition proceedings in the Requested State without further certification, authentication, or other legalization. "Ministry of Justice" shall mean, for the United States, the United States Department of Justice; and, for the United Kingdom, the Home Office.

Article 10
Additional Information

1. If the Requested State requires additional information to enable a decision to be taken on the request for extradition, the Requesting State shall respond to the request within such time as the Requested State requires.

2. Such additional information may be requested and furnished directly between the United States Department of Justice and the Home Office.

Article 11
Translation

All documents submitted under this Treaty by the Requesting State shall be in English or accompanied by a translation into English.

Article 12
Provisional Arrest

1. In an urgent situation, the Requesting State may request the provisional arrest of the person sought pending presentation of the request for extradition. A

request for provisional arrest may be transmitted through the diplomatic channel or directly between the United States Department of Justice and such competent authority as the United Kingdom may designate for the purposes of this Article.

2. The application for provisional arrest shall contain:

(a) a description of the person sought;

(b) the location of the person sought, if known;

(c) a brief statement of the facts of the case including, if possible, the date and location of the offense(s);

(d) a description of the law(s) violated;

(e) a statement of the existence of a warrant or order of arrest or a finding of guilt or judgment of conviction against the person sought; and

(f) a statement that the supporting documents for the person sought will follow within the time specified in this Treaty.

3. The Requesting State shall be notified without delay of the disposition of its request for provisional arrest and the reasons for any inability to proceed with the request.

4. A person who is provisionally arrested may be discharged from custody upon the expiration of sixty (60) days from the date of provisional arrest pursuant to this Treaty if the executive authority of the Requested State has not received the formal request for extradition and the documents supporting the extradition request as required in Article 8. For this purpose, receipt of the formal request for extradition and supporting documents by the Embassy of the Requested State in the Requesting State shall constitute receipt by the executive authority of the Requested State.

5. The fact that the person sought has been discharged from custody pursuant to paragraph 4 of this Article shall not prejudice the subsequent re-arrest and extradition of that person if the extradition request and supporting documents are delivered at a later date.

## Article 13
## Decision and Surrender

1. The Requested State shall promptly notify the Requesting State of its decision on the request for extradition. Such notification should be transmitted directly to the competent authority designated by the Requesting State to receive such notification and through the diplomatic channel.

2. If the request is denied in whole or in part, the Requested State shall provide reasons for the denial. The Requested State shall provide copies of pertinent judicial decisions upon request.

3. If the request for extradition is granted, the authorities of the Requesting and Requested States shall agree on the time and place for the surrender of the person sought.

4. If the person sought is not removed from the territory of the Requested State within the time period prescribed by the law of that State, that person may be discharged from custody, and the Requested State, in its discretion, may subsequently refuse extradition for the same offense(s).

Article 14
Temporary and Deferred Surrender

1. If the extradition request is granted for a person who is being proceeded against or is serving a sentence in the Requested State, the Requested State may temporarily surrender the person sought to the Requesting State for the purpose of prosecution. If the Requested State requests, the Requesting State shall keep the person so surrendered in custody and shall return that person to the Requested State after the conclusion of the proceedings against that person, in accordance with conditions to be determined by mutual agreement of the States.

2. The Requested State may postpone the extradition proceedings against a person who is being prosecuted or who is serving a sentence in that State. The postponement may continue until the prosecution of the person sought has been concluded or until such person has served any sentence imposed.

Article 15
Requests for Extradition or Surrender Made by Several States

1. If the Requested State receives requests from the Requesting State and from any other State or States for the extradition of the same person, either for the same offense or for different offenses, the executive authority of the Requested State shall determine to which State, if any, it will surrender the person.

2. If the United Kingdom receives an extradition request from the United States and a request for surrender pursuant to the European arrest warrant for the same person, either for the same offense or for different offenses, its executive authority shall determine to which State, if any, it will surrender the person.

3. In making its decision under paragraphs 1 and 2 of this Article, the Requested State shall consider all of the relevant factors, including, but not limited to, the following:

(a) whether the requests were made pursuant to a treaty;
(b) the places where each of the offenses was committed;
(c) the respective interests of the requesting States;
(d) the seriousness of the offenses;
(e) the nationality of the victim;
(f) the possibility of any subsequent extradition between the requesting States; and
(g) the chronological order in which the requests were received from the requesting States.

Article 16
Seizure and Surrender of Property

1. To the extent permitted under its law, the Requested State may seize and surrender to the Requesting State all items in whatever form, and assets, including proceeds, that are connected with the offense in respect of which extradition is granted. The items and assets mentioned in this Article may be surrendered even when the extradition cannot be effected due to the death, disappearance, or escape of the person sought.

2. The Requested State may condition the surrender of the items upon satisfactory assurances from the Requesting State that the property will be returned to the Requested State as soon as practicable. The Requested State may also defer the surrender of such items if they are needed as evidence in the Requested State.

Article 17
Waiver of Extradition

If the person sought waives extradition and agrees to be surrendered to the Requesting State, the Requested State may surrender the person as expeditiously as possible without further proceedings.

Article 18
Rule of Specialty

1. A person extradited under this Treaty may not be detained, tried, or punished in the Requesting State except for:

(a) any offense for which extradition was granted, or a differently denominated offense based on the same facts as the offense on which extradition was granted, provided such offense is extraditable, or is a lesser included offense;

(b) any offense committed after the extradition of the person; or

(c) any offense for which the executive authority of the Requested State waives the rule of specialty and thereby consents to the

person's detention, trial, or punishment. For the purpose of this subparagraph:

(i) the executive authority of the Requested State may require the submission of the documentation called for in Article 8; and

(ii) the person extradited may be detained by the Requesting State for 90 days, or for such longer period of time as the Requested State may authorize, while the request for consent is being processed.

2. A person extradited under this Treaty may not be the subject of onward extradition or surrender for any offense committed prior to extradition to the Requesting State unless the Requested State consents.

3. Paragraphs 1 and 2 of this Article shall not prevent the detention, trial, or punishment of an extradited person, or the extradition of the person to a third State, if the person:

(a) leaves the territory of the Requesting State after extradition and voluntarily returns to it; or

(b) does not leave the territory of the Requesting State within 20 days of the day on which that person is free to leave.

4. If the person sought waives extradition pursuant to Article 17, the specialty provisions in this Article shall not apply.

## Article 19
## Transit

1. Either State may authorize transportation through its territory of a person surrendered to the other State by a third State or from the other State to a third State. A request for transit shall contain a description of the person being transported and a brief statement of the facts of the case. A person in transit shall be detained in custody during the period of transit.

2. Authorization is not required when air transportation is used by one State and no landing is scheduled on the territory of the other State. If an unscheduled landing does occur, the State in which the unscheduled landing occurs may require a request for transit pursuant to paragraph 1 of this Article, and it may detain the person until the request for transit is received and the transit is effected, as long as the request is received within 96 hours of the unscheduled landing.

Article 20
Representation and Expenses

1. The Requested State shall advise, assist, and appear on behalf of, the Requesting State in any proceedings in the courts of the Requested State arising out of a request for extradition or make all necessary arrangements for the same.

2. The Requesting State shall pay all the expenses related to the translation of extradition documents and the transportation of the person surrendered. The Requested State shall pay all other expenses incurred in that State in connection with the extradition proceedings.

3. Neither State shall make any pecuniary claim against the other State arising out of the arrest, detention, examination, or surrender of persons under this Treaty.

Article 21
Consultation

The Parties may consult with each other in connection with the processing of individual cases and in furtherance of efficient implementation of this Treaty.

Article 22
Termination

Either State may terminate this Treaty at any time by giving written notice to the other State through the diplomatic channel, and the termination shall be effective six months after the date of receipt of such notice.

**EMBASSY OF THE**
**UNITED STATES OF AMERICA**

No. 120

The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honor to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "2003 Extradition Treaty").

Having been informed by the Government of the United Kingdom of Great Britain and Northern Ireland that it will be unable to apply Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, relating to authentication of extradition documents, until a corresponding change is made in its domestic law governing extradition, the Embassy has the honor to propose on behalf of the United States Government as follows:

Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, shall not be applied until the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland indicate in a subsequent exchange of notes that the required internal procedures have been completed. Until that time, the parties agree to apply the procedure for authentication of extradition documents set forth in Article 9 of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003, upon its entry into force. The Government of the United Kingdom of Great Britain and Northern Ireland shall undertake to seek the necessary legislation at the earliest possible time.

The Embassy also wishes to confirm that two exchanges of letters related to the 2003 Extradition Treaty and done simultaneous with its signature shall remain the understandings of the Governments with respect to this Instrument, until such time as they may agree otherwise.

If the foregoing is acceptable to your Government, the Embassy has the honor to propose that this Note and your Note in reply shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Instrument.

The Embassy avails itself of the opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration.

Embassy of the United States of America
London, England. December 16, 2004

The Consular Directorate of the Foreign and Commonwealth Office presents its compliments to the Embassy of the United States of America and has the honour to refer to the Embassy's Note No. 120 of 16 December 2004 which reads as follows:

"The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honour to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the United States of America and the European Union signed June 25, 2003, as to the application of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003 (the "2003 Extradition Treaty").

Having been informed by the Government of the United Kingdom of Great Britain and Northern Ireland that it will be unable to apply Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, relating to authentication of extradition documents, until a corresponding change is made in its domestic law governing extradition, the Embassy has the honour to propose on behalf of the United States Government as follows:

Article 5(2) of the Agreement on Extradition between the United States of America and the European Union, as set forth in Article 9 of the Annex to the Instrument, shall not be applied until the United States of America and the Government of Great Britain and Northern Ireland indicate in a subsequent exchange of notes that the required internal procedures have been completed. Until that time, the parties agree to apply the procedure for authentication of extradition documents set forth in Article 9 of the Extradition Treaty between the Government of the United States of America and the Government of the United Kingdom of Great Britain and Northern Ireland signed March 31, 2003, upon its entry into force. The Government of the United Kingdom of Great Britain and Northern Ireland shall undertake to seek the necessary legislation at the earliest possible time.

The Embassy also wishes to confirm that two exchanges of letters related to the 2003 Extradition Treaty and done simultaneous with its signature shall remain the understandings of the Governments with respect to this Instrument, until such time as they may agree otherwise.

If the foregoing is acceptable to your Government, the Embassy has the honour to propose that this Note and your Note in reply shall constitute an agreement between our two Governments, which shall enter into force on the date of entry into force of the Instrument.

The Embassy avails itself of this opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration."

In reply, the Foreign and Commonwealth Office has the honour to confirm that the proposal set out in the Embassy's Note is acceptable to the Government of the United Kingdom of Great Britain and Northern Ireland and that the Embassy's Note, and this Reply, shall constitute an agreement between the two Governments which shall enter into force on the date of entry into force of the Instrument.

The Consular Directorate of the Foreign and Commonwealth Office avails itself of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration.

London
16 December 2004

FOREIGN AND COMMONWEALTH OFFICE LONDON

Note No. 30/10

The Foreign and Commonwealth Office presents its compliments to the Embassy of the United States of America and has the honour to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America, signed on 25 June 2003, as to the application of the Extradition Treaty between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the United States of America, signed on 31 March 2003.

Further to the Exchange of Notes to that Instrument, done at London on 16 December 2004, the Foreign and Commonwealth Office has the honour to confirm that the necessary domestic legislation is now in place to allow the Government of the United Kingdom of Great Britain and Northern Ireland to apply Article 5(2) of the Agreement on Extradition between the European Union and the United States of America, as set forth in Article 9 of the Annex of the Instrument, relating to the authentication of extradition documents.

The Foreign and Commonwealth Office avails itself of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration.

FOREIGN & COMMONWEALTH OFFICE
LONDON

Embassy of the United States of America
24 Grosvenor Square
London
W1A 1AE

20 October 2010

5

EMBASSY OF THE UNITED STATES OF AMERICA
LONDON

No. 108

The Embassy of the United States of America at London, England, presents its compliments to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs and has the honor to acknowledge receipt of Diplomatic Note No. 30/10, dated October 20, 2010, from Her Majesty's Foreign and Commonwealth Office which reads as follows:

"The Foreign and Commonwealth Office presents its compliments to the Embassy of the United States of America and has the honour to refer to the Instrument as contemplated by Article 3(2) of the Agreement on Extradition between the European Union and the United States of America, signed on 25 June 2003, as to the application of the Extradition Treaty between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of the United States of America, signed on 31 March 2003.

Further to the Exchange of Notes to that Instrument, done at London on 16 December 2004, the Foreign and Commonwealth Office has the honour to confirm that the necessary domestic legislation is now in place to allow the Government of the United Kingdom of Great Britain and Northern Ireland to

apply Article 5(2) of the Agreement on Extradition between the European Union and the United States of America, as set forth in Article 9 of the Annex of the Instrument, relating to the authentication of extradition documents.

The Foreign and Commonwealth Office avails itself of this opportunity to renew to the Embassy of the United States the assurances of its highest consideration."

On behalf of the United States Government, the Embassy has the honor to confirm that pursuant to the Foreign and Commonwealth Office's note and this Note in reply, Article 5(2) of the Agreement on Extradition between the United States and the European Union, as set forth in Article 9 of the Annex to the Instrument, applies between the two Governments as of the date of this note.

The Embassy avails itself of the opportunity to express to Her Majesty's Principal Secretary of State for Foreign and Commonwealth Affairs the renewed assurance of its highest consideration.

Embassy of the United States of America
London, England. November 23, 2010

Home Office

Extradition Section
UK Central Authority
6th Floor Fry Building
2 Marsham Street
London
SW1P 4DF

Home Office - GOV.UK

Our ref: EXO-000028476-US

US Department of Justice
Washington DC,20530
United States of America

**9 September 2026**

Dear Sir / Madam,

**REQUEST FROM THE UNITED KINGDOM TO UNITED STATES OF AMERICA FOR THE EXTRADITION OF TRISTAN TATE**

The British Government respectfully extends its gratitude and appreciation to the Government of United States of America for its assistance and support in respect of the request for the extradition to the United Kingdom of Tristan TATE.

Please find enclosed the full extradition request for Tristan TATE which is made under Article 8 of the Extradition Treaty between the United Kingdom of Great Britain and Northern Ireland and United States of America dated 31 March 2003 and in force from 26 April 2007.

It would be appreciated if, in the event of the return to the United Kingdom being ordered, the Home Secretary could be informed, so that, when appropriate, arrangements can be made for Tristan Tate's escort back to the United Kingdom.

Many thanks and kind regards

Noorel Haque
Senior Extradition Caseworker
Extradition Team | UK Central Authority
Serious Organised Crime (SOC) and International Criminality Directorate

me Office

R.

orwarding the attached papers, to be used in support of an application for the surrender n the United States of America of Tristan Tate, who is accused of 17 offences:

1. Rape a woman 16 years of age or over, contrary to Section 1, Sexual Offences Act 2003 (Five (5) offences)

2. Assault a person thereby occasioning them actual bodily harm, contrary to Section 47 Offences Against the Person Act 1861 (Six (6) offences)

3. Arrange or facilitate travel of another person with a view to exploitation contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (two (2) offences)

4. Arrange or facilitate travel of another person with a view to sexual exploitation contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (three (3) offences)

5. Penetrative sexual assault of a woman 16 years of age or older, contrary to section 2, Sexual Offences Act 2003 (one (1) offence)

I hereby certify that, to the best of my knowledge and belief, the signature on the supplementary evidence dated 8 September 2026 contained herein is the signature of Narinder Dhillon at Crown Prosecution Service.

I further certify that the documents authenticated here are in support of the request for the surrender of Tristan TATE.

Date: 9 September 2026

Noorel Haque
Senior Extradition Caseworker
UK Central Authority
ome Office

Home Office

# C.R.

In forwarding the attached papers, to be used in support of an application for the surrender from the United States of America of Tristan Tate, who is accused of 17 offences:

1. Rape a woman 16 years of age or over, contrary to Section 1, Sexual Offences Act 2003 (Five (5) offences)

2. Assault a person thereby occasioning them actual bodily harm, contrary to Section 47 Offences Against the Person Act 1861 (Six (6) offences)

3. Arrange or facilitate travel of another person with a view to exploitation contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (two (2) offences)

4. Arrange or facilitate travel of another person with a view to sexual exploitation contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (three (3) offences)

5. Penetrative sexual assault of a woman 16 years of age or older, contrary to section 2, Sexual Offences Act 2003 (one (1) offence)

I hereby certify that, to the best of my knowledge and belief, the signature on the supplementary evidence dated 8 September 2026 contained herein is the signature of Narinder Dhillon at Crown Prosecution Service.

I further certify that the documents authenticated here are in support of the request for the surrender of Tristan TATE.

Date: 9 September 2026

Noorel Haque
Senior Extradition Caseworker
UK Central Authority
Home Office

# THE EXTRADITION OF

# TRISTAN TATE

# FROM

# THE UNITED STATES OF AMERICA

## Before the Westminster Magistrates' Court (code 2570)

ACCUSED: **Tristan TATE** D.O.B: [redacted]

ADDRESS: [redacted] Romania

OFFENCE:

(4) Details of the alleged offence(s)

CrimPR 7.3 requires that an allegation of an offence in an application for the issue of a summons or warrant must contain (a) a statement of the offence that (i) describes the offence in ordinary language, and (ii) identifies any legislation that creates it; and (b) such particulars of the conduct constituting the commission of the offence as to make clear what the prosecutor alleges against the defendant.

(4) Details of the alleged offence(s)

CrimPR 7.3 requires that an allegation of an offence in an application for the issue of a summons or warrant must contain (a) a statement of the offence that (i) describes the offence in ordinary language, and (ii) identifies any legislation that creates it; and (b) such particulars of the conduct constituting the commission of the offence as to make clear what the prosecutor alleges against the defendant.

1. **Offence:**

Rape a woman 16 years of age or over – Section 1 SOA 2003 (01/04/2012 - 26/12/2013)

**Particulars:**

Between 01/04/2012 and 26/12/2013 intentionally penetrated the anus [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting.

2. **Offence:**

Rape a woman 16 years of age or over – Section 1 SOA 2003 (01/04/2012 - 26/12/2013)

**Particulars:**

Between 01/04/2012 and 26/12/2013, on not less than 3 occasions and on an occasion other than that specified on charge 1, intentionally penetrated the anus of [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting.

3. **Offence:**

Assault a person thereby occasioning them actual bodily harm Section 47 Offences Against the Person Act 1861 (01/04/2012 - 26/12/2013)

**Particulars:**

Between 01/04/2012 and 26/12/2013 assaulted [redacted] thereby occasioning her, actual bodily harm.

4. **Offence:**

Assault a person thereby occasioning them actual bodily harm Section 47 Offences Against the Person Act 1861 (01/04/2012 - 26/12/2013)

**Particulars:**

Between 01/04/2012 and 26/12/2013, on not less than 3 occasions and on occasions other than that specified on charge 3 assaulted [redacted] thereby occasioning her, actual bodily harm.

5. **Offence:**

Assault a person thereby occasioning them actual bodily harm Section 47 Offences Against the Person Act 1861 (01/04/2012 - 26/12/2013)

**Particulars:**

Between 01/04/2012 and 26/12/2013, on an occasion other than that specified in counts 3 & 4, assaulted [redacted] thereby occasioning her, actual bodily harm.

6. **Offence:**

Assault a person thereby occasioning them actual bodily harm Section 47 Offences Against the Person Act 1861 (01/04/2012 - 26/12/2013)

**Particulars:** between 01/04/2012 and 26/12/2013, on not less than 3 occasions and on occasions other than that specified in counts 3, 4 & 5, assaulted [redacted] thereby occasioning her, actual bodily harm

7. **Offence:**

Assault a person thereby occasioning them actual bodily harm Section 47 Offences Against the Person Act 1861 (01/04/2012 - 26/12/2013)

**Particulars:**

Between 01/04/2013 and 26/12/2013, on an occasion other than that specified in charges 3,4,5 & 6, assaulted [redacted] thereby occasioning her, actual bodily harm.

8. **Offence:**

Assault a person thereby occasioning them actual bodily harm Section 47 Offences Against the Person Act 1861 (01/04/2013 - 26/12/2013)

**Particulars:**

Between 01/04/2013 and 26/12/2013, on not less than 3 occasions and on an occasion other than that specified in charges 3,4,5 ,6 & 7 assaulted [redacted] thereby occasioning her, actual bodily harm.

9. **Offence:**

Rape a woman 16 years of age or over – Section 1 SOA 2003 (24/12/2012)

**Particulars:**

On 24/12/2012 intentionally penetrated the vagina of [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting.

10. **Offence:**

Arrange or facilitate travel of another person with a view to exploitation Contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (03/04/2016 - 30/04/2016)

**Particulars:**

Between 03/04/2016 and 30/04/2016 arranged or facilitated the travel of [redacted] with a view to her being exploited.

**11. Offence:**

Arrange or facilitate travel of another person with a view to exploitation Contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (31/08/2016 - 01/10/2016)

**Particulars:**

Between 31/08/2016 and 01/10/2016 arranged or facilitated the travel of [redacted] with a view to her being exploited.

Information having been laid before me on ~~oath~~ *affirmation* by DC5913 Lee-Anne Marshall on Friday 19th January 2024

That the accused committed the above offences.

DIRECTION: You, the constables, are hereby required to arrest the accused and to bring the accused before the Westminster Magistrates Court immediately unless the accused is released on bail as directed below.

~~BAIL:~~ ~~On arrest, after complying with the condition(s) specified in Schedule I hereto, the accused shall be released on bail subject to the conditions specified in Schedule II hereto and with a duty to surrender to the custody of the above court on at 10 a.m.~~

~~**SCHEDULE I**~~

~~**Conditions to be complied with before release on bail**~~

~~To provide N/A surety(ies) in the sum of £ N/A (each) to secure the Accused's surrender to custody at the time and place appointed.~~

~~**SCHEDULE II**~~

~~**Conditions to be complied with after release on bail**~~

NONE

19/1/24.

Date: ~~15th September 2016~~

| M.C.A. 4 |
|---|
| Warrant of arrest in first instance. |

[signature]

SDJ District Judge (Magistrates' Court)
Justice of the Peace for the inner London Area
By Order of the Court/Clerk of the Court

SDJ Goldspring
Crg

I certify that this is a true and redacted copy of the original warrant issued by Senior District Judge Goldspring on 19 January 2024

CITY OF WESTMINSTER MAGISTRATES COURT

[signature]

TANWEER IKRAM 07/09/2026.

Dep Senior District Judge

**Before the Westminster Magistrates' Court (code 2570)**

**ACCUSED:** Tristan Tate **D.O.B:** [redacted]

**ADDRESS:** [redacted] Romania

**OFFENCES:**

**Details of the alleged offences:**

CrimPR 7.3 requires that an allegation of an offence in an application for the issue of a summons or warrant must contain (a) a statement of the offence that (i) describes the offence in ordinary language, and (ii) identifies any legislation that creates it; and (b) such particulars of the conduct constituting the commission of the offence as to make clear what the prosecutor alleges against the defendant.

1. **Offence:**
   Rape a woman 16 years of age or older, contrary to s.1 of the Sexual Offences Act 2003 (between 21 July 2010 – 3 August 2010)
   **Particulars:**
   On a day between 21 July 2010 and 3 August 2010 intentionally penetrated the vagina of [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting.

2. **Offence:**
   Rape a woman 16 years of age or older, contrary to s.1 of the Sexual Offences Act 2003 (between 21 July 2010 – 3 August 2010)
   **Particulars:**
   On a day between 21 July 2010 and 3 August 2010 intentionally penetrated the vagina of [redacted] with your penis, when she did not consent, and you did not reasonably believe that she was consenting

3. **Offence:**
   Penetrative sexual assault of a woman 16 years of age or older, contrary to Section 2 SOA 2003 (between 21 July 2010 – 3 August 2010)
   **Particulars:**
   Between 21 July 2010 and 3 August 2010 intentionally penetrated the vagina of [redacted] with your fingers, when that penetration was sexual, when she did not consent, and you did not reasonably believe that she was consenting

4. **Offence:**
   **Arranging or facilitating travel of another with a view to sexual exploitation, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (between 31 July 2015 and 30 March 2016)**
   **Particulars:**
   Between 31 July 2015 and 30 March 2016 arranged or facilitated the travel of another [redacted] with the intention that she would be exploited or knew or ought to have known that she would be sexually exploited by another during or after travel

5. **Offence:**
   **Arranging or facilitating travel of another with a view to sexual exploitation, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (between 1 June 2016 and 30 March 2017)**
   **Particulars**
   Between 1 June 2016 and 30 March 2017 arranged or facilitated the travel of another [redacted] with the intention that she would be exploited or knew or ought to have known that she would be sexually exploited by another during or after travel.

6. **Offence:**
   **Arranging or facilitating travel of another with a view to sexual exploitation, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (between 27 April 2016 and 18 August 2017)**
   **Particulars:**
   Between 27 April 2016 and 18 August 2017 arranged or facilitated the travel of another [redacted] with the intention that she would be exploited or knew or ought to have known that she would be sexually exploited by another during or after travel

Information having been laid before me on oath/affirmation by DS 30 Clare Matier on XXXX 5/8/26 that the accused committed the above offences.

**DIRECTION:** You, the constables, are hereby required to arrest the accused and to bring the accused before the Westminster Magistrates' Court immediately.

The warrant is not backed for bail.

Date: XXXX 5/8/26

**Senior District Judge Paul Goldspring (Chief Magistrate) For England & Wales**

[signature]

District Judge (Magistrates' Court)

I certify that this is a true and redacted copy of the original warrant

[signature]

**Senior District Judge Paul Goldspring (Chief Magistrate) For England & Wales**

# RE: THE EXTRADITION OF

# TRISTAN TATE

# FROM

# THE UNITED STATES OF AMERICA

## INDEX TO STATEMENTS AND EXHIBITS



| | Item Description | Page Number |
|---|---|---|
| 1. | Detective Constable Lee-Anne MARSHALL statement of fact (dated 7 September 2026) | 1-59 |
| | Exhibit LM/01– photograph | 60-61 |
| 2. | Narinder DHILLON statement of law (dated 8 September 2026) | 62-85 |

**LEE-ANNE MARSHALL states as follows:**

## INTRODUCTION

1. I am a Detective Constable in the Major Crime Unit employed by Bedfordshire Police in England. I am the officer in the case concerning the criminal conduct of Tristan Tate. I can provide a summary of the evidence for the purpose of extradition proceedings.

2. Tristan Tate is wanted to stand trial in England for a total of seventeen charges including rape, assault by penetration, assault occasioning actual bodily harm and human trafficking.

3. The charges are included in two separate warrants as described in Paragraphs 5 and 7 below. The complainants' names have been anonymised and will be referred to as Complainant 1 to 7. Each respective Complainant is the same Complainant as referred to (by the same number) in the request for Andrew Tate where they have been jointly charged.

4. Tristan Tate was arrested on 18 July 2026 in Miami, Florida on a provisional arrest request and has been detained in custody on these matters.

## ARREST WARRANT

5. On 19 January 2024 a warrant of arrest was issued by Senior District Judge Paul Goldspring sitting at Westminster Magistrates Court for charges 1 (i) to 11 (xi) set out below. The warrant is live and in force.

6. The particulars on the warrant of arrest dated 19 January 2024 contains an administrative error. On the warrant itself, the date for Charge 7 (vii below) and Charge 8 (viii below) is recorded incorrectly as *between 1 April **2013** and 26 December 2013*. The correct date range for both charges should read, *between 1 April **2012** and 26 December 2013*. The charges and conduct described below specifies the correct dates. If Tristan Tate is surrendered to the United Kingdom, an application to amend the particulars of charge vii and viii (labelled Charge 7 and Charge 8 on the warrant itself) will be made at his first hearing to reflect the correct dates: *between 1 April **2012** and 26 December 2013.*

**CHARGES**

i. Between 1 April 2012 and 26 December 2013 Tristan Tate intentionally penetrated the anus of Complainant 1 with his penis, when she did not consent, and he did not reasonably believe that she was consenting, contrary to section 1 of the Sexual Offences Act 2003.

ii. Between 1 April 2012 and 26 December 2013 on not less than 3 occasions and on an occasion other than that specified in charge 1 (i), Tristan Tate intentionally penetrated the anus of Complainant 1 with his penis, when she did not consent, and he did not reasonably believe that she was consenting, contrary to section 1 of the Sexual Offences Act 2003.

iii. Between 1 April 2012 and 26 December 2013 Tristan Tate assaulted Complainant 1, thereby occasioning her actual bodily harm, contrary to section 47 of the Offences Against the Person Act 1861.

iv. Between 1 April 2012 and 26 December 2013 on not less than 3 occasions and on occasions other than that specified in charge 3 (iii), Tristan Tate assaulted Complainant 1, thereby occasioning her actual bodily harm, contrary to section 47 of the Offences Against the Person Act 1861.

v. Between 1 April 2012 and 26 December 2013 on an occasion other than that specified in charges 3 (iii) and 4 (iv), Tristan Tate assaulted Complainant 1, thereby occasioning her actual bodily harm, contrary to section 47 of the Offences Against the Person Act 1861.

vi. Between 1 April 2012 and 26 December 2013 on not less than 3 occasions and on occasions other than that specified in charges 3 (iii), 4 (iv) and 5 (v), Tristan Tate assaulted Complainant 1, thereby occasioning her actual bodily harm, contrary to section 47 of the Offences Against the Person Act 1861.

vii. Between 1 April 2012 and 26 December 2013 on an occasion other than that specified in charges 3 (iii), 4 (iv), 5 (v) and 6 (vi), Tristan Tate assaulted Complainant 1, thereby occasioning her actual bodily harm, contrary to section 47 of the Offences Against the Person Act 1861.

viii. Between 1 April 2012 and 26 December 2013 on not less than 3 occasions and on an occasion other than that specified in charges 3 (iii), 4 (iv), 5 (v), 6 (vi) and 7 (vii), Tristan Tate assaulted Complainant 1, thereby occasioning her actual bodily harm, contrary to section 47 of the Offences Against the Person Act 1861.

ix. On 24 December 2012 Tristan Tate intentionally penetrated the vagina of Complainant 1 with his penis, when she did not consent, and he did not reasonably believe that she was consenting, contrary to section 1 of the Sexual Offences Act 2003.

x. Between 3 April 2016 and 30 April 2016 Tristan Tate and Andrew Tate[1] arranged or facilitated the travel of Complainant 1 with a view to her being exploited, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015.

xi. Between 31 August 2016 and 1 October 2016 Tristan Tate and Andrew Tate[2] arranged or facilitated the travel of Complainant 1 with a view to her being exploited, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015.

**ADDITIONAL CHARGES**

7. On 10 July 2026 additional charges were authorised by the Crown Prosecution Service, and on 5 August 2026 a warrant of arrest was issued by Senior District Judge Paul Goldspring sitting at Westminster Magistrates Court for charges twelve (xii) to seventeen (xvii) set out below. The warrant is live and in force.

xii. Between 21 July 2010 and 3 August 2010 Tristan Tate intentionally penetrated the vagina of Complainant 4 with his penis, when she did not consent, and he did not

[1] The corresponding charge for Andrew Tate is charge i.
[2] The corresponding charge for Andrew Tate is charge ii.

reasonably believe that she was consenting, contrary to section 1 of the Sexual Offences Act 2003.

xiii. Between 21 July 2010 and 3 August 2010 (on an occasion other than that specified in charge 12 (xii) Tristan Tate intentionally penetrated the vagina of Complainant 4 with his penis, when she did not consent, and he did not reasonably believe that she was consenting, contrary to section 1 of the Sexual Offences Act 2003.

xiv. Between 21 July 2010 and 3 August 2010 Tristan Tate intentionally penetrated the vagina of Complainant 4 with his fingers, when that penetration was sexual, when she did not consent, and he did not reasonably believe that she was consenting, contrary to Section 2 Sexual Offence Act 2003.

xv. On a day between 31 July 2015 and 30 March 2016 Tristan Tate and Andrew Tate[3] arranged or facilitated the travel of Complainant 5 with the intention that she would be exploited or knew or ought to have known that she would be sexually exploited by another during or after travel, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015.

xvi. On a day between 1 June 2016 and 30 March 2017 Tristan Tate and Andrew Tate[4] arranged or facilitated the travel of Complainant 6 with the intention that she would be exploited or knew or ought to have known that she would be sexually exploited

[3] The corresponding charge for Andrew Tate is charge xxi.
[4] The corresponding charge for Andrew Tate is charge xxiii.

by another during or after travel, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015.

xvii. Between 27 April 2016 and 18 August 2017 Tristan Tate and Andrew Tate[5] arranged or facilitated the travel of Complainant 7 with a view to her being exploited or knew or ought to have known that she would be sexually exploited by another during or after travel, contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015.

**PARTICULARS OF IDENTITY**

8. I have gathered information about Tristan Tate's identity as follows:

**Name:** Tristan Tate

**Date of birth:** [redacted]

**Nationality:** British and United States of America

**Last known address:** [redacted] Romania.

**Passport number:** [redacted] **Expiry date:** [redacted]

**USA Passport number:** [redacted]

9. A copy of Tristan Tate's passport photograph is produced as **Exhibit LM/01**. Complainant 1, Complainant 4, Complainant 5, Complainant 6 and Complainant 7 have been shown a copy of the passport photograph of Tristan Tate, and have each identified the person depicted in the photograph as Tristan Tate, the person who committed the offences against them.

[5] The corresponding charge for Andrew Tate is charge xviii.

10. I confirm that this is the Tristan Tate named in the warrant of arrests issued by Westminster Magistrates' Court on 19 January 2024 and 5 August 2026, who is wanted to stand trial for the charges set out therein. I am satisfied and certify this photograph as being a true likeness of Tristan Tate.

## **OVERVIEW**

### **Introduction**

11. The United Kingdom seeks the extradition of Andrew Tate and Tristan Tate (by separate request) to stand trial for serious criminal allegations made by seven complainants over a seven-year period between 2010 and 2017. The allegations include, rape (Andrew Tate and Tristan Tate), offences of violence (Andrew Tate and Tristan Tate), controlling prostitution for gain (Andrew Tate), human trafficking for the purposes of sexual exploitation (Andrew Tate and Tristan Tate) and offences relating to indecent images of children and extreme pornography (Andrew Tate). The prosecution does not contend that every complainant was subjected to every form of offending. Rather, the evidence demonstrates an overarching pattern of behaviour in which the Tate brothers employed similar methods of recruitment, grooming, control and coercion, with the precise nature of the offending varying according to the individual circumstances of each complainant.

12. This overview is derived from evidence in the case as set out in detail below. Whilst its primary purpose is to describe the alleged human trafficking operation and the methods employed by the Tate brothers to recruit women into their sex webcamming business, and to control and coerce them following recruitment, it is important to specify that

Complainants 2, 3 and 4 are not alleged to have been victims of human trafficking. The allegations made by those complainants are nonetheless extremely serious. Each alleges rape; complainants 2 and 3 also allege violence, and complainant 3 was used for prostitution in the UK. The general descriptions of the Tate brothers' attitude towards women and their alleged desire to dominate through violence and the removal of women's autonomy as set out in paragraph 30 below, apply equally to those complainants. The specific allegations relating to each of the seven complainants are addressed separately in the individual case summaries and charge analyses below.

**Overall Method of the Operation**

13. The brothers are both citizens of the United Kingdom and the United States of America. They grew up in both jurisdictions, but in 2014 (the date from which the charged human trafficking conduct starts) they were sharing a two-bedroom apartment in Luton, England. Although only in their early twenties, Andrew Tate being 24 years old and Tristan Tate being 22 years old, both had already achieved a degree of public prominence through their professional kickboxing careers and Tristan Tate's appearance on a reality television programme in the UK. In 2016 Andrew Tate appeared on a different UK reality show.

14. The prosecution case is that the Tate brothers established and operated a webcam business since 2014, which involved recruiting young women to perform on webcam platforms and produce bespoke sexual content for paying subscribers using different platforms such as *MyFreeCams* and *AdultWorks*. Where a complainant was caused to perform sexual activity online, including in private chat rooms or through the production of bespoke videos, access to the chat room or delivery of the video was restricted to subscribers who had made the

requisite payment set by the Tate brothers. The operation was initially based in the UK and was subsequently relocated to Romania, where the Tates relocated permanently in 2017.

**Roles**

15. Andrew Tate acted as the principal recruiter. The prosecution case is that he identified women whom he perceived to be vulnerable, established intimate relationships with them, and persuaded, coerced and arranged for them to travel internationally, and played a significant role in maintaining their compliance and directing their activities thereafter.

16. Tristan Tate also established an intimate relationship with one of the complainants and recruited her into the webcam industry. On 8 April 2016 he set up the company *ModelStars* through which the webcam operation was conducted.

17. Tristan Tate and [redacted] provided operational and logistical support. Their roles included arranging travel, collecting complainants from airports, transporting them to accommodation and facilitating the day-to-day running of the operation. Together with Andrew Tate, they also played a role in directing complainants' webcam activities, including determining when complainants worked and the nature of the content they were expected to produce.

**Recruitment Methods**

18. Having attained a level of prominence and influence the Tate brothers used their status to attract and pursue vulnerable women. The complainants were often individuals who had

experienced failed or abusive relationships, social isolation, low self-esteem or other personal vulnerabilities. The prosecution case is that these vulnerabilities were not incidental but were deliberately identified and exploited by the Tate brothers.

19. From the outset, the relationships were characterised by marked imbalances of power. The prosecution case is that the Tate brothers exploited these imbalances through emotional manipulation, intimidation, coercive behaviour and sexual dominance. Those complainants who allege rape describe aggressive sexual conduct, including choking or suffocation, which is said to exemplify the Tate brothers' broader disregard for their autonomy, dignity and wellbeing. It is alleged that the Tate brothers' actions were driven by a desire to exert control and obtain personal gratification, with little or no regard for the complainants' wishes, welfare or ability to freely consent.

**Use of the "Lover-Boy" Model**

20. It is alleged that these relationships were not genuine romantic partnerships but formed part of a wider pattern of coercive conduct through which the Tate brothers established and maintained control over the complainants. The operation incorporated features commonly associated with the "lover-boy" model of exploitation. This method involves an offender presenting himself as a romantic partner, demonstrating affection, attention and apparent commitment in order to establish emotional dependency.

21. Through this process, complainants may come to view the offender as someone they trust, love or rely upon. Once that dependency is established, the relationship can be manipulated to facilitate exploitation. Requests initially framed as acts of loyalty, support or

commitment may gradually become demands that place the complainant in situations of exploitation for the offender's benefit.

22. The apparent romantic relationship therefore functions as a means of control rather than a genuine partnership, enabling the offender to maintain influence over the complainant while disguising the exploitative nature of the arrangement.

**Promises of Financial Gain**

23. Andrew Tate further encouraged complainants to relocate to Romania from the UK, by representing that they could earn substantial sums of money through participation in his webcam business should they wish to do so. Some complainants describe being shown videos of women purportedly earning significant amounts of money through webcam activity whilst remaining fully clothed. It is alleged that Andrew Tate represented that participation would be voluntary, that complainants would retain control over the nature of any work undertaken, and that they would be free to leave if dissatisfied with the arrangements.

24. The prosecution case is that these representations were fraudulent. Whilst some complainants travelled to Romania believing that any participation in webcam activities would be optional, it is alleged that, upon arrival, they encountered a significantly greater degree of control and direction than they had been led to expect.

**Movement From the UK to Romania**

25. The complainants' journeys to Romania were outwardly voluntary. They were not physically forced to travel and, in many cases, travelled believing they were doing so as Andrew Tate's romantic partner. Some also understood that webcam work was available and believed that any such work would be undertaken on their own terms and subject to their own choices. The prosecution case, however, is that these beliefs were founded upon a carefully cultivated deception. By the time travel occurred, the Tate brothers had already established emotional influence and control over the trafficked complainants through physical and sexual violence and emotional dependency. The complainants were therefore unable to appreciate the true nature of the arrangements into which they were entering, or the extent to which they would later be controlled, directed and exploited.

**Controlling Measures and Use of Violence**

26. Whilst the complainants had travelled to Romania ostensibly of their own free will, the prosecution case is that, upon arrival, they were subjected to a range of controlling measures. Their passports were removed and retained, they were accommodated in premises under the Tate brothers' control, and they became dependent upon the Tate brothers for accommodation, transport and financial support. The females were vulnerable and trusted the brothers to care for them in a foreign country. The removal of travel documents, combined with the complainants' emotional dependency upon the Tate brothers and their unfamiliarity with their surroundings, substantially reduced their ability to leave the situation or exercise independent choice.

27. The prosecution case is that Andrew Tate and Tristan Tate used and threatened physical and sexual violence in order to maintain control and compliance. There was a culture of fear and intimidation created by Andrew and Tristan Tate. By means of manipulation, coercion and violence the complainants were pressured to produce increasingly intimate pornographic material for subscribers on webcams. It is further alleged that the Tate brothers employed emotional manipulation by rewarding behaviour they considered desirable, including praising those generating the highest earnings, whilst belittling others whom they knew were seeking their approval.

28. Two complainants ultimately left by fabricating emergencies at home in order to secure permission to leave. Another complainant left after being compelled to engage in webcam work, despite this not having been discussed prior to her arrival. When she resisted, she was threatened, forced to participate in further webcam activity and sexual acts with others, before eventually being allowed to leave. A further complainant reported being threatened with a machete and was later ejected after the Tate brothers suspected her of try to sabotage their business.

**Conclusion**

29. Viewed cumulatively, the allegations describe a consistent pattern of conduct in which the Tate brothers are said to have used their status, relationships and commercial interests to recruit, influence and control vulnerable women for their own financial, sexual and personal benefit.

30. Although the circumstances of each complainant differ, a consistent theme emerges of women being treated as commodities whose value lay in the money, sexual gratification or services they could provide to the Tate brothers. The prosecution case is that the offending was facilitated by an entrenched imbalance of power which the Tate brothers deliberately created, maintained and exploited. The Tate brothers would repeatedly use rape and sexual violence to establish control and other violence as a means of establishing dominance over women.

31. The allegations concerning trafficking, rape, violence and controlling prostitution for gain, together with the allegations against Andrew Tate relating to the making and distribution of indecent images of a child and the possession of extreme pornographic images, are relied upon by the prosecution as demonstrating a wider pattern of alleged sexually exploitative conduct spanning a number of years and involving multiple complainants.

**SUMMARY OF EVIDENCE**

**COMPLAINANT 1**

32. Complainant 1 first contacted the Police in January 2023 after seeing media reports that Tristan Tate was under investigation in Romania for sexual offences. There are eleven charges relating to Complainant 1. The Police interviewed Complainant 1 in a video recorded interview on 6 January 2023 and again on 10 January 2023 in which she provided an account of the allegations summarised below.

**BACKGROUND**

33. In late 2011, Tristan Tate responded to a public message posted by Complainant 1 on Twitter. They subsequently communicated via Facebook and WhatsApp for several months before meeting in person [redacted]. Following this meeting, they began a consensual sexual relationship. Complainant 1 was 19 years old at the time. Tristan Tate had recently appeared on a UK reality television programme and had developed a public profile. Complainant 1 describes being in awe of him and feeling fortunate that he had shown an interest in her.

34. In the summer [redacted], Tristan Tate asked Complainant 1 to be his girlfriend. A few months into the relationship, he told her that he enjoyed rough sex, choking women, and anal sex. Complainant 1 states that she had never experienced choking before but was willing to explore Tristan Tate's sexual preferences on the understanding that he would stop if she became uncomfortable or withdrew her consent. She describes much of the sexual activity during the relationship as consensual.

35. However, Complainant 1 states that sexual encounters frequently escalated beyond what she had agreed to. She recalls that Tristan Tate would regularly choke her during sex, often causing her to lose consciousness. When she regained consciousness, she says he would sometimes be penetrating her anus. She recalls occasions she cried, screamed, or told him to stop but he continued regardless. Complainant 1 states that she specifically communicated to Tristan Tate that she was willing to consent to anal sex, but not anal intercourse forced upon her whilst unconscious. She says that Tristan Tate nevertheless penetrated her anus whilst she was unconscious and did so knowing that she did not consent.

36. Complainant 1 recalls Tristan Tate telling her that the more he liked someone, the more he wanted to hurt them. Complainant 1 says she therefore came to believe that Tristan Tate hurt her because he loved her. Looking back on the relationship, she recognises his behaviour was abusive, but she was naïve and eager to please him.

37. Complainant 1 further describes a pattern of controlling and degrading behaviour throughout the relationship. She recalls feeling unable to refuse Tristan Tate on occasion because she did not want to disappoint him, and on other occasions, because she feared how he would react. She states that he frequently called her weak, pathetic and stupid, made misogynistic comments, and referred to her as a "*slut*" if she spoke to other men. She says she became increasingly isolated from friends and family and recalls feeling "*brainwashed*".

38. Complainant 1 also describes incidents in which Tristan Tate restrained her using cable ties or other items, struck or slapped her to wake her after she had lost consciousness. She states that he also struck her with a belt, causing bruising and welts. She states that these forms of violence became an established feature of the relationship.

39. The relationship ended in [redacted] after Complainant 1 discovered that Tristan Tate had been unfaithful. Thereafter, contact between them was limited and sporadic.

40. In April 2016, Complainant 1 was contacted by *ModelStars*, a webcam business established by Tristan Tate. Following renewed contact, Complainant 1 travelled on two occasions to work in webcam businesses operated by Andrew Tate and Tristan Tate. She states that she was recruited by promises of earnings and assurances that she could leave if she wished.

On both occasions she travelled abroad at their expense and performed sexual acts online for paying subscribers. Complainant 1 alleges that Andrew Tate and Tristan Tate exercised control over her work, failed to pay her as promised, and exploited her for their financial gain. These allegations form the basis of charges x and xi below. Andrew Tate and Tristan Tate have been jointly charged in respect of these two offences.

41. The allegations set out in Charges i to viii are said to have occurred at Tristan Tate's apartment in Luton. The allegation contained in Charge ix, which is said to have occurred on Christmas Eve, took place at Tristan Tate's mother's address in Luton.

## CHARGES

## RAPE

i. **Between 1 April 2012 and 26 December 2013 Tristan Tate intentionally penetrated the anus of Complainant 1 with his penis, when she did not consent, and he did not reasonably believe that she was consenting:**

42. Complainant 1 recalls a specific incident in approximately mid-November 2012 at Tristan Tate's apartment in Luton. During vaginal intercourse Tristan Tate manually strangled her until she lost consciousness. When she regained consciousness, she realised that Tristan Tate was penetrating her anus with his penis. She recalls significant pain to her anus and eye or cheek area, having been struck in the face whilst unconscious in an attempt to wake her. Tristan Tate continued until ejaculation.

43. Complainant 1 describes regaining consciousness in a confused and disorientated state whilst Tristan Tate was penetrating her anus. She recalls feeling as though she was having an "*out of body experience*" and being unable to communicate properly. Her arms felt numb, she was seeing what she describes as "*stars*", and she struggled to hear because her senses felt unusual. She recalls being overwhelmed by pain and unable to focus on what hurt more: the pain from the anal penetration, the pain caused by Tristan Tate's weight on top of her, or the pain to her eye or cheek bone from being struck. She believes that Tristan Tate moved from vaginal intercourse to anal penetration whilst she was unconscious and ejaculated shortly afterwards. Given her condition, she cannot recall whether she told him to stop or, if she did, whether it was coherent. She states that he only stopped when he ejaculated.

44. Complainant 1 draws a clear distinction between consensual anal intercourse and anal penetration whilst unconscious. She states that she did not consent to the latter. On 21 October 2012 she sent Tristan Tate a message stating: "*Only thing I don't want is you raping my arse. Anal yes, but I don't want you to force it upon me.*"

**<u>RAPE</u>**

ii. **Between 1 April 2012 and 26 December 2013 on no less than 3 occasions and on an occasion other than that specified in charge 1 (i), Tristan Tate intentionally penetrated the anus of Complainant 1 with his penis, when she did not consent, and he did not reasonably believe that she was consenting:**

45. This charge concerns further occasions, separate from the incident described in charge i, during which Complainant 1 alleges that Tristan Tate penetrated her anus after rendering her unconscious by strangulation.

46. Complainant 1 states that the pattern of behaviour was broadly the same as that described in charge i. Tristan Tate would choke her until she lost consciousness and she would regain consciousness to find that he was penetrating her anus. On some occasions, she recalls being restrained and tied using cable ties or other items and having her legs pinned apart whilst she lay on her back.

47. Complainant 1 states that Tristan Tate knew she did not consent to anal penetration whilst unconscious. She recalls him telling her that anal intercourse was easier when she was unconscious because she was more relaxed. She states that on some occasions she screamed for him to stop but he continued regardless.

48. Complainant 1 confirmed that they did not have a safe word, but she thought that Tristan Tate would stop when she was screaming no, she thought that she could trust him enough to stop.

**ASSAULT OCCASIONING ACTUAL BODILY HARM**

iii. **Between 1 April 2012 and 26 December 2013 Tristan Tate assaulted Complainant 1, thereby occasioning her actual bodily harm:**

49. This charge arises from the same incident described in charge i. Tristan Tate manually strangled Complainant 1 until she lost consciousness. Complainant 1 also sustained a black eye from being struck whilst unconscious.

**ASSAULT OCCASIONING ACTUAL BODILY HARM**

**iv. Between 1 April 2012 and 26 December 2013 on not less than 3 occasions and on occasions other than that specified in charge 3 (iii), Tristan Tate assaulted Complainant 1, thereby occasioning her actual bodily harm:**

50. This charge concerns further occasions, separate from charge iii, where Tristan Tate manually strangled Complainant 1 until she lost consciousness.

51. Complainant 1 describes the mechanism of strangulation as Tristan Tate applying pressure with both hands to either side of her neck, causing her to black out. She recalls seeing black spots, feeling numb and subsequently regaining consciousness in a state of confusion. On these occasions, Complainant 1 recalls Tristan Tate explaining to her that he was restricting the blood flow to her brain rather than her airway, and she recalls that he appeared to derive pleasure from the control this gave him. She was slapped in order to revive her, which would cause marks to her face, she would also sustain marks to her wrists from restraints.

**ASSAULT OCCASIONING ACTUAL BODILY HARM**

**v. Between 1 April 2012 and 26 December 2013 on an occasion other than that specified in counts 3 (iii) and 4 (iv), Tristan Tate assaulted Complainant 1, thereby occasioning her actual bodily harm:**

52. This charge relates to a separate occasion on which Tristan Tate strangled Complainant 1 until she lost consciousness during vaginal intercourse.

53. Unlike the incidents underlying charges i and ii, Complainant 1 states that she consented to being choked on this occasion. She lost consciousness. She recalls trusting Tristan Tate and initially experiencing the act as pleasurable and euphoric.

**ASSAULT OCCASIONING ACTUAL BODILY HARM**

**vi. Between 1 April 2012 and 26 December 2013 on not less than 3 occasions and on occasions other than that specified in counts 3 (iii), 4 (iv) and 5 (v), Tristan Tate assaulted Complainant 1, thereby occasioning her actual bodily harm:**

54. This charge concerns multiple further incidents in which Tristan Tate strangled Complainant 1 to the point of unconsciousness during sexual activity.

55. Complainant 1 states that strangulation became a regular feature of sexual encounters and occurred on most occasions during sexual intercourse. She recalls that it often happened without discussion beforehand and without any opportunity for her to indicate whether she consented. She frequently lost consciousness and would often have marks after being struck in the face to revive her, and her jaw would hurt.

56. As the relationship progressed, particularly after incidents of anal rape whilst unconscious, she became fearful of being choked but felt unable to prevent it.

**ASSAULT OCCASIONING ACTUAL BODILY HARM**

**vii. Between 1 April 2012 and 26 December 2013 on an occasion other than that specified in charges 3 (iii), 4 (iv), 5 (v) and 6 (vi), Tristan Tate assaulted Complainant 1, thereby occasioning her actual bodily harm:**

57. This charge relates to a specific incident in approximately September 2012 when Tristan Tate struck Complainant 1 repeatedly with a belt, causing bruising.

58. Complainant 1 recalls that Tristan Tate told her he wanted to film her. She agreed because she wanted to please him and felt unable to refuse him. Tristan Tate then pressed record on a camera, threw her face down onto a bed and restrained her wrists with cable ties.

59. Tristan Tate asked Complainant 1 to choose a number between one and ten. She recalls choosing either seven or eight. He then began striking her with a folded belt to her buttocks and the backs of her legs. Although the first strike was painful, she recalls the blows becoming progressively harder as he continued.

60. Complainant 1 states that the pain was excruciating and caused significant bruising. She screamed and repeatedly told Tristan Tate to stop, but he continued. Because her hands were secured with cable ties and her head was hanging off the side of the bed, she was unable to move away or protect herself.

61. Complainant 1 recalls that she had previously discussed Tristan Tate's interest in using a belt during sexual activity, but she does not recall him telling her that he intended to use

one on this occasion. She states that, because she was tied up, lying face down in a dark room and unable to see what Tristan Tate was doing, she did not know he had produced a belt until she felt the first blow. She recalls feeling shocked and unprepared for the level of force used.

**ASSAULT OCCASIONING ACTUAL BODILY HARM**

**viii. Between 1 April 2012 and 26 December 2013 on not less than 3 occasions and on an occasion other than that specified in charges 3 (iii), 4 (iv), 5 (v), 6 (vi) and 7 (vii), Tristan Tate assaulted Complainant 1, thereby occasioning her actual bodily harm:**

62. This charge concerns further occasions, separate from charge vii, when Tristan Tate struck Complainant 1 with a belt causing bruising and welts to her buttocks and legs.

63. Complainant 1 states that Tristan Tate used a belt on approximately four or five occasions between September and December 2012. She recalls that he sometimes threatened her with the belt beforehand and would require her to choose a number, which determined the number of strikes he would administer. She states that she regularly screamed, cried and asked him to stop, but he continued regardless.

64. Complainant 1 further recalls that Tristan Tate would ask her to photograph the resulting injuries and send the images to him. She states that he appeared proud of the bruising and would require her to clean his flat in her underwear so that he could see the injuries.

**RAPE**

ix. **On 24 December 2012 Tristan Tate intentionally penetrated the vagina of Complainant 1 with his penis, when she did not consent, and he did not reasonably believe that she was consenting:**

65. On 24 December 2012 Complainant 1 went to see Tristan Tate to talk to him as she thought she might be pregnant and was obviously very worried; she had no intention of having sex with him, she wanted to talk to him and thought that they would do a pregnancy test together. He picked her up from Luton train station and took her to his mother's house. He did not speak to her during the entire journey. Tristan Tate took Complainant 1 upstairs, immediately pushed her onto a mattress and pinned her down so that she could not move. He pulled her trousers down and vaginally raped her. He used his hand to hit and grab onto her buttocks around five or six times, causing a red handprint welt on her, which eventually bruised. The incident lasted approximately two minutes before Tristan Tate ejaculated. He was angry and rough, which scared Complainant 1. Complainant 1 felt humiliated after the incident, she did not have the choice to consent, and Tristan Tate did not check whether she consented.

66. The relationship between Tristan Tate and Complainant 1 ended in [redacted]. Although they maintained some form of contact, it was sporadic.

**HUMAN TRAFFICKING**

x. **Between 3 April 2016 and 30 April 2016 Andrew Tate and Tristan Tate arranged or facilitated the travel of Complainant 1 with a view to her being exploited:**

67. In April 2016, Complainant 1 was contacted via Facebook by *ModelStars*, a webcam business established by Tristan Tate. Although she had blocked Tristan Tate following the end of their relationship in [redacted], she resumed contact with him after being encouraged to do so by the company. Tristan Tate invited Complainant 1 to work as a webcam model in Liverpool, Amsterdam or Romania. Complainant 1 initially refused because she did not want to perform sexual acts online. Tristan Tate nevertheless continued to encourage her, describing the work as a lucrative opportunity and telling her that some women earned up to £8,000 per month.

68. Tristan Tate told Complainant 1 that she could try webcamming and return home after three days if she did not like it. He offered to arrange and pay for her travel and told her that she could earn approximately £2,000 per fortnight. Complainant 1 states that Tristan Tate was aware that she was unemployed, living with her parents and recovering from a relationship breakdown. She recalls him encouraging her by telling her that "*uglier girls than you*" were making substantial amounts of money through webcamming. The communications subsequently moved to WhatsApp and Andrew Tate became involved in the recruitment process. Complainant 1 eventually agreed to travel.

69. Andrew Tate arranged Complainant 1's travel. Flight records show that she travelled from [redacted] Airport to Kosice, Slovakia, on 15 April 2016, accompanied by another female intending to work for the business. Andrew Tate collected them from the airport. He created a *MyFreeCams* account for Complainant 1 using an email address which she believed he exclusively controlled, preventing her from changing the password. After observing other women performing on webcam platforms, Complainant 1 quickly concluded that the work was not something she wanted to do. Nevertheless, she briefly went online that evening because she did not want to disappoint Andrew Tate.

70. The following day, Andrew Tate drove Complainant 1 and two other females to an apartment in Brasov, Romania, used by Andrew and Tristan Tate. Complainant 1 remained there for approximately four or five days. Andrew Tate encouraged her to perform increasingly sexual acts online, telling her that the more sexual she was, the more money she would make.

71. Complainant 1 states that Andrew Tate controlled the operation of her *MyFreeCams* account and communicated with subscribers on her behalf. Subscribers were led to believe they were communicating directly with Complainant 1. She recalls that subscribers would request increasingly sexual acts in exchange for tokens, including nudity and masturbation. Complainant 1 states that her IP address was altered so that it appeared she was broadcasting from the UK rather than Romania.

72. Complainant 1 recalls performing sexual acts on camera, including masturbation and nudity. She describes a pricing structure under which subscribers paid tokens to view increasingly explicit content. She states that she undertook this work believing that she

would receive the payments promised by Andrew and Tristan Tate. Tristan Tate had previously told her that she would be paid £1,000 every two weeks at the outset, whilst Complainant 1 recalls being told she could expect to earn approximately £2,000 per fortnight. Andrew Tate also told her that she would receive a percentage of her earnings after deductions. Despite this, the percentage was never disclosed.

73. On approximately the fourth day of Complainant 1's stay in Romania, Tristan Tate arrived at the apartment. Complainant 1 states that she told him she no longer wished to work online and wanted to return home. In response, Tristan Tate became angry, brandished a machete and told her that if she wanted to leave, she could walk down the hill and obtain a taxi herself. Complainant 1 recalls that the apartment was situated in an isolated location outside Brasov, that she had no money and could not speak the language. She believed that Andrew and Tristan Tate were responsible for facilitating her return home. Andrew Tate laughed during the incident and only agreed to assist her after she repeatedly begged to leave.

74. Complainant 1 states that she was eventually driven to the airport and returned to the UK. Despite performing webcam work whilst in Romania, she received no payment. She estimates that she generated approximately $1,000 through the work she carried out during her stay.

75. The Prosecution case is that Andrew Tate and Tristan Tate jointly arranged and facilitated Complainant 1's travel to Romania with a view to her exploitation through commercial webcam work. It is alleged that they recruited her through promises of earnings and assurances that she could leave if she wished, exercised control over her work and online accounts, and failed to pay her for the sexual performances she carried out whilst in Romania.

**HUMAN TRAFFICKING**

xi. **Between 31 August 2016 and 1 October 2016 Andrew Tate and Tristan Tate arranged or facilitated the travel of Complainant 1 with a view to her being exploited:**

76. In June 2016, Complainant 1 emailed Tristan Tate asking whether he had any webcamming work available because she needed money to go travelling. Tristan Tate told her that there was no space available. Looking back, Complainant 1 does not believe she was in the right frame of mind when she contacted him because of the abuse she says she had previously suffered during their relationship. Messages recovered during the investigation show that, in September 2016, Tristan Tate contacted Complainant 1 and asked for her telephone number. Andrew Tate subsequently contacted her and offered her the opportunity to work as a webcam model from a house in Bucharest, Romania. He told her that she would have better working conditions, would be paid a percentage of what she earned, would continue to receive money fortnightly, and that she would be safe. Andrew Tate also told her that there were "*loads of other females working there*". Complainant 1 states that she believed she had a relationship of mutual trust with Andrew Tate, which made her feel safe. Andrew Tate arranged and paid for her travel. Flight information confirms that Complainant 1 travelled from [redacted] to Bucharest on 21 September 2016.

77. On arrival, Complainant 1 was collected from the airport and taken to a large house where a number of women were working as webcam models. She recalls seeing one woman who was visibly distressed and wanted to return home. Complainant 1 resumed using the *MyFreeCams* account previously established by Andrew Tate. She states that she felt under

pressure to engage in increasingly sexual activity on the webcam because she believed she owed Andrew Tate for the opportunity he had given her.

78. Complainant 1 states that she worked overnight shifts from approximately 22:00 hours until 08:00 hours. She had not anticipated working through the night and says that she was not given a choice. She found it difficult to stay awake and was concerned about stepping out of line, particularly because she feared a repeat of the earlier incident involving Tristan Tate and a machete. Subscriber communications were controlled by Andrew and Tristan Tate's cousin, who responded to messages on her behalf. Complainant 1 recalls that her expressed boundaries were ignored. In particular, she made clear that she did not wish to perform sexual acts involving her anus. She states that the person controlling the account ignored those wishes and that she would have to do whatever paying subscribers requested. Reflecting on the situation, she recalls feeling that "*they were willing to sell me for anything*".

79. Complainant 1 recalls that a laptop would be positioned on the bed whilst she performed in front of the camera. Subscribers could purchase sexual content through a token-based system. She recalls a pricing structure under which increasingly explicit acts commanded higher payments. She also recalls there being both public and private chatrooms, with subscribers paying additional tokens for private interactions. On one occasion, a subscriber paid a substantial amount of money to watch her spank herself 100 times. Although she felt uncomfortable doing so, she complied and sustained bruising to her buttocks.

80. Complainant 1 states that the sexual acts she performed online included masturbating vaginally and anally, using sex toys anally, and pretending to have orgasms. She recalls

making clear that she did not want to perform sexual acts involving her anus but states that those boundaries were ignored. Complainant 1 states that she was compelled to create recorded content for sale to subscribers. She recalls making three or four videos, including one in which she used a sex toy in the shower and others in which she appeared in her underwear "*teasing*". These recordings were sold to subscribers in exchange for tokens. She further recalls that her telephone number and Skype details were sold to subscribers so that they could contact her directly for private calls.

81. Complainant 1 states that Andrew Tate and Tristan Tate closely monitored her movements whilst she was living at the property and would want to know where she was going and when she would return if she left the house. She recalls having very little money during her stay in Bucharest and says that she would often go without food. Complainant 1 felt uncomfortable asking Andrew Tate or Tristan Tate for money and did not feel able to approach them for financial assistance.

82. Complainant 1's involvement ended after Tristan Tate accused her of attempting to sabotage the business. She states that Tristan Tate drove her to a hotel near the airport whilst shouting, swearing and attempting to intimidate her. He left her there overnight and returned the following morning with her belongings. Andrew Tate subsequently offered her the opportunity to continue working from the apartment in Brasov. Complainant 1 declined the offer, booked her own return flight and returned to England.

83. Complainant 1 estimates that she remained in Bucharest for approximately six or seven days. Despite carrying out webcam work during that period, she states that she received no payment. Although she understood generally what webcamming involved, she says that

she did not know what to expect, did not know what happened behind the scenes, did not know about the long hours, and did not know what she would be expected to do. She states that she travelled believing that Andrew Tate and Tristan Tate would look after her.

**CORROBORATION**

84. In 2018, Complainant 1 disclosed the allegations to a colleague. The colleague subsequently provided a statement to police regarding that disclosure. Police also recovered messages showing that Complainant 1 had disclosed to a friend in 2013 that she had sustained bruises, black eyes and cut lips during her relationship with Tristan Tate. Complainant 1 further provided photographs of injuries she says she sustained during the relationship. Whilst those injuries cannot be linked to specific offences charged, they are capable of corroborating her account that the relationship was violent.

85. Police recovered messages between Complainant 1 and Tristan Tate discussing beatings, violent sex and rape. For example, on 21 December 2012, Complainant 1 sent Tristan Tate a message stating that he was "*being too nice*" to her. Tristan Tate replied that she would have "*Viscous beatings and rape then*". Complainant 1 responded: "*Only thing I don't want is you raping my arse. Anal yes, but I don't want you to force it upon me.*" These messages are capable of corroborating Complainant 1's account that she distinguished between consensual anal sex and anal intercourse forced upon her.

86. Police recovered email communications between Complainant 1 and Tristan Tate from April 2016 concerning webcam work. Those communications are capable of corroborating Complainant 1's account that Tristan Tate recruited her to travel abroad to engage in online

sex work. In an email dated 3 April 2016, Tristan Tate told Complainant 1: "*You know the business i'm in. I'll work you from my place in Amsterdam or my studio... work 9-10 hours per day 5 days a week (it isn't easy) but I'll pay you every 2 weeks*." He further stated: "*There are girls on the Internet uglier than you making 8k a month.*" and: "*Quit your shitty... job and I'll book you a flight.*" He also told Complainant 1: "*Fly to Amsterdam for 5 days. Don't quit your job. Try the job for 3 days. Then fly home if you don't like it.*"

87. In the same email exchange, Complainant 1 stated that she did not have the "*guts or the confidence*" to undertake webcam work and sought reassurance regarding the earnings she had been promised. Tristan Tate responded that he had "*20+ employees*", that some women earned substantially more than the amount discussed, and assured her that she would be paid. These communications are capable of corroborating Complainant 1's account that she was encouraged to travel by promises of income, paid travel and assurances that she could leave if she did not enjoy the work. It also supports that the purpose of travel was to work for the Tates as a cam girl to earn money for them by performing sexual acts for their financial gain.

88. Flight information shows that Complainant 1 travelled from [redacted] Airport to Kosice (Slovakia) on 15 April 2016 and from [redacted] Airport to Bucharest (Romania) on 21 September 2016. These records are capable of corroborating Complainant 1's account that travel was arranged for her in connection with the webcam work described in Charges x and xi.

## ADDITIONAL CHARGES

89. The charges numbered one (represented by xii above) to six (represented by xvii above) in the warrant issued on 5 August 2026 concern four further Complainants (Complainant 4, Complainant 5, Complainant 6 and Complainant 7). A summary of the evidence is set out below.

## COMPLAINANT 4

90. Complainant 4 contacted UK Police in September 2025. There are three charges that relate to Complainant 4. She provided a formal account to the Police in February and April 2026 in a video recorded interview as set out below.

## BACKGROUND

91. At the time of the alleged offences Complainant 4 was in a relationship with a female who knew Andrew Tate [redacted]. Complainant 4 and her then girlfriend did not live in the UK and were planning to travel around Europe. Complainant 4 wanted to visit the UK. She did not know anyone in the UK, but her girlfriend knew Andrew Tate and had recently reconnected with him on Facebook. Her girlfriend made arrangements with Andrew Tate for them to stay at his place whilst they were in the UK.

92. Complainant 4 and her girlfriend travelled to London Luton Airport. Andrew Tate collected them from the airport. Complainant 4 states that the first red flag was a comment made by Andrew Tate that he could *"Fritzl"* them (a reference to the *Joseph Fritzel* case which

involved rape and false imprisonment) as they did not know the address they were staying at. The apartment had two bedrooms and for the first couple of nights Complainant 4 and her girlfriend slept in Tristan Tate's bed whilst he slept on the couch.

93. Over the first few days a lot of inappropriate things were said by both brothers. They would make misogynistic comments, including that women should submit to men – they would say this a lot. Andrew Tate would say that feminism was poison. Tristan Tate told Complainant 4 a story of how he made a woman submit to anal sex because she had annoyed him. Complainant 4 recalls a whole dialogue based on punishment.

94. Tristan Tate questioned Complainant 4's relationship with her girlfriend and whether she was gay. Both brothers put pressure on Complainant 4 and her girlfriend to drink alcohol. Tristan Tate would pretend to control them by putting a belt around their necks, pretend that he was going to beat them with it and refusing to remove the belt until they had done what had been requested, for example getting him a glass of water. This made Complainant 4 uncomfortable. It was painful and there were moments she could not breathe properly with the belt around her neck. She says it was scary. There was bruising on her neck, but she cannot recall when she got it. Complainant 4 states that on one occasion Tristan Tate pulled the belt hard enough that she could not breathe properly at all. There was a lot of pressure in her face. On another occasion whilst she was sat on the couch, Tristan Tate removed his belt and put it around her neck and used it to forcibly lift her off the couch onto her feet. She could not speak and recalls that her heart was pounding. Tristan Tate laughed and removed the belt from her neck.

**CHARGES**

**RAPE**

**xii. Between 21 July 2010 and 3 August 2010 Tristan Tate intentionally penetrated the vagina of Complainant 4 with his penis, when she did not consent, and he did not reasonably believe that she was consenting:**

95. One night during their stay they agreed to have reunion drinks. On this night the brothers pressured Complainant 4 and her girlfriend to consume alcohol by putting a belt around their necks and not taking it off until they drank. Tristan Tate suggested making a punch. There was Kool-Aid and alcohol. Complainant 4 did not want to drink it because it seemed strong. She said she would have a beer. She got away with this for a while having sips of it. Eventually Tristan Tate figured this out and he put the belt around her neck. This made Complainant 4 uncomfortable. Complainant 4 states that the pressure just kept mounting. The belt was tight, she states that it was freaking her out. Eventually she drank most of her drinks. She felt very drunk, very quickly. She remembers being very unsteady and falling over at one point. Complainant 4 recalls being pulled onto Tristan Tate's lap. At some point Tristan Tate tried to kiss her. Her head was pounding and she did not know what was happening.

96. At some point Complainant 4 realised that Andrew Tate and her girlfriend had left the room, she realised she was alone with Tristan Tate. She describes having delayed processing at this point and remembers being confused. Tristan Tate suggested that they go

and lie down in his room as the couch was uncomfortable. Complainant 4 did not want to go to his room. She felt safer in the living room.

97. Complainant 4 did not want to hurt Tristan Tate's feelings and could feel herself trying to de-escalate the situation by trying to make him think she liked him but declining him in a manner that would not upset him. For example, she told him she was too drunk and that she had never had sex with a man before. She told him she did not want to do anything without her girlfriend and that she did not want to cheat on her girlfriend or make her mad.

98. Tristan Tate picked Complainant 4 up off the couch and she says they literally flew through the hallway and very suddenly she was laying on her back. He had put her on his bed. She does not recall having a shirt on. He took his clothes off and climbed onto the bed. She remembers feeling like she did not have any control over what was happening. She continued to say they should sleep. She continued to say she wanted to go back to the living room. Complainant 4 says Tristan Tate was not listening to what she was saying. He told her it was totally fine. He told her she was feeling guilty and not to listen to her thoughts. She did not fight him physically.

99. He was on top of her very suddenly. She was not feeling her body properly, his penis was inside her vagina, but she could not feel what was happening at first. Complainant 4 recalls feeling that what was happening was not real. She said she had had too much to drink and describes the room spinning. Tristan Tate continued despite her telling him to stop. She continued to say she needed to stop. She told him that she was nauseous and did not feel well. At some point, she started to feel what was happening. She says that it was sore and painful. She describes a burning feeling. She wanted it to stop. He told her that he would

ejaculate soon and that she should "*...just relax*". She says it went on for ages, that she felt deep anxiety, and she felt that she could not make it stop.

100. Complainant 4 says that she could not handle that he was not listening to her, she wanted to get up, was feeling nauseous and started to feel overwhelmed. Her ams and legs felt weird and were not responding as quickly as she wanted them to. She wanted to push him off but did not want to cause a big conflict because she did not know what would happen if she did.

101. Complainant 4 asked him to stop and at one point she was desperate for it to stop and offered to give him oral sex if he stopped. He said no and just kept going. Finally, Complainant 4 felt that she could not hold being sick any longer. She started to gag and he then stopped. She rolled to her side of the bed but could not get up to go to the bathroom. Tristan Tate said they should just finish and that propelled her to get out of bed and go.

102. Complainant 4 stumbled, feeling very dizzy. She made it to the bathroom and before she went in Tristan Tate asked her to come back to bed when she was done. i.e. after she had been sick. She vomited. From the bathroom she went into the hallway having decided she was going back to the living room. Complainant 4 was so sick that she ended up lying on the hallway floor and vomiting intensely. Blue liquid was coming out, she could not catch a breath, and her arms and legs were tingling. She felt cold and she felt an immense sense of shame. It was not until 4 or 5am that she felt she could stand up. She does not know if she slept or not. She cleaned up her vomit and lay on the couch.

103. Next to wake up was Complainant 4's girlfriend. She was also sick and complained of not being able to remember much. Complainant 4 sat on the toilet and wiped herself, it hurt when she urinated. She remembers wiping herself and there not being a lot of blood, but pink.

104. Tristan Tate got up next. He was being friendly and normal as if nothing had happened. Andrew Tate came out last. He commented on the house smelling like sick. Complainant 4 states that all was brushed off as if they had all just had a wild night together. Complainant 4 did not feel well for the rest of the day.

105. That night Tristan Tate said he could not sleep on the couch as he was hungover. He needed to be in bed. This led to Complainant 4 sleeping in a bed with him again whilst her girlfriend shared a bed with Andrew Tate. Tristan Tate asked Complainant 4 for sex again. Complainant 4 refused.

**RAPE**

**xiii. Between 21 July 2010 and 3 August 2010 [on an occasion other than that specified in charge 12 [xii] Tristan Tate intentionally penetrated the vagina of Complainant 4 with his penis, when she did not consent, and he did not reasonably believe that she was consenting:**

106. The next day Complainant 4 spoke with her girlfriend privately in the bathroom. She states that she was *"having a freak out about it"* and crying, saying she did not want to sleep in the bed with Tristan Tate again. Her girlfriend told her to say no or pretend to be asleep.

107. The next night she tried to tell Tristan Tate that she was tired, and she was going to bed early. She went in first and lay on the edge of the bed as far as she could facing the bathroom on her left side. He came in and she pretended to be asleep. She recalls him moving around the room and getting undressed. He asked if she was awake and she ignored him. He tried to wake her up asked if she wanted to have sex, pushing his erection against her bottom. Complainant 4 said no. She told him she was not drunk. She said she was too drunk the other night and that never should have happened. She told him she was not going to betray her girlfriend and that she was a lesbian.

108. Tristan Tate's response was that Complainant 4 could not expect to come to stay in his apartment and sleep in his bed and he would not want to have sex with her. He told her that her relationship with her girlfriend was not a real relationship because she was a woman; and that the only thing men respect is another man. He told her that men have a right to have sex with women who do not have boyfriends.

109. Complainant 4 started outright saying *"No"* and stopped trying to say so in nicer ways. Tristan Tate kept pushing his erection between Complainant 4's legs and against her vagina. She was wearing a t-shirt and shorts. Tristan Tate pushed the fabric with his erection into Complainant 4's body in a way that was painful. It felt like he was trying to have sex with her through her clothing. She told him he was hurting her. She told him to stop. He told her to take her shorts off. She refused and again told him to stop. He continued humping or thrusting, pushing her pants into her body with his penis and insisting that she took her shorts off. She kept saying no.

110. Eventually it was so painful, and Complainant 4 could not handle it. He had hold of her. She states that she could have screamed or called for her girlfriend, but she felt she was in trouble and did not want her girlfriend to hear. He tugged at her shorts, pulled them down, and continued to try to enter her vagina with his penis. It was painful. She kept asking him to stop and told him that she did not want her girlfriend to think she wanted to have sex with him. She tried to get off the bed to get away from him. He got off the bed with her and said they would have sex on the floor then. The rape continued on the floor. Tristan Tate was annoyed; he seemed irritated that Complainant 4 would not stop talking about her girlfriend. He wanted her to forget about her girlfriend and told her that she had been brainwashed. He said he was an "*Alpha*" and it was impossible for women not to be attracted to him. He told her she was only saying no because she felt guilty.

111. He was annoyed that they were on the floor and not the bed. He stayed behind her. She was on her knees, he pushed her head and shoulders down on the floor. He kept telling her to relax and threatened to get the belt. At one point he told her to "*submit*". Complainant 4 feared that Tristan Tate would anally rape her. He leaned over and grabbed his belt from the floor. He put it round her neck and pulled on it, she felt light-headed. She felt confused; her hands and feet were tingling. He was penetrating her vagina with his penis from behind her.

112. Complainant 4 recalls that it was really painful, like a very sharp pain. She kept trying to make it less painful by trying to move slightly or shift slightly. He complained about it being uncomfortable on the floor. At one point, he said that her body wanted it, even though her brain was saying no and that girls wanted to be dominated, that they only respect men that can do that.

113. Complainant 4 states that it did not last as long as the first time. Eventually he started being intense and aggressive. She describes him pushing her face and shoulders down into the ground as he ejaculated. She states that he was very aggressive with the intercourse when he was ejaculating. He ejaculated on the floor and inside her vagina. She says it was awful. Complainant 4's hips ached and it was uncomfortable for her to get out of the position she was in.

114. Complainant 4 did not consent to sexual intercourse with Tristan Tate on either of the above occasions.

**ASSAULT BY PENETRATION**

**xiv. Between 21 July 2010 and 3 August 2010 Tristan Tate intentionally penetrated the vagina of Complainant 4 with his fingers, when that penetration was sexual, when she did not consent, and he did not reasonably believe that she was consenting:**

115. After the rape, Complainant 4 wanted to go into the bathroom to get away from Tristan Tate. She wanted to have a shower. He said he was going to have a shower as well. She said no to this. She describes being in a fog and questioning what was happening. She did not want Tristan Tate in the bathroom with her, and she did not want him to get in the shower with her. Complainant 4 states that he just did whatever he wanted to do. She did not feel like she had a choice. She asked him to be quiet, to leave her alone, to go away and he found this funny laughing loudly.

116. In the shower Tristan Tate washed Complainant 4's body. She just stood there. She remembers him penetrating her vagina with his fingers saying they could have sex again in the shower. She told him off at this point. He found it funny. She felt like she had no power to do anything. She got out of the shower, dried off, and put her clothes on quickly. She was bleeding a lot; she saw blood every time she went to the toilet. Over the next two days her underwear was stained, and she had to throw it away.

117. Complainant 4 did not consent to Tristan Tate penetrating her vagina with his fingers. She recalls explicitly telling him that she did not want him to come into the shower with her and recalls telling him to stop.

**CORROBORATION**

118. Complainant 4 provided photographs to the Police that were taken of her trip, some of which depict the events she described. Photographs that show drinks and Kool-Aid on a table, three images of Tristan Tate with his belt around Complainant 4's girlfriend's neck and photographs showing them at Tristan and Andrew Tate's apartment.

119. Complainant 4 also provided screenshots of Facebook of messages between Complainant 4 and Tristan Tate, including references to Tristan Tate using a belt. Complainant 4 made disclosures of the incident to friends. Complainant 4 has provided Police with an email from a friend she disclosed to dated 14 September 2025, in which her friend confirms that she told him in October 2010 that she was sexually assaulted but did not at the time name her assailant. Complainant 4 also disclosed to Police that in 2010 she sought support from a rape crisis charity.

**COMPLAINANT 5**

120. Complainant 5 was contacted by the Police in February 2025. There is one charge that relates to Complainant 5. She provided a formal account to the Police in November 2025 in a video recorded interview as set out below.

**BACKGROUND**

121. Complainant 5 was in a relationship with Andrew Tate in [redacted]. Complainant 5 described herself as vulnerable and lacking in confidence during this time. Complainant 5 described Tristan Tate as the clever younger brother, a bit more awkward but confident and quiet. She believed that he was the brains behind it all, and Andrew was the talk. Although she only met Tristan Tate a handful of times, maybe two to three times, she thought that he was the nicer brother.

**CHARGES**

**HUMAN TRAFFICKING**

xv. **Between 31 July 2015 and 30 March 2016 Tristan Tate and Andrew Tate arranged or facilitated the travel of Complainant 5 with the intention that she would be exploited or knew or ought to have known that she would be sexually exploited by another during or after travel:**

122. Throughout her relationship with Andrew Tate, he would often try to recruit her to work for him as a cam girl. Complainant 5 refused on many occasions. Andrew Tate eventually managed to persuade Complainant 5 to go to Romania with him as his girlfriend, under the pretence that it would be the two of them spending time together on holiday. In 2016, Complainant 5 agreed to go to Romania with Andrew Tate based on his promises.

123. Andrew Tate booked and paid for Complainant 5's trip and she flew to Romania. Andrew Tate was meant to be travelling with Complainant 5 but at the last minute she had to travel without him because he said that he was already there. She was met by Tristan Tate and another female at the airport and was driven to the apartment. There were three other females at the apartment. That night they all consumed alcohol in a hot tub. Andrew Tate then told the females to get to work and accompanied them into a room. Complainant 5 was told to stay with Tristan Tate in the other room.

124. Tristan Tate was working on his laptop (on the webcam platform), when he asked Complainant 5 to try webcamming. Complainant 5 refused and told him that she had made it clear to Andrew Tate that she was not participating. He told her that she was going to have to do it, all she had to do was sit there. So, she sat there whilst Tristan Tate typed to men online, he then told her to pretend that she was typing. She was fully clothed sat on the bed at this point. Complainant 5 was given a keyboard but was not typing convincingly, which annoyed Tristan Tate. He told her she needed to do it properly. He then told her that a man online wanted her to take her top off. She refused. She had only met Tristan Tate a handful of times before this and felt uncomfortable.

125. Tristan Tate then left the room and Andrew Tate entered; Complainant 5 recalls being pinned up against the wall by Andrew Tate, he put his hand around her neck and told her to do as Tristan Tate told her, "*you do what the captain says. You fucking do what he says*". She was really scared so she got back onto the bed and took her top off. Complainant 5 became very distressed during this incident and started crying, because of this they stopped.

126. That night she slept in the same room as Andrew Tate and another female. The female was drunk and was passed out on the bed next to Complainant 5. Complainant 5 recalls fearing Andrew Tate when he came into the bedroom, he started kissing her, took her clothes off and started having sexual intercourse with her (Complainant 5), she did not want to have intercourse with him, but she just lay there and let him do it. This does not form part of the charge but shows the level of control Andrew Tate had over Complainant 5.

127. On the second night, Andrew Tate told the females to get to work, Complainant 5 refused and told him that she was not there to work. Andrew Tate verbally threatened her and told her to get ready, so she did because by this point, she was utterly terrified of him. He told her that she was going to be in the room with the other two females. Andrew Tate was in the same room, typing on the laptop. There were people logged onto the chatroom watching them on the laptop. Andrew Tate instructed them all to perform oral sex on each other, they all did as they were instructed, including Complainant 5. Complainant 5 did not consent to this, she did not want to participate, she felt uncomfortable.

128. Following this, Complainant 5 physically vomited and spent the night in the bathroom with the door locked. Complainant 5 told Andrew Tate that she did not want to be there anymore. He told her that she was not allowed to leave; Andrew Tate had her passport, he

had taken this off her when she arrived in Romania under the pretence that he needed it to book flights for the two of them to go on holiday. Complainant 5 realised that Andrew Tate did not love her, he only wanted to make money off her. He initially refused to let Complainant 5 go home but eventually agreed after she told him that her family knew that she was in Romania with him.

129. On the same day Andrew Tate took Complainant 5 to an apartment complex, which she thought was a brothel, where he persisted to try and convince her to stay. When Complainant 5 refused, Andrew Tate became angry and threatened to kill her and her family if she told anyone what happened. He then drove her to what she thought was a service station and returned her passport. She was driven to the airport by a man who did not speak English. She felt sick and was terrified the entire journey. She got on a plane and flew to the UK.

130. Complainant 5 went to Romania for the sole purpose of spending time with her boyfriend, Andrew Tate. She did not expect to be in an apartment with Tristan Tate or other women, nor did she expect to be forced and threatened to perform sexual acts on a webcam. The last time she saw Andrew and Tristan Tate in person was in Romania. Tristan Tate has been jointly charged with Andrew Tate in respect of this offence.

**CORROBORATION**

131. The Police have obtained a screen recording of Facebook messages between Complainant 5 and Andrew Tate in October 2015, November 2015 and June 2016, where he states that he is a *pimp*, and persistently tries to recruit Complainant 5 to work for him

*"You don't have to do shit but sit there and talk" "Nothing else". "I guarantee u 2k a week and free place to live".* On 20 November 2015 he sends a photograph of a female to Complainant 5 stating *"sits at a computer gets 5K a week"* and *"… plus she gets fucked by me. Dream life obviously" "You would make double that"*.

**COMPLAINANT 6**

132. Complainant 6 was first contacted by the Police in January 2025. She provided the Police with her evidential account in June 2025 in a video recorded interview as summarised below. There is one charge that relates to Complainant 6.

**BACKGROUND**

133. Complainant 6 was in a relationship with Andrew Tate in [redacted]. She was 21 years old at the time. She reflects that she was young and very vulnerable; at that point in her life she felt completely alone, she was experiencing family difficulties, had left a difficult romantic relationship and had no friends she could turn to.

134. After giving her evidential account Complainant 6 expressed that she's now ten years older and ten years wiser but when she looks back at herself at 21 years of age, she realises that it was a horrible experience. She says she would never wish for anybody to go through it in the way that she did.

**CHARGES**

**HUMAN TRAFFICKING**

**xvi. Between 1 June 2016 and 30 March 2017 Andrew Tate and Tristan Tate arranged or facilitated the travel of another Complainant 6 with the intention that she would be exploited or knew or ought to have known that she would be sexually exploited by another during or after travel:**

135. This charge relates to Andrew Tate and Tristan Tate arranging and facilitating travel for Complainant 6 to Romania to work for them as a cam girl by exploiting her to perform sexual acts online in exchange for money.

136. Andrew Tate recruited Complainant 6 to work as a cam girl in his and Tristan Tate's webcam business based in Romania. He achieved this by telling her she would be his girlfriend and that she could make money from doing webcam work without taking her clothes off. He showed her a webcam site of another female who was clothed and earning money. He put the prospect of her being his girlfriend and doing webcam work forward as an exciting opportunity.

137. On 2 September 2016, Complainant 6 left the UK for Romania believing she would be in an exclusive relationship with Andrew Tate. Complainant 6 did not book or pay for the flight and is not sure who did. However, she recalls being met at the airport and taken to the house in Romania by Tristan Tate and a female called [redacted].

138. When Complainant 6 arrived at the house, her passport was taken from her and locked away. Andrew Tate was present at the house and seemed pleased to see her. Andrew Tate showed her around the house, and she recalls seeing an area with lots of screens and keypads. She was shown to her bedroom and told that she was to share a bed with Andrew Tate and another female. At this point she still believed she was Andrew Tate's girlfriend.

139. The reality of Complainant 6's life in Romania differed from the promises: she was lured to Romania with a promise of being Andrew Tate's girlfriend - he had no intention of being in a relationship with Complainant 6 and within two months of her arriving in Romania, he sent her a text message saying that she was no longer his girlfriend.

140. Complainant 6 acknowledged that she expected to do some clothed webcam work from Romania. However, within 24 hours of arriving in Romania, she was made to perform naked on webcams. She often worked a minimum of nine hour days doing webcam sex work; others (usually [redacted] but sometimes Tristan Tate) controlled the webchat and accepted payments for sex acts regardless of her agreement. As well as the webcam work, she was required to produce bespoke pornographic videos for Andrew and Tristan Tate's subscribers.

141. Complainant 6 describes some of the sexual acts she was required to do on camera for payment, including spanking her buttocks and spanking her vagina – she would be instructed on how hard she was to hit herself; suck a sex toy on camera; wear nipple clamps, a gag or sex toys. Complainant 6 had not engaged in anal sexual activity before she was trafficked to Romania. She also engaged in digital anal penetration of other females. On

one occasion it was pre-agreed that she would behave like a three-year-old and recalls coming off the Skype chat and sobbing because she felt really dirty.

142. She recalls Tristan Tate and [redacted] taking her to Ikea and purchasing items for her webcam room to make it look like she was a girl in the UK working from her own bedroom. They also purchased a transparent plastic chair which Complainant 6 was told to use to film herself engaging in sexual activity.

143. Complainant 6 describes being required to make bespoke sexual videos depicting herself urinating in the shower. The videos were requested by Andrew Tate and Tristan Tate's subscribers; she did not have the option to refuse the requests because others controlling her messages agreed on her behalf. Complainant 6 explains there was a culture of fear in the house, the females had to do as they were instructed.

144. Complainant 6 alleges that Andrew Tate orally raped her whilst in Romania. That offence cannot be charged in England and Wales due to jurisdictional issues, however, it is relevant insofar as it demonstrates a course of conduct involving the use of violence, whether sexual or otherwise, to coerce and control Complainant 6. Having entered the bedroom where Complainant 6 was made to share a bed with Andrew Tate and another female, he said to complainant 6 "*you are going to suck my dick*". Complainant 6 was frightened and moved onto the floor beside the bed. She did not agree to perform oral sex on Andrew Tate; he grabbed hold of her head and forced her face towards his genitals. She performed oral sex for approximately five minutes after which he told her she was "*shit*" and made her massage his shoulders whilst another female performed oral sex on him.

145. Andrew Tate committed non-sexual violent acts towards Complainant 6. Whilst in Romania he made it clear that he did not like Complainant 6 smoking and on one occasion when he challenged her about it, she initially lied and said that she had not been smoking, she quickly admitted the truth as she was frightened. Andrew Tate grabbed her by the throat and lifted her off the floor. He told her not to disrespect him, that he would send her home and threatened to kill her if he caught her again. She describes being petrified. She had marks on her neck which lasted a day or two. She explained that Andrew Tate was very good at making everyone aware that he was a kickboxing champion and he "*made you feel small and weak*".

146. On another occasion Complainant 6 had been abandoned by Andrew Tate in a nightclub in Bucharest. She sent him a message complaining but then was terrified of the repercussions. Tristan Tate told her to apologise to Andrew Tate as he (Andrew Tate) was fuming. Andrew Tate said she was lucky he liked her – if she was any other girl, he would send her back to the UK.

147. Andrew Tate and Tristan Tate manipulated the trafficked females by creating a culture of belonging to a family in Romania; the trafficked females wanted to please Andrew Tate and Complainant 6 confirms that she sought validation from him. The threat of being sent back to the UK carried with it a sense of failure and lack of validation. Andrew Tate and Tristan Tate also praised any female who made big money and would belittle those who made less.

148. On 17 March 2017, Complainant 6 fled back to the UK. She told Andrew and Tristan Tate that she was attending a funeral. She booked the flight ticket on 8 March 2017 and

was made to purchase a return flight for 18 March 2017. Complainant 6 did not use the prebooked return portion on 18 March 2017, and the same day she told Andrew Tate that she would not be returning to Bucharest. Andrew Tate suggested that she continue doing webcam work from a flat [redacted]. Complainant 6 had left her belongings, some of which had sentimental value attached to them, at the house in Romania; to enable her to safely return to recover her belongings she ostensibly agreed to Andrew Tate's proposal of working from a flat [redacted] but in reality, had no intention of doing so. She was collected from the airport by Tristan Tate and [redacted]. Tristan Tate would not speak to her, and [redacted] told her that Tristan was "*disappointed*" with her. When being taken back to the airport to return to the UK Tristan Tate told Complainant 6 that she was a "*piece of shit*" for leaving them.

149. After finally leaving Romania Complainant 6 did not undertake any further webcam work. She blocked Andrew Tate, Tristan Tate and [redacted] in her phone contacts list and on all social media sites.

**<u>CORROBORATION</u>**

150. Evidence obtained from *MyFreeCams* confirms that Complainant 6 signed a *MyFreeCams* agreement on 27 August 2016.

151. Complainant 6's bank accounts have been reviewed and reveal that on 2 September 2016 she made non flight purchases at [redacted] airport. Thereafter, bank transactions all take place in Romania until she returns to the UK on 17 March 2017.

52

152. A screenshot of a message sent by Complainant 6 to Tristan Tate dated 11 March 2017 asking for permission to go out and buy a new phone has been obtained.

153. Enquiries with Wizz Air reveal that Complainant 6 booked her first flight back to the UK on 8 March 2017. She boarded the flight departing Bucharest Henri Coanda airport in Romania bound for [redacted] airport on 17 March 2017. The same enquiries reveal that Complainant 6 did not board the return flight from [redacted] airport to Bucharest Henri Coanda airport in Romania on 18 March 2017. Further on 27 March 2017 Complainant 6 booked a flight through Wizz Air departing from Bucharest Henri Coanda airport in Romania to [redacted] airport on 29 March 2017. Complainant 6 boarded the flight to [redacted] airport on 29 March 2017.

154. Evidence has been obtained which demonstrates that Complainant 6 worked at total of 1,248 hours online between September 2016 and March 2017 earning $115,469.90. Applying an average exchange rate in January 2017 of £0.81 to $1, this equates to £93,530.62. Complainant 6 received £26,454.52 demonstrating she was paid a fraction of what she earned, with Andrew Tate and Tristan Tate making significant profits from her.

155. Screenshots demonstrating that Andrew Tate, Tristan Tate and [redacted] are blocked contacts on Complainant 6's mobile phone contact list and social media sites have also been obtained.

53

**COMPLAINANT 7**

156. Complainant 7 was contacted by UK Police in March and July 2025. She provided the Police with a formal account in a video recorded interview on 14 July 2025, as summarised below. There is one charge concerning Complainant 7.

**BACKGROUND**

157. Complainant 7 met Andrew Tate and Tristan Tate in November 2011 at a nightclub in London. Andrew Tate and Complainant 7 exchanged numbers and were in a relationship for approximately a year. When they would have sex, Andrew Tate wanted to play the "daddy" role and would have her wear clothing of young girls like frilly socks. Both Andrew Tate and Tristan Tate would joke in front of Complainant 7 that they were paedophiles and that they liked little girls.

158. Complainant 7 reflects that she was young and naïve during her relationship with Andrew Tate. The relationship lasted approximately 12 months and ended [redacted] when Complainant 7 learned that Andrew Tate had been seeing someone else.

159. Complainant 7 moved on, met someone else, and got married in 2016 although Andrew Tate would still occasionally contact her. In 2017, Complainant 7 responded to one of Andrew Tate's emails. This resulted in dialogue between the two culminating in them both meeting up.

**CHARGES**

**HUMAN TRAFFICKING**

**xvii. Between 27 April 2016 and 18 August 2017 Tristan Tate and Andrew Tate arranged or facilitated the travel of Complainant 7 with a view to her being exploited:**

160. This charge relates to Andrew Tate and Tristan Tate arranging and facilitating travel for Complainant 7 to Romania to work for them as a cam girl by pressuring her to perform sexual acts online in exchange for money.

161. Andrew Tate encouraged Complainant 7 to leave her husband and for her to move in with him in Romania. He told her he loved her. He said she would live with him and another female in a big house and lead a lifestyle of eating out and partying. He promised she would have her own money, she would not have to do webcam work (online pornography), but she could if she wanted to earn money. She was told if she did the webcam work, she would keep 80% of her earning and Andrew Tate would keep 20% to cover overheads.

162. Eventually Complainant 7 agreed to go to Romania. Andrew Tate booked her flight and in June 2017 she flew to Romania. Andrew Tate, Tristan Tate and another female from the house collected her from the airport. When she arrived, she was taken to a house where there were four or five other young females staying. There were webcams set up in the rooms, and each room was made to look like a bedroom. [redacted] was there too; she was running the business.

163. The time in Romania was not what Complainant 7 had been promised. She was working on camera often for 12 hours a day. Others in the house, including Andrew Tate and Tristan Tate would control the chat function on the webcam broadcast and would accept payment for sex acts for Complainant 7 to carry out on camera irrespective of Complainant 7's agreement. They controlled everything she did. She describes there was a complete disregard for her autonomy and consent to carry out sexual acts on camera. Complainant 7 had made it clear that she did not want to do any anal activity, but this was ignored Tristan Tate and others controlling the webchat would accept payment for Complainant 7 to carry out anal sex acts – including inserting sex toys in her anus, she would be pressured into doing them. She did not feel like she was allowed to say no. One time Complainant 7 had to "*fuck a bed knob for an hour*." She describes it felt like sexual slavery.

164. In contrast to the indication Complainant 7 had been given before she travelled, Complainant 7 was only allowed to keep 20% of her earnings and had to pay her own living expenses. The banking documentation obtained specifically references Tristan Tate's payments to Complainant 7 during the period she was in Romania.

165. Complainant 7 had sex with Andrew Tate whilst in Romania out of obligation. This happened frequently. Complainant 7 would sleep in her studio room so she did not have to share a room with Andrew Tate who would demand sex from Complainant 7.

166. Andrew Tate used violence against Complainant 7 and other women in house whilst in Romania. Complainant 7 was thrown in the pool, choked, tripped, slapped and left on the floor unconscious. She describes the brothers would make death threats to her and the

others living there. Those living in the house were subject to an environment of intimidation and control, causing them to feel fearful of Andrew Tate and Tristan Tate.

167. Her movements were restricted and controlled by Andrew and Tristan Tate, she recalls being hungry and wanting to go to a McDonalds restaurant, it was made clear to her this was not allowed. She feared for her personal safety, felt isolated and alone.

168. After approximately three months Complainant 7 left Romania in August 2017. She booked a flight and waited until Andrew Tate was out. She ran to [redacted]'s apartment and came up with an elaborate lie saying she had to return to the UK as her mother was in hospital.

169. The whole experience has massively affected Complainant 7's life and mental health. It was only when Complainant 7 reflected following Andrew Tate's growth to fame that she realised that she had been trafficked.

**CORROBORATION**

170. Prior to her disclosure to the Police about Andrew Tate's conduct, on 27 September 2024 Complainant 7 disclosed to her ex-husband that she had been trafficked by Andrew Tate. Complainant 7 has provided this text message to the Police. Complainant 7 had disclosed details about her experiences with Andrew Tate to her ex-husband and friends. Some of the disclosure is retained in text messages recovered from digital devices.

171. Email correspondence has been provided which demonstrates the contact between Complainant 7 and Andrew Tate in the period before she left for Romania in 2017. The emails show that Andrew Tate emailed the Complainant in 2013, 2014, 2016 and 2017. In 2013 he asked how she was and asked her to accompany him on a business trip to Kosice, he said she would spend three nights clubbing. She refused. In 2014 he asked for Complainant's phone number, she refused. He emailed her again in 2014 asking her to be a webcam girl on his webcam platform, he told her fully clothed females made £700-£1000 per week, she refused. Later in 2014 he unsuccessfully tried again to obtain her phone number and persuade her to do the webcam work and this time said she would earn £1500-£2000 per week. In April 2017 Andrew Tate emailed Complainant 7 prior to her leaving for Romania. He told her she did not need to do the webcam work in Romania if she did not want to, "*daily life would be perfect*", she was his "*Number 1*" and he felt excited at the prospect of them being around each other. Complainant 7's email shows she was unsure about the prospect of going to Romania.

172. In relation to her time in Romania Complainant 7 has provided details of her flights to and from Romania. Banking documentation has been obtained which shows the payments Complainant 7 received from Tristan Tate during the period she was in Romania. The banking documentation shows between 4 July 2017 and 26 August 2017 Complainant 7 received four payments from Tristan Tate totalling £2,711.01. A further payment scheduled to take place on the 8 September 2017 for £128.18 was cancelled and Complainant 7 did not receive the money.

173. Finally, the Police have obtained copies of the invoices showing Andrew Tate stayed in hotels and ate in restaurants near Complainant 7's hometown in England, in April 2017.

FB

**OTHER PROCEEDINGS**

174. On 12 March 2024 Tristan Tate was arrested in Romania on a Trade and Cooperation Agreement (TACA) warrant, issued by the United Kingdom in relation to charges one (i) to eleven (xi) as set out in the arrest warrant dated 19 January 2024. Extradition was ordered by the Romanian authorities on the same date; however, surrender was deferred until the conclusion of domestic proceedings in Romania, which are still ongoing. This does not prevent the United Kingdom seeking the surrender of Tristan Tate from the United States of America. Since extradition was ordered by the Romanian authorities, the Crown Prosecution Service have laid further charges which are encompassed in the warrant issued on 5 August 2026 as set out above.

Signed: LMarshall

**Lee-Anne Marshall**

Dated: 07/09/2026

**EXHIBIT**

This is Exhibit LM/01 referred to in the statement of Lee-Anne Marshall.

**Exhibit LM/01**

**Photograph of Tristan Tate**



**NARINDER DHILLON states as follows:**

1. I am a Solicitor and Specialist Prosecutor employed by the Crown Prosecution Service of England and Wales based in the Extradition Unit. I am well acquainted with the criminal law of England and Wales. I have conduct of the request made to the United States of America for the extradition of Tristan Tate to the United Kingdom.

2. This extradition request is made so that Tristan Tate can be extradited to the United Kingdom to stand trial for a total of seventeen offences as set out in the two arrest warrants for Tristan Tate. The first warrant is dated 19 January 2024 and relates to eleven offences; the second warrant is dated 5 August 2026 and relates to six offences.

3. For ease of reference, in the extradition request and in this statement of law, the charges in the second warrant have been numbered consecutively after charges 1 to 11 in the first warrant. Accordingly, the numbering continues from the first warrant. Any number shown in brackets denotes the original numbering of that charge within the second warrant itself.

4. In summary these offences are:

| Offence | Warrant of Arrest dated 19 January 2024 | Warrant of Arrest dated 5 August 2026 | Maximum Sentence if convicted |
|---|---|---|---|
| Rape | Charges 1, 2 and 9 | Charges 12(1), 13(2) | Life imprisonment |
| Assault occasioning actual bodily harm | Charges 3, 4, 5, 6, 7 and 8 | | 5 years' imprisonment |
| Human trafficking | Charges 10 and 11 | Charges 15(4), 16(5), 17(6) | Life imprisonment |
| Assault by penetration | | Charge 14(3) | Life imprisonment |

5. I set out below the relevant law applicable at the time the offences were committed. Each offence is punishable under the law of the United Kingdom by a term of imprisonment of more than one year.

**Rape**

6. Rape is an offence contrary to section 1 of the Sexual Offences Act 2003.

7. Section 1 of the Sexual Offences Act 2003 provides:

(1) A person (A) commits an offence (Rape) if –

(a) he intentionally penetrates the vagina, anus or mouth of another person (B) with his penis,

(b) B does not consent to the penetration, and

(c) A does not reasonably believe that B consents.

(2) Whether a belief is reasonable is to be determined having regard to all the circumstances, including any steps A has taken to ascertain whether B consents.

**Penetration**

8. Penetration is a continuing act from entry to withdrawal so that it follows that consensual intercourse will become rape if the woman or man ceases to consent during the intercourse and the accused with the necessary mens rea continues the intercourse. Similarly non-consensual intercourse will become rape if the accused continues intercourse after ceasing to believe on reasonable grounds that the complainant was consenting.

9. Where vaginal rape is alleged, it is not necessary to prove penetration of the vagina; it is sufficient that there was *any* degree of penetration by the penis within the labia.

**Consent**

10. Section 74 of the Sexual Offences Act 2003 provides that for the purposes of this offence, *"a person consents if he agrees by choice and has the freedom and capacity to make that choice."*

**Evidential presumptions about consent**

11. Certain evidential (i.e. rebuttable) presumptions are applied to the issue of consent by section 75 of the Sexual Offences Act 2003:

(1) If in proceedings for an offence to which this section applies it is proved –

(a) that the defendant did the relevant act;

(b) that any of the circumstances specified in subsection (2) existed, and

(c) that the defendant knew that those circumstances existed,

the complainant is to be taken not to have consented to the relevant act unless sufficient evidence is adduced to raise an issue as to whether the complainant

consented, and the defendant is to be taken not to have reasonably believed that the complainant consented unless sufficient evidence is adduced to raise an issue as to whether he reasonably believed it

(2) The circumstances are that –

(a) any person was, at the time of the relevant act or immediately before it began, using violence against the complainant or causing the complainant to fear that immediate violence would be used against him;

(b) any person was, at the time of the relevant act or immediately before it began, causing the complainant to fear that violence was being used, or that immediate violence would be used, against another person;

(c) the complainant was, and the defendant was not, unlawfully detained at the time of the relevant act;

(d) the complainant was asleep or otherwise unconscious at the time of the relevant act;

(e) because of the complainant's physical disability, the complainant would not have been able at the time of the relevant act to communicate to the defendant whether the complainant consented;

66

(f) any person had administered to or caused to be taken by the complainant, without the complainant's consent, a substance which, having regard to when it was administered or taken, was capable of causing or enabling the complainant to be stupefied or overpowered at the time of the relevant act.

(3) In subsection (2)(a) and (b), the reference to the time immediately before the relevant act began is, in the case of an act which is one of a continuous series of sexual activities, a reference to the time immediately before the first sexual activity began.

**Conclusive presumptions about consent**

12. Additional presumptions, this time irrefutable or conclusive in nature are set out in section 76 of the Act:

(1) If in proceedings for an offence to which this section applies it is proved that the defendant did the relevant act and that any of the circumstances specified in subsection (2) existed, it is to be conclusively presumed –

(a) that the complainant did not consent to the relevant act, and

(b) that the defendant did not believe that the complainant consented to the relevant act.

(2) The circumstances are that –

(a) the defendant intentionally deceived the complainant as to the nature or purpose of the relevant act

(b) the defendant intentionally induced the complainant to consent to the relevant act by impersonating a person known personally to the complainant.

In relation to an offence to which sections 75 and 76 apply, references to the relevant act mean the defendant intentionally penetrating, with his penis, the vagina, anus or mouth of another person ("the complainant").

**Allocation**

13. Rape is an indictable-only offence and may be tried only on indictment before a jury at the Crown Court.

**Punishment**

14. Section 1(4) of the Sexual Offences Act 2003 provides that the maximum penalty which may be imposed following conviction on indictment for an offence of rape is imprisonment for life.

**Limitation**

15. There is no time limit for bringing a charge under section 1 of the Sexual Offences Act 2003.

**Life Sentence**

16. Where a life sentence (whether mandatory or discretionary) is imposed the sentencing judge determines what part of the sentence must be served in prison before the offender may be considered for release on licence: That period is referred to as the minimum term. Every person sentenced on indictment has the right to ask for a review of that minimum term by the Court of Appeal.

17. The offender must serve the appropriate minimum term that reflects the punitive element of the sentence. Once this punitive term of imprisonment has expired, the offender enters the 'risk' element of the sentence. He may only be detained if he continues to present a risk to the public.

18. An independent Parole Board conducts a review of the prisoner's sentence once the punitive element of the sentence has expired. A judge chairs this panel. An oral hearing can take place to determine whether the prisoner's detention should continue. The Parole Board must decide whether it is necessary for the protection of the public, for the prisoner's detention to continue. At this hearing the prisoner

has the right to be present, to be legally represented and to call and question witnesses.

19. The Parole Board can direct the release of the prisoner. If it decides that the prisoner should not be released, then a further hearing will take place within 2 years to review the prisoner's detention and at regular intervals thereafter.

20. All life sentence prisoners are released under a licence that remains in force for the rest of their lives. The life licence can be revoked at any time, if necessary, on public protection grounds.

21. In every case, including cases where a whole life term or a minimum term exceeding twenty years has been imposed, the prisoner may apply for compassionate release under section 30 of the Crime (Sentences) Act 1997 and/or for release under the powers of the Royal Prerogative of Mercy. The Secretary of State may release a serving prisoner at any point in the sentence if they are satisfied that exceptional circumstances exist which justify the prisoner's release on compassionate grounds.

**Assault by penetration**

22. Assault by penetration is an offence contrary to section 2 of the Sexual Offences Act 2003.

(1) A person (A) commits an offence if–

(a) he intentionally penetrates the vagina or anus of another person (B) with a part of his body or anything else,

(b) the penetration is sexual,

(c) B does not consent to the penetration, and

(d) A does not reasonably believe that B consents.

(2) Whether a belief is reasonable is to be determined having regard to all the circumstances, including any steps A has taken to ascertain whether B consents.

(3) Sections 75 and 76 apply to an offence under this section.

**Sexual**

23. Section 78 states for the purposes of this Part, penetration, touching or any other activity is sexual if a reasonable person would consider that–

(a) whatever its circumstances or any person's purpose in relation to it, it is because of its nature sexual, or

(b) because of its nature it may be sexual and because of its circumstances or the purpose of any person in relation to it (or both) it is sexual.

**Allocation**

24. Assault by penetration is an indictable-only offence and may be tried only on indictment before a jury at the Crown Court.

**Punishment**

25. Section 2 (4) of the Sexual Offences Act 2003 provides that the maximum penalty which may be imposed following conviction on indictment for an offence of rape is imprisonment for life

26. The operation of life sentences as described in paragraphs 16-21 above would be applicable in the event a life sentence was imposed following conviction of an offence of assault by penetration.

**Limitation**

27. There is no time limit for bringing a charge under section 2 of the Sexual Offences Act 2003.

**Assault occasioning actual bodily harm**

28. Assault occasioning actual bodily harm is an offence contrary to section 47 of the

Offences against the Person Act 1861 which provides:

Whosoever shall be convicted on indictment of any assault occasioning actual bodily harm shall be liable to imprisonment for not more than five years.

**Assault**

29. An assault is any act, and not a mere omission to act, by which a person intentionally or recklessly causes another to apprehend immediate and unlawful violence. Assault can also include a "battery" which is the intentional or reckless application of unlawful force to the victim. The act must be accompanied by a hostile intent calculated to cause apprehension in the mind of the victim.

**Occasioning**

30. The prosecution must prove the assault "occasioned" or caused the bodily harm.

**Actual bodily harm**

31. "Bodily harm" has its ordinary meaning and includes any hurt or injury calculated to interfere with the health or comfort of the complainant. Such hurt or injury need not be permanent but must be more than merely transient and trifling ( *Donovan [1934] 2 K.B. 498* (1936) 25 Cr. App. R. 1, CCA). "Bodily harm" also includes a momentary loss of consciousness (*R. (T) v DPP* [2003] EWHC 266 (Admin); [2003] Crim. L.R. 622, QBD).

**Consent**

32. In R v Brown [1994] 1 AC 212, the House of Lords held that a person cannot validly consent to the infliction of actual bodily harm or more serious injury unless the conduct falls within a recognised exception, such as properly conducted sport, lawful surgery, tattooing or ritual circumcision. The satisfaction of sadomasochistic sexual desires was specifically held not to constitute a good reason capable of creating such an exception.

33. The principle is not confined to sadomasochistic homosexual activity. In R v Emmett [1999] WL 477810, the Court of Appeal applied *Brown* to consensual heterosexual sexual activity involving asphyxiation and burning. The Court held that consent was no defence where the activity caused actual bodily harm and exposed the complainant to a risk of serious injury. The Court expressly stated that there was no basis for distinguishing between homosexual and heterosexual sadomasochistic activity.

34. Accordingly, where sexual activity involves the intentional infliction of actual bodily harm, including injury caused by choking, strangulation or other forms of rough sexual violence, consent will not ordinarily provide a defence to an offence under section 47 of the Offences Against the Person Act.

**Allocation**

35. Assault occasioning actual bodily harm is an either-way offence and can proceed summarily at the Magistrates' Court, or on indictment before a jury at the Crown Court.

**Punishment**

36. Section 47 of the Offences against the Person Act 1861 provides that the maximum penalty which may be imposed following conviction on indictment for an offence of assault occasioning actual bodily harm is imprisonment for a term not exceeding five years.

**Limitation**

37. There is no time limit for bringing a charge under section 47 of the Offences against the Person Act 1861.

**Human trafficking**

38. Section 2 of The Modern Slavery Act 2015 provides:

(1) A person commits an offence if the person arranges or facilitates the travel of another person ("V") with a view to V being exploited.

(2) It is irrelevant whether V consents to the travel (whether V is an adult or a child).

(3) A person may in particular arrange or facilitate V's travel by recruiting V, transporting or transferring V, harbouring or receiving V, or transferring or exchanging control over V.

(4) A person arranges or facilitates V's travel with a view to V being exploited only if—

(a) the person intends to exploit V (in any part of the world) during or after the travel, or

(b) the person knows or ought to know that another person is likely to exploit V (in any part of the world) during or after the travel.

(5) "Travel" means—

(a) arriving in, or entering, any country,

(b) departing from any country,

(c) travelling within any country.

(6) A person who is a UK national commits an offence under this section regardless of—

(a) where the arranging or facilitating takes place, or

(b) where the travel takes place.

[...]

**Meaning of exploitation**

39. Section 3 of the Modern Slavery Act defines the meaning of exploitation.

(1) For the purposes of section 2 a person is exploited only if one or more of the following subsections apply in relation to the person.

[...]

*Sexual exploitation*

(3) Something is done to or in respect of the person—

(a) which involves the commission of an offence under—

(i) section 1(1)(a) of the Protection of Children Act 1978 (indecent photographs of children), or

(ii) Part 1 of the Sexual Offences Act 2003 (sexual offences), as it has effect in England and Wales, or

(b) which would involve the commission of such an offence if it were done in England and Wales.

[…]

*Securing services etc by force, threats or deception*

(5) The person is subjected to force, threats or deception designed to induce him or her—

(a) to provide services of any kind,

(b) to provide another person with benefits of any kind, or

(c) to enable another person to acquire benefits of any kind.

[…]

40. For the purpose of construing Section 3 (a) (ii), Part 1 of the Sexual Offences 2003 includes but is not limited to sexual offences against adults and children and controlling prostitution for gain. To aid construction further, the offence of controlling prostitution for gain so far as it is relevant is set out below.

*Controlling prostitution for gain*

41. By section 53 of the Sexual Offences Act 2003:

(1) A person commits an offence if–

(a) he intentionally controls any of the activities of another person relating to that person's prostitution in any part of the world, and

(b) he does so for or in the expectation of gain for himself or a third person.

42. Section 54 of the Sexual Offences Act 2003 defines 'gain', 'prostitute' and 'payment' as used in section 53 as follows:

*Gain*

(1) In sections 52, 53 and 53A "gain" means

(a) any financial advantage, including the discharge of an obligation to pay or the provision of goods or services (including sexual services) gratuitously or at a discount; or

(b) the goodwill of any person which is or appears likely, in time, to bring financial advantage.

79

*Prostitute*

(2) In sections 51A, 52, 53 and 53A "prostitute" means a person (A) who, on at least one occasion and whether or not compelled to do so, offers or provides sexual services to another person in return for payment or a promise of payment to A or a third person; and "prostitution" is to be interpreted accordingly.

*Sexual*

43. Whilst sexual services is not defined, section 78 of the Sexual Offence Act 2003 does provide a definition of sexual.

44. Section 78 states for the purposes of this Part, penetration, touching or any other activity is sexual if a reasonable person would consider that–

(c) whatever its circumstances or any person's purpose in relation to it, it is because of its nature sexual, or

(d) because of its nature it may be sexual and because of its circumstances or the purpose of any person in relation to it (or both) it is sexual.

*Payment*

(3) In subsection (2) and section 53A "payment" means any financial advantage, including the discharge of an obligation to pay or the provision of goods or services (including sexual services) gratuitously or at a discount.

**Allocation**

45. The offence under Section 2 of The Modern Slavery Act 2015 is triable either-way and can proceed summarily at the Magistrates' Court, or on indictment before a jury at the Crown Court.

**Punishment**

46. Section 5 (1) of the Modern Slavery Act 2015 provides that the maximum penalty which may be imposed following conviction on indictment for an offence of human trafficking is imprisonment for life.

47. The operation of life sentences as described in paragraphs 16-21 above would be applicable in the event a life sentence was imposed following conviction of an offence of human trafficking.

**Limitation**

48. There is no time limit for bringing a charge under section 2 of the Modern Slavery Act 2015.

**Evidence**

49. The Youth Justice and Criminal Evidence Act 1999 ("the YJCEA") provides a statutory framework for the admission of evidence from vulnerable and intimidated witnesses in criminal proceedings in England and Wales.

50. Pursuant to section 17(4) of the YJCEA, complainants in sexual offence cases are automatically eligible for special measures as intimidated witnesses.

51. Section 27 of the YJCEA provides that a video recording of an interview with a witness may be admitted as the witness's evidence-in-chief, subject to the directions of the trial court.

52. The complainants in this case have each provided their accounts during video recorded Achieving Best Evidence ("ABE") interviews conducted by police officers. Those recordings form part of the prosecution evidence and are capable of being admitted as evidence-in-chief in criminal proceedings in England and Wales.

53. The use of video-recorded interviews is intended to maximise the quality and completeness of a witness's evidence by obtaining and preserving their account at an early stage of the investigation.

54. The admission of a video-recorded interview as evidence-in-chief does not prevent the defendant from challenging that evidence. If the matter proceeds to trial, the complainants may be required to attend court and may be cross-examined on behalf of the defendant in accordance with the procedures of the courts of England and Wales.

55. Accordingly, under the laws and procedures of England and Wales, the complainants' video-recorded ABE interviews constitute admissible evidence capable of being relied upon by the prosecution at trial, subject to the rules of evidence and any directions of the trial court.

**Extradition Act 2003**

56. Section 151A makes provision for dealing with a person for other offences following extradition

(1) This section applies if a person is extradited to the United Kingdom from a territory which is not—

(a) a category 1 territory, or

(b) a territory falling within section 150(1)(b). [this relates to Commonwealth countries etc]

(2) The person may be dealt with in the United Kingdom for an offence committed before the person's extradition only if—

(a) the offence is one falling within subsection (3), or

(b) the condition in subsection (4) is satisfied.

(3) The offences are—

(a) the offence in respect of which the person is extradited;

(b) an offence disclosed by the information provided to the territory in respect of that offence;

(c) an offence in respect of which consent to the person being dealt with is given on behalf of the territory.

(4) The condition is that—

(a) the person has returned to the territory from which the person was extradited, or

(b) the person has been given an opportunity to leave the United Kingdom.

(5) A person is dealt with in the United Kingdom for an offence if—

(a) the person is tried there for it;

(b) the person is detained with a view to trial there for it.

Signed____________________

**Narinder Dhillon**

Dated 8.9.2026.

British Embassy
Washington

Embassy Note No: 104/2026

**SUPPLEMENTARY INFORMATION TO THE EXTRADITION REQUEST OF TRISTAN TATE FROM THE UNITED STATES OF AMERICA TO THE UNITED KINGDOM.**

His Britannic Majesty's Embassy presents its compliments to the Department of State and encloses supplementary information in support of the extradition from the United States of America of Tristan TATE to the United Kingdom.

His Majesty's Embassy avails itself of this opportunity to express to the Department of State the renewed assurance of its highest consideration.

BRITISH EMBASSY ★ WASHINGTON ★

**British Embassy, Washington DC**

**28th September 2026**

Home Office

**.R.**

forwarding the attached papers, to be used in support of an application for the surrender om the United States of America of Tristan Tate, who is accused of 17 offences:

1. Rape a woman 16 years of age or over, contrary to Section 1, Sexual Offences Act 2003 (Five (5) offences)

2. Assault a person thereby occasioning them actual bodily harm, contrary to Section 47 Offences Against the Person Act 1861 (Six (6) offences)

3. Arrange or facilitate travel of another person with a view to exploitation contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (two (2) offences)

4. Arrange or facilitate travel of another person with a view to sexual exploitation contrary to sections 2(1) and 5(1) of the Modern Slavery Act 2015 (three (3) offences)

5. Penetrative sexual assault of a woman 16 years of age or older, contrary to section 2, Sexual Offences Act 2003 (one (1) offence)

I hereby certify that, to the best of my knowledge and belief, the signature on the supplementary evidence dated 25 September 2026 contained herein is the signature of Narinder Dhillon at Crown Prosecution Service.

I further certify that the documents authenticated here are in support of the request for the surrender of Tristan TATE.

Date: 28 September 2026

Noorel Haque
Senior Extradition Caseworker
UK Central Authority
Home Office

Rachel Yasser
Office of International Affairs
U.S. Department of Justice

25 September 2026

Dear Rachel Yasser

**Extradition Request for Tristan Tate**

Further to the submission of the extradition request for Tristan Tate, I write to advise that the statement of Lee-Anne Marshall dated 7 September 2026 contains a typographical error at paragraph 85 in relation to the date that the message was sent.

Paragraph 85 should refer to 21 October 2012 and not 21 December 2012. The paragraph should read:

For example, on **21 October 2012**, Complainant 1 sent Tristan Tate a message stating that he was *"being too nice"* to her. Tristan Tate replied that she would have *"Viscous beatings and rape then"*. Complainant 1 responded: *"Only thing I don't want is you raping my arse. Anal yes, but I don't want you to force it upon me."*

The message referred to in paragraph 85 is the same message identified and discussed at paragraph 44. This amendment is purely typographical in nature and does not affect the substance of the evidence or the extradition request. I would be grateful if the corrected wording could be noted and considered as forming part of the extradition request documentation.

Please do not hesitate to contact me should any further information be required.

Yours faithfully

*N Dhillon*

Narinder Dhillon

Extradition Unit | International, London and South East Division (ILSED) | Serious Economic, Organised Crime and International Directorate | 102 Petty France | London | SW1H 9EA